# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JULIO SUAREZ;** | : | Civil Rights Complaint |
| **DANIEL R. BINDERUP;** | : | 42 U.S.C. § 1983 |
| **DANIEL F. MILLER;** | : | |
| **FIREARMS POLICY** | : | Docket No. 1:21-cv-00710 |
| **COALITION, INC.; and,** | : | |
| **SECOND AMENDMENT** | : | |
| **FOUNDATION,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COL. ROBERT EVANCHICK,** | : | |
| Commissioner of Pennsylvania | : | |
| State Police, | : | |
| Defendant. | : | |

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    Introduction ................................................................. 1

II.   Procedural History ...................................................... 3

III.  Statement of Facts ...................................................... 3

   A.   Facts Related to the Laws of the Commonwealth of
      Pennsylvania ........................................................ 3

   B.   Facts Specific to Julio Suarez ................................ 7

   C.   Facts Specific to Daniel Binderup ......................... 8

   D.   Facts Specific to Daniel Miller ............................. 9

   E.   Facts Specific to All Individual Plaintiffs ............. 10

IV.   Statement of Question Involved .............................. 11

V.    Standard of Review ................................................ 11

VI.   Argument ............................................................... 12

   A.   The Second Amendment Protects the Rights of Law-Abiding
      Adults to Carry Firearms Outside of the Home for Self-Defense
      ............................................................................. 12

   B.   Defendant's Regulations Violate the Second Amendment Right to
      Bear Arms in Public ............................................. 17

    1.   Defendant's Actions are Categorically Unconstitutional ............ 17

    2.   In the Alternative, Defendant's Actions Still Fails Under Tiered
       Scrutiny ........................................................ 20

VII.  Conclusion ............................................................ 24

# Table of Authorities

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................12

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)..................................16

*Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020) ..................25

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016).........................25

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ..................................19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................12

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ..........23

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)................23

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................ *passim*

*Drake v. Filko,* 724 F.3d 426 (3d Cir. 2013) .............................................23

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ..23, 24

*Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015)
.......................................................................................................................23

*McCullen v. Coakley*, 573 U.S. 464 (2014).................................................25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .....................13, 15, 20

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................14, 18, 22

*Muscarello v. United States*, 524 U.S. 125 (1998).....................................18

*Nunn v. State*, 1 Ga. 243 (1846)...........................................................15, 18

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)...........................................16

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............22

*Slagle v. Cnty. of Clarion*, 435 F.3d 262 (3d Cir. 2006) .........................12

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................25

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017)..............22

**Statutes**

18 Pa. C. S § 6108...........................................................................................6

18 Pa. C.S. § 4904...........................................................................................9

18 Pa. C.S. § 6106 ................................................................................ *passim*

18 Pa. C.S. § 6301 ...........................................................................................8

18 Pa.C.S. § 6107 ......................................................................................5, 10

18 Pa.C.S. § 6109 ................................................................................3, 7, 8, 9

18 U.S.C. § 922(g)(1)....................................................................................1, 4

53 P.S. § 101....................................................................................................7

75 Pa. C.S. § 7122 ................................................................ 9
Md. Ann. Code art. 27§ 36B(b)................................................ 7

**Other Authorities**

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES
    WILSON 79 (1804) .............................................................. 16
1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE
    CROWN 71 (1716) .............................................................. 15
5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed.,
    1803) ................................................................................. 15

**Rules**

Fed.R.Civ.P. 56(a) ................................................................ 11

**Constitutional Provisions**

U.S. CONST. amend. II ........................................................... 12

## I.   Introduction

Plaintiffs wish to exercise their fundamental, individual right to carry and transport firearms in public and in motor vehicles for all lawful purposes including immediate self-defense—a right the Constitution guarantees in its text. *See District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (The right to keep and bear arms guarantees "the individual right to possess and carry weapons in case of confrontation."). But because of Defendant's laws, regulations, policies, enforcement practices, and actions (hereinafter collectively "regulations"), which have been and continue to be actively enforced today, Plaintiffs and Plaintiffs' similarly situated members are not only completely prevented from exercising their rights but are threatened with draconian criminal sanctions should they do so, which if convicted for a violation thereof, would result in them being prohibited from firearms ownership for life under federal law, pursuant to 18 U.S.C. § 922(g)(1). Nothing in the Constitution's text nor the applicable history and tradition of the right to bear arms supports the categorical ban that the prior and continuing enforcement of Defendant's regulations impose on Plaintiffs. Defendant's regulations thus unconstitutionally prohibit

and criminalize lawful, constitutionally protected conduct that Plaintiffs seek to engage in, including, but not limited to, carrying firearms for self-defense and merely being able to stop for a bathroom break or pick up a friend on the way to or from a firearm shooting range.

There is no reasoned, let alone legitimate, public-safety justification for this total ban. Individual Plaintiffs in this case all brought constitutional challenges against the enforcement of a federal law that putatively prohibited them from possessing firearms and ammunition. In each instance, the courts determined that the prohibition against them was unconstitutional. Yet Defendant continues to enforce his regulations against them, depriving Plaintiffs of their right and ability to carry and transport firearms. In the Commonwealth of Pennsylvania, individuals are generally not barred from openly carrying firearms in public absent a License to Carry Firearms ("LTCF") (except in the City of Philadelphia ("Philadelphia")). However, due to a myriad of laws, a gubernatorially declared State of Emergency that has been in effect for almost three years, and the general prohibition of utilizing a mode of conveyance while carrying or

otherwise transporting a firearm, Plaintiffs are unable to exercise this fundamental right.

As there are no material facts that are or can be disputed, and the questions raised are a matter of law, this court should grant Plaintiffs' motion and enjoin the enforcement of the Defendant's regulations.

## II.    Procedural History

Plaintiffs initiated this litigation in the Middle District of Pennsylvania against Defendant Evanchick on April 16, 2021. The instant motion was filed immediately subsequent to the complaint.

## III.    Statement of Facts

### A.    Facts Related to the Laws of the Commonwealth of Pennsylvania

The Commonwealth of Pennsylvania generally allows individuals to openly carry firearms without a license (except in Philadelphia), but it has broadly criminalized the carrying of loaded concealed firearms in public and in motor vehicles by ordinary citizens unless they have a valid LTCF issued pursuant to 18 Pa.C.S. § 6109. Concise Statement of Material Facts ("SOMF") ¶¶ 1-3. The Commonwealth also generally bars the transportation and carrying of loaded and unloaded firearms

3

by law-abiding citizens in public for lawful purposes, including self-defense, unless they first acquire a LTCF to carry a firearm under 18 Pa.C.S. § 6109. *Id.*

Specifically, except as provided in 18 Pa. C.S. § 6106(a)(2),[1] "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree." SOMF ¶ 4. Thereafter, Section 6106(b) prohibits individuals, in the absence of an LTCF, from transporting firearms, except to extremely limited locations and only when transported directly to and from those limited locations. SOMF ¶ 6.  As a result, an individual, in the absence of a LTCF, is, for example, precluded from: (1) transporting a loaded or unloaded rifle,

---

[1] Section 6106(a)(2) provides that "[a] person who is otherwise eligible to possess a valid license under this chapter but carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license and has not committed any other criminal violation commits a misdemeanor of the first degree." SOMF ¶ 5. Regardless of whether the individual is convicted of a violation of Section 6106(a)(1) or (a)(2), either conviction is prohibiting for purposes of purchasing, possessing, and utilizing firearms and ammunition, pursuant to 18 U.S.C. § 922(g)(1).

shotgun, or handgun to a friend's home; (2) transporting a loaded or unloaded rifle, shotgun, or handgun from a successful hunt to a business that processes/butchers the successfully taken game; (3) transporting a loaded or unloaded rifle, shotgun, or handgun from a Federal Firearms Licensee (*i.e.* gun dealer) to another Federal Firearms Licensee; (4) transporting a loaded or unloaded rifle, shotgun, or handgun from a range to another range; and, (5) while transporting a rifle, shotgun, or handgun to or from a range or other permitted location form stopping for bathroom breaks, food, coffee, or to pick up or drop off a friend. SOMF ¶ 7.

Pennsylvania further prohibits the "carry[ing of] a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive" unless the individual possesses a valid LTCF. 18 Pa.C.S. § 6107. SOMF ¶ 8. Because of Opioid and COVID-19 declarations of emergency by Governor Tom Wolf, Pennsylvania has been in a state of emergency since 2018.[2] SOMF ¶ 9-10. Because of the proclamations, Section 6107

---

[2] *See* https://www.governor.pa.gov/newsroom/governor-wolf-declares-heroin-and-opioid-epidemic-a-statewide-disaster-emergency and

additionally and currently restricts the Plaintiffs, and all those similarly situated, from transporting or carrying firearms in public, and upon public streets and public property, even for lawful purposes, including self-defense. Governor Wolf had an opportunity to lift this unconstitutional restriction but vetoed an act passed by the Commonwealth's Legislature, House Bill 1747 ("HB 1747"). SOMF ¶ 11.

Moreover, 18 Pa. C. S § 6108 further provides that: "No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless: (1) such person is licensed to carry a firearm; or (2) such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license)." SOMF ¶ 10. Unless a law-abiding person has a valid LTCF, he or she is further specifically prohibited from carrying firearms in Philadelphia under State law, since it is the only "city of the first class," with a population of approximately

---

https://www.governor.pa.gov/newsroom/gov-wolf-signs-8th-opioid-disaster-declaration-renewal-vows-continued-concerted-efforts, last visited April 12, 2021; *See also* https://www.governor.pa.gov/newsroom/gov-wolf-signs-covid-19-disaster-declaration-to-provide-increased-support-for-state-response, last visited April 12, 2021.

1,584,000 in 2010.[3]   SOMF ¶ 14. Defendant continues to enforce the Commonwealth's regulations pertaining to the keeping and bearing of arms, including 18 Pa.C.S. §§ 6106–09.

B.   <u>Facts Specific to Julio Suarez</u>

In 1990, Plaintiff Suarez was convicted of a violation of Md. Ann. Code art. 27§ 36B(b) (1990), carrying a handgun without a license, for which he received one year probation, as well as 180 days' imprisonment and a $500 fine, which both were suspended. SOMF ¶ 18. Plaintiff Suarez was only once otherwise charged and convicted of another misdemeanor[4]—and never of a felony offense—prior to or since the charge in 1990. SOMF ¶19.

In November of 2017, Plaintiff Suarez applied for a license to carry firearms with his County Sherriff as required by 18 Pa. C. S. § 6109 and was denied that license by Defendant's Pennsylvania State Police ("PSP"). SOMF ¶ 24. He subsequently filed a Pennsylvania Instant Check System Challenge Form, to which Defendant's PSP

---

[3] 53 P.S. § 101, defining "city of the first class" to be those that contain a population of one million or more.

[4] In 1998, over two decades ago, Plaintiff Suarez was convicted in Maryland of a state law misdemeanor for driving under the influence of alcohol. SOMF ¶ 20.

responded on or about November 2017, stating that he was denied because of his 1990 conviction for "handgun on person: carry/wear" in the State of Maryland was putatively prohibiting under 18 Pa. C.S § 6109(e)(1)(viii) as a crime punishable by imprisonment for a term exceeding one year. SOMF ¶ 25.

C.   Facts Specific to Daniel Binderup

In 1997, Plaintiff Binderup pled guilty to a violation of 18 Pa. C.S. § 6301, corruption of a minor, as a result of a consensual sexual relationship with a seventeen-year-old employee at his bakery, for which he received three years of probation and a $300.00 fine, plus costs and restitution. SOMF ¶ 31. He has never been charged with or convicted of any other misdemeanor or felony offense. SOMF ¶ 32.

In March of 2018, Plaintiff Binderup applied for a license to carry firearms with his County Sherriff as required by 18 Pa. C. S. § 6109 and was denied that license by Defendant's PSP. SOMF ¶ 36. Plaintiff Binderup subsequently filed a Pennsylvania Instant Check System Challenge Form, to which Defendant's PSP responded on March 23, 2018, stating that he was denied because of his 1997 conviction for corruption of a minor was putatively prohibiting under 18 Pa. C.S. §

6109 (e)(1)(viii), as a crime punishable by imprisonment for a term exceeding one year. SOMF ¶ 37.

### D.   Facts Specific to Daniel Miller

In 1998, Plaintiff Miller pled guilty to a violation of 18 Pa. C.S. § 4904(a)(2), unsworn falsifications to authorities, and 75 Pa. C.S. § 7122(3), use of an altered PennDot window tint exemption certificate, as a result of his use of the altered certificate during a court proceeding, for which he received a year of probation, plus court costs and restitution. SOMF ¶ 43. Plaintiff Miller has never been charged with or convicted of any other misdemeanor or felony offense, prior to or since that charge in 1998. SOMF ¶ 44.

In April of 2019, Plaintiff Miller applied for a license to carry firearms with his County Sherriff as required by 18 Pa. C. S. § 6109 and was denied that license by Defendant's PSP. SOMF ¶ 48. Plaintiff Miller subsequently filed a Pennsylvania Instant Check System Challenge Form, to which Defendant's PSP responded on or about June 24, 2019, stating that he was denied because of his 1998 conviction for use of an altered PennDot window tint exemption certificate that was

putatively prohibiting under 18 Pa. C.S. § 6109 (e)(1)(viii) as a crime punishable by imprisonment for a term exceeding one year. SOMF ¶ 49.

### E.   Facts Specific to All Individual Plaintiffs

Individual Plaintiffs are all residents and citizens of the Commonwealth of Pennsylvania. SOMF ¶ 16, 29, 41. Plaintiffs are members of Firearms Policy Coalition and the Second Amendment Foundation. SOMF ¶¶ 17, 30, 42. As the federal courts have held, Plaintiffs are not disqualified from exercising their Second Amendment rights. SOMF ¶ 21, 33, 45.  Plaintiffs desire to exercise their right to bear arms by carrying loaded, operable firearms on their person, in public, for lawful purposes, including self-defense. SOMF ¶¶ 23, 35, 47. Plaintiffs also desire to lawfully transport firearms within the Commonwealth during a proclaimed emergency or during periods where an emergency is not proclaimed. SOMF ¶¶ 26, 38, 50. This includes constitutional protected conduct, which exceeds the limited exceptions contained in 18 Pa. C.S. §§ 6106 and 6107. *Id*. Plaintiffs lawfully own and possess rifles, shotguns, and handguns. SOMF ¶ 22, 34, 46. Plaintiffs have abstained from carrying or otherwise transporting loaded and unloaded firearms on their persons and in

motor vehicles in public, for lawful purposes including self-defense, based on their reasonable fear of arrest, prosecution, incarceration, and/or fine under the Commonwealth's regulations as they are actively being enforced by Defendant. SOMF ¶¶ 27, 39, 51.

## IV.   Statement of Question Involved

1. Do Defendant's regulations, which prevent the Individual Plaintiffs and similarly situated members of Firearms Policy Coalition and Second Amendment Foundation from carrying and transporting loaded and unloaded, operable firearms on their person, outside their homes, while in public and in motor vehicles, for lawful purposes including immediate self-defense violate their Second Amendment rights?

   Suggested Answer in the *Affirmative*.

## V.   Standard of Review

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of*

*Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

## VI.   Argument

### A.   The Second Amendment Protects the Rights of Law-Abiding Adults to Carry Firearms Outside of the Home for Self-Defense

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. As the Supreme Court held, this constitutional provision "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. That right is incorporated as against the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion).

First, as a matter of plain meaning, the text of the Second Amendment leaves no doubt that it applies outside the home, as otherwise the inclusion of "bear arms" would be rendered superfluous. Because "[t]o speak of 'bearing' arms within one's home would at all

times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Any other reading of the operative clause would render a guaranteed right to carry to be non-existent, which is flatly wrong and incompatible with the plain language of the Second Amendment. However, Defendant's regulations do just that and as a result, isolate Plaintiffs' Second Amendment right to only *keeping* arms while in their home, amounting to Plaintiffs being able to exercise only half the right.

Second, the purpose behind the Second Amendment's codification requires that it protect carrying of arms outside the home, not just within the home. Self-defense, "the central component" of the Second Amendment, *Heller*, 554 U.S. at 599, obviously "is as important outside the home as inside," *Moore*, 702 F.3d at 942. In fact, the 2019 nationwide data from the Bureau of Justice Statistics show less than a third of violent crimes occur at home or near it.[5] Similarly just as self-

---

[5] Percent of violent victimizations by location of incident, 1993-2019, BUREAU OF JUST. STATISTICS, OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST. (Nov. 11, 2020), generated using the NCVS Victimization Analysis Tool at https://bit.ly/3qWaSQq (select "Custom

defense is not isolated to the home, hunting, just as obviously, does not occur within the home.[6] Even as announced by the Amendment's "prefatory" clause, the constitutional right was designed in part "to prevent elimination of the militia." *Id*. And a right to bear arms only at home would not aid "rearing up and qualifying a well-regulated militia," *id*. at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), as citizens who cannot bear arms in public cannot act as a militia. Defendant's regulations cut against the various purposes for which the Second Amendment was codified.

Third, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home. As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). Further, because the need to exercise the right to self-defense may and often does arise in public, it has long

---

Tables"; then select "Personal Victimization"; then select "Violent Victimization and "Location of Incident" as the variable; then select "Generate Results"), last visited April 1, 2021.

[6] The Second Amendment affirmed the "ancient right" to bear arms, finding it "important for . . . hunting" in addition to self-defense. *Heller*, 554 U.S. at 599.

been recognized that the right may be exercised in public. Sergeant William Hawkins's widely read "Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716). And because the right to self-defense was taken to extend beyond the home, the right to armed self-defense naturally was, too. Seventeenth-century English courts even recognized the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES, App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 id. App.n.D, at 289. Early American courts and commentators

shared this understanding of the scope of the right to bear arms. James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804).

Finally, confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Moore*, 702 F.3d at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess and *carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *Id*. at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

*Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise, identifying exceptions would be pointless. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating ruling that Second Amendment does not protect right to carry a stun gun in public). Therefore, Defendant's regulations and his past and continued enforcement of them violate the Supreme Court's decisions in *Heller* and *Caetano*.

B.   Defendant's Regulations Violate the Second Amendment Right to Bear Arms in Public

1.   *Defendant's Actions are Categorically Unconstitutional*

As recounted *supra,* the Second Amendment protects the rights of law-abiding individuals, like Plaintiffs, to carry firearms for self-defense outside the home. *Heller* makes the next analytical steps clear. "The very enumeration of the right takes out of the hands of government, even the Third Branch of Government, the power to decide on a case-by-

case basis whether the right is really worth insisting upon." Therefore, wholesale infringements on Plaintiffs' rights textually protected by the Constitution must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. Defendant's prohibition on the right of law-abiding citizens to bear arms in public without a LTCF is just such an infringement of Second Amendment conduct. Accordingly, it is flatly unconstitutional.

In *Heller*, the Supreme Court declined to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), holding instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id*. at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

Rights covered by the text of the Second Amendment—as interpreted and understood according to history, practice, and public meaning—are not divided into lesser and greater categories. The Constitution itself has done the categorizing and those rights covered "shall not be infringed." Period. There is no further clause beginning with "except * * *." No qualification of the prohibition saying some of those rights can be infringed a little, or if the government really feels strongly about it, or has reconsidered the costs and benefits of protecting such rights. *Heller*, 554 U.S. 570, 635-36. The text of the Second Amendment, informed by history and tradition, makes clear that the rights of individuals to bear firearms outside the home for self-defense and all lawful purposes is constitutionally protected.

Here, the Plaintiffs wish only to bear firearms that are in common use for lawful purposes. However, Defendant's regulations currently restrict the Plaintiffs from transporting or carrying firearms in public, and upon public streets and public property, even for lawful purposes, including self-defense. This is simply because Plaintiffs do not have a LTCF, which they have attempted to obtain but have been denied by Defendant, the result of which is a categorical prohibition that bars

19

them from bearing firearms in public period. And, as illustrated *supra*, the right to bear arms extends beyond one's own home. This includes simply transporting a firearm in a way that Section 6106(b) criminalizes in the absence of an LTCF.

Defendant's regulations categorically bar Plaintiffs from bearing arms in public for lawful purposes. But the Second Amendment takes Defendant's regulations prohibiting Plaintiffs from carrying of loaded or unloaded firearms in public "off the table." *Heller*, 554 U.S. at 636. Therefore, *Heller*'s categorical approach must apply. *See Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017); *Moore*, 702 F.3d at 942.

> ## 2. In the Alternative, Defendant's Actions Still Fails Under Tiered Scrutiny

Should this Court apply tiered scrutiny instead of *Heller's* prescribed text as informed by history and tradition standard, the proper analysis requires strict scrutiny because Defendant's actions "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). However, Defendant's regulations fail even under intermediate scrutiny.

First, this conclusion follows as a matter of law from the Supreme Court's secondary-effects doctrine. To this end, constitutionally protected conduct, particularly expressive conduct, is subject to intermediate scrutiny if the purpose and effect of the restrictions is to reduce the negative "secondary effects" of the expression—rather than to suppress the expression itself. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). According to Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, a restriction fails intermediate scrutiny if "it will reduce secondary effects by reducing speech in the same proportion," for government shall not "attack secondary effects indirectly by attacking speech." 535 U.S. 425, 449, 450 (2002); see also *Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Drake v. Filko,* 724 F.3d 426, 455–56 (3d Cir. 2013) (Hardiman, J., dissenting); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016).

This analysis applies to the enforcement of Defendant's regulations here, which do not to merely regulate the manner of bearing arms in public, but instead bar the conduct outright if an individual does not or cannot obtain a LTCF. This is true even when individuals,

like Plaintiffs, are impermissibly denied a LTCF by the Defendant and his PSP. Any alleged purpose behind Defendant's regulations in maintaining public safety is outweighed by the regulations outrightly barring the conduct of bearing arms in public. Under any level of heightened scrutiny, that is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148. Thus, Defendant's actions fail intermediate scrutiny because to achieve a secondary goal of maintaining public safety, the Commonwealth bars bearing arms openly in public unless a person holds a valid LTCF, which Defendant denied to the Plaintiffs, thus completely foreclosing access to the right.

Second, Defendant's regulations fail intermediate scrutiny because they are insufficiently tailored to the government's asserted goals. As an initial matter, the Commonwealth needed to, but did not, carefully consider alternatives to its adopted course. *McCullen v. Coakley*, 573 U.S. 464, 494–95 (2014); accord *Bruni v. City of Pittsburgh*, 824 F.3d 353, 367–68. (3d Cir. 2016). That is, "the government is obliged to demonstrate that it actually tried or considered less-[arms-bearing]-restrictive alternatives and that such alternatives were inadequate to serve the government's interest."

*Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). Furthermore, there must be, but there is not, "a close fit between ends and means," *McCullen*, 573 U.S. at 486; *accord Bruni*, 824 F.3d at 365, such that "the law in dispute does not 'regulate [bearing arms] in such a manner that a substantial portion of the burden on [arms-bearing] does not serve to advance its goals," *Billups*, 961 F.3d at 688 n.9 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

Defendant's regulations criminalize conduct that is otherwise lawful simply because the Plaintiffs would bear arms. Defendant's enforcement of Sections 6106–09 makes it illegal to stop for a bathroom break, coffee, or to pick up a friend, or to engage in other lawful conduct simply because an individual is bearing a firearm. Defendant's regulations impact lawful conduct in a way that is well beyond the goal of public safety. And Defendant did not even seek to tailor his regulations by directing the manner in which law-abiding citizens can bear and transport arms without a LTCF. Instead, Defendant takes the constitutionally untenable position of banning the exercise of right to bear arms without an LTCF. This outright ban is not sufficiently

tailored, and therefore Defendant's regulations must fail even under intermediate scrutiny.

## VII.   Conclusion

Defendant's regulations fail under a textual and historical analysis of the Second Amendment, and fare no better under strict or intermediate scrutiny. This Court should grant Plaintiffs' Motion for Summary Judgement and enjoin Defendant's regulations.

Respectfully Submitted,

Joshua Prince, Esq.
Attorney Id. No. 306521
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-9297 ext 81114
(610) 400-8439 (f)
Joshua@CivilRightsDefenseFirm.com

Adam Kraut, Esq.
Attorney Id. No. 318482
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
Akraut@fpclaw.org

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, the undersigned, certify that the foregoing brief complies with the word count limit of Local Rule 7.8 (b)(2). This brief contains 4,630 words, as calculated by the word processing system used to prepare this brief.

Joshua Prince, Esq.
Attorney Id. No. 306521
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-9297 ext 81114
(610) 400-8439 (f)
Joshua@CivilRightsDefenseFirm.com

25