# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JULIO SUAREZ;** | : | Civil Rights Complaint |
| **DANIEL R. BINDERUP;** | : | 42 U.S.C. § 1983 |
| **DANIEL F. MILLER;** | : | |
| **FIREARMS POLICY** | : | Docket No. 1:21-cv-00710 |
| **COALITION, INC.; and,** | : | |
| **SECOND AMENDMENT** | : | |
| **FOUNDATION,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COL. ROBERT EVANCHICK,** | : | |
| Commissioner of Pennsylvania | : | |
| State Police, | : | |
| Defendant. | : | |

# PLAINTIFFS' BRIEF IN OPPOSITION TO
# DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

I.     Introduction ................................................................... 1

II.    Procedural History ......................................................... 5

III.   Statement of Facts ......................................................... 5

    A.   Facts Related to the Laws of the Commonwealth of
         Pennsylvania ............................................................. 5

    B.   Facts Specific to Julio Suarez ................................... 10

    C.   Facts Specific to Daniel Binderup ............................ 11

    D.   Facts Specific to Daniel Miller ................................. 11

    E.   Facts Specific to All Individual Plaintiffs ................ 12

IV.    Standard of Review ....................................................... 13

V.     Argument ....................................................................... 14

    A.   The Second Amendment Protects the Rights of Law-
         Abiding Adults to Carry Firearms Outside of the Home
         for Self-Defense ......................................................... 14

    B.   Defendant's Regulations Violate the Second Amendment
         Right to Bear Arms in Public ................................... 25

       1.  Defendant's Actions are Categorically Unconstitutional ............ 25

       2.  In the Alternative, Defendant's Actions Still Fails Under
           Tiered Scrutiny ..................................................... 31

VI.    Conclusion .................................................................... 37

# Table of Authorities

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................13

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ....................................18

*Beard v. United States*, 158 U.S. 550 (1895) ................................................18

*Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020) ...............33, 34

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ....................33, 34

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................. 1, 15, 22

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ............32

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ..................32

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................passim

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013)........................................ 1, 22, 23

*Dred Scott v. Sandford*, 60 U.S. 393 (1857)....................................................21

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d
    247 (3d Cir. 2007)....................................................................................... 14, 37

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) .........................14

*Gamble v. United States*, 139 S. Ct. 1960 (2019)........................................20

*Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187 (3d Cir.
    2009) ......................................................................................................................14

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016)....32, 33

*Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir.
    2015) ......................................................................................................................32

*Lara v. Evanchick*, 2021 WL 1432802 (W.D. Pa. Apr. 16, 2021) ...............1

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..............................................33, 34

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)........................ 15, 16, 21, 31

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943) ......................................2, 24

*Muscarello v. United States*, 524 U.S. 125 (1998) ................................22, 29

*Nunn v. State*, 1 Ga. 243 (1846) ...............................................................17, 22

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).................................................18

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)...............31

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003)......................................34

*Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498 (1911) ......................9

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................................34

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ................31

## Statutes

18 Pa.C. S § 6107.........................................................................................passim

18 Pa.C. S § 6108.........................................................................................passim

18 Pa.C.S. § 6106.........................................................................................passim

18 Pa.C.S. § 501..................................................................................................7

18 Pa.C.S. § 6102...............................................................................................7

18 Pa.C.S. § 6109.........................................................................................passim

18 U.S.C. § 922(g)(1)......................................................................................2, 6

Md. Ann. Code art. 27§ 36B(b) .....................................................................10

## Other Authorities

1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785)
    (H. A. Washington ed., 1884) ....................................................................20

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF
    RECONSTRUCTION (1906) ...........................................................................21

3 JAMES WILSON, THE WORKS OF THE HONOURABLE
    JAMES WILSON 79 (1804) ...........................................................................20

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803) ............................................................................. 18, 19

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ........................................ 20

An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165 ................................................. 21

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) .................................... 21

FBI, *Active Shooter Incidents in the United States in 2016 and 2017* 8 (Apr. 2018), https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view .................................................. 36

*Firearms*, MONTICELLO, https://goo.gl/W6FSpM ......................................... 19

HARLOW GILES UNGER, LION OF LIBERTY (2010) ........................................... 19

https://www.governor.pa.gov/newsroom/governor-wolf-declares-heroin-and-opioid-epidemic-a-statewide-disaster-emergency, last visited July 26, 2021 .......................................................................................... 9

https://www.governor.pa.gov/newsroom/gov-wolf-signs-14th-renewal-of-opioid-disaster-declaration, last visited July 26, 2021 ......... 9

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds., 1905) ........................................................................................ 19

JOSHUA PRINCE, ESQ. and ALLEN THOMPSON, ESQ., *The Inalienable Right To Stand Your Ground*, 27 ST. THOMAS L. REV. 32 (2015) ......................................................................................... 18

Percent of violent victimizations by location of incident, 1993-2019, BUREAU OF JUST. STATISTICS, OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST. (Nov. 11, 2020) ............................ 16

ROBERT J. COTTROL & RAYMOND T. DIAMOND, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991) ............................................................................... 20, 21

iv

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893) ............19

**Rules**

Fed. R. Civ. P. 12 ...........................................................................13, 14

**Constitutional Provisions**

U.S. CONST. amend. II .........................................................................14

## I.   Introduction

In outright defiance of the U.S. Supreme Court's holdings in *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008), declaring that—at the *core* of the Second Amendment—to "bear arms" means to "wear, bear, or *carry…upon the person or in the clothing or in a pocket*, for the purpose…of *being armed and ready for offensive or defensive action* in a case of conflict with another person," and *Caetano v. Massachusetts*, 577 U.S. 411, 413-14 (2016)(Alito J., concurring) that the possession and use of *even stun guns in public* is protected by the Second Amendment, the Defendant continues to actively enforce 18 Pa.C.S. §§ 6106-6109 and the regulations, policies, enforcement practices, and actions related thereto (hereinafter collectively "regulations")[1] that not only effectively bar Plaintiffs and Plaintiffs'

---

[1] Defendant's justification for this is two-fold. First, his putative reliance on non-binding and irrelevant jurisprudence, such as *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013)(because the Third Circuit only assumed "some application [of the Second Amendment] beyond the home") and *Lara v. Evanchick*, 2021 WL 1432802, at \*11 (W.D. Pa. Apr. 16, 2021)(irrelevantly holding that 18-21 year olds do not enjoy the same Second Amendment rights as those over 21 and that, *unlike in this case*, the plaintiffs did "not challenge any of the relevant provisions of the Pennsylvania Uniform Firearms Act *individually*). Contrary to Defendant's suggestion (Doc. 24, pg. 12) that "Plaintiffs [only] assert that §§ 6106-6109, collectively and through their interaction, deprive

similarly situated members (hereinafter collectively "Plaintiffs") from wearing, bearing, and carrying firearms, including upon their person or in a pocket—whether openly or concealed, loaded or unloaded—outside of their homes, but also threaten Plaintiffs with draconian criminal sanctions should they do so, which if convicted for a violation thereof, would result in them being perpetually prohibited from firearm ownership under federal law, pursuant to 18 U.S.C. § 922(g)(1). But the breadth of these unconstitutional regulations goes even further, making felons out of anyone who, without a License to Carry Firearms (hereinafter "LTCF"), stops to pick up a friend, grab a cup of coffee, or

---

people of rights secured by the Second Amendment," Plaintiffs are also challenging, *individually*, the constitutionality of 6106, 6107, 6108, and 6109. *See e.g.* Doc 1, ¶ 115, Prayer for Relief, ¶¶ a), b).

And second, his unsupported contention that Plaintiffs should "have made [] efforts to obtain [pardons] before bringing this lawsuit," as that would in some unexplained way change Defendant's unconstitutional regulations from unconstitutional to constitutional. Doc. 24, pg. 9. To the extent Defendant contends that Plaintiffs would then, potentially, be eligible for (but not guaranteed issuance of) a LTCF, Plaintiffs' constitutional rights to keep and bear arms cannot and do not hinge on an act of executive grace (whether that be by a governor, a sheriff, or both) and to require Plaintiffs to obtain a LTCF would require that they pay a tax to exercise their right in violation of the Supreme Court's holding in *Murdock v. Pennsylvania*, 319 U.S. 105, 113, that "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution." *See* 6109(h) requiring a fee of $20.00 for a LTCF.

utilize a bathroom, while transporting his/her firearms to an extremely limited number of locations that are permitted by Defendant.

Plaintiffs only desire to exercise their core, fundamental, individual right to carry and transport firearms in public and in motor vehicles for all lawful purposes including immediate self-defense—a right the Constitution guarantees in its text. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010)("[I]ndividual self-defense is 'the central component' of the Second Amendment right"); *Heller*, 554 U.S. at 592 (The right to keep and bear arms guarantees "the individual right to possess and carry weapons in case of confrontation."). Nothing in the Constitution's text nor the applicable history and tradition of the right to bear arms supports the categorical ban that the prior and continuing enforcement of Defendant's regulations impose on Plaintiffs. Defendant's regulations thus unconstitutionally prohibit and criminalize lawful, constitutionally protected conduct that Plaintiffs seek to engage in, including, but not limited to, carrying firearms for self-defense and merely being able to stop for a bathroom break or pick up a friend on the way to or from a firearm shooting range.

Even if, *arguendo*, *Heller, McDonald,* and *Caetano* permitted a balancing of interests—which they do not—there is no reasoned, let alone legitimate, public-safety justification for this total ban. Indeed, individual Plaintiffs in this case all brought constitutional challenges against the enforcement of a federal law that putatively prohibited them from possessing firearms and ammunition. In each instance, the courts determined that the prohibition against them was unconstitutional and that they all continue to enjoy their Second Amendment rights. Yet, Defendant continues to enforce his regulations against them—the text of which is almost verbatim that of the federal law that the Individual Plaintiffs successfully challenged[2]—depriving Plaintiffs of their right and ability to carry and transport firearms. While individuals in Pennsylvania are generally not barred from openly carrying firearms in public absent a LTCF (except in the City of Philadelphia), due to a myriad of laws, a gubernatorially declared State of Emergency that has been in effect for almost three years, and the general prohibition of utilizing any mode of conveyance while carrying

---

[2] *Cf.* 18 Pa.C.S. § 6109(e)(1)(viii) as defined by 18 Pa.C.S. § 6102 with 18 U.S.C. § 922(g)(1) as defined by 18 U.S.C. § 921(a)(20).

or otherwise transporting a firearm, Plaintiffs are unable to exercise this fundamental right.

As the Defendant's regulations clearly, palpably, and unconstitutionally infringe on Plaintiffs' Second Amendment rights, this Court should deny Defendant's Motion to Dismiss.

## II.    Procedural History

Plaintiffs filed the underlying action on April 16, 2021. *See* Doc. 1. Defendant filed a motion to dismiss on June 17, 2021 (*see* Doc. 13), and a brief in support on July 15, 2021. *See* Doc. 24.

## III.   Statement of Facts

### A.    Facts Related to the Laws of the Commonwealth of Pennsylvania

While Pennsylvania generally allows individuals to openly carry firearms without a license (except in Philadelphia), it has broadly criminalized the carrying of loaded concealed firearms in public and in vehicles by ordinary citizens, unless they have a valid LTCF. Doc. 8-1, ¶¶ 1-3. The Commonwealth also generally bars the transportation and carrying of *loaded and unloaded* firearms by law-abiding citizens in public for lawful purposes, including self-defense, unless they first acquire a LTCF to carry a firearm under 6109. *Id.*

Specifically, except as provided in 18 Pa.C.S. § 6106(a)(2),[3] "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree." Doc. 8-1, ¶ 4. Thereafter, 6106(b) prohibits individuals, in the absence of a LTCF, from transporting firearms, except to extremely limited locations and *only when* transported directly to and from those limited locations.[4] Doc. 8-1, ¶ 6. As a result, an individual, in the absence of a LTCF, is, for example, precluded from: (1) transporting a loaded or unloaded

---

[3] 6106(a)(2) reduces the penalty to a first degree misdemeanor if the person is eligible for a LTCF but regardless of whether the individual is convicted of a violation of 6106(a)(1) or (a)(2), both are prohibiting for purposes of purchasing, possessing, and utilizing firearms and ammunition, pursuant to 18 U.S.C. § 922(g)(1).

[4] For example, *inter alia*, Plaintiffs are barred from transporting a firearm to a restaurant, a grocery store, and a friend or significant other's home; just to name a few examples of the locations that individuals travel to on a daily/weekly basis that are not enumerated locations in 6106(b). Moreover, Plaintiffs are likewise barred from stopping for coffee or to use the bathroom when going to an enumerated location, as they must go directly to and from that enumerated location from another enumerated location. *See* 6106(b)(4),(8),(9), limiting the applicable enumerated locations to going directly to or from 1. a gun range; 2. their home or vacation home; 3. their business; 4. a gun store; and, 5. a hunting location.

handgun, rifle, or shotgun to a significant other or friend's home;[5,6,7] (2) transporting a loaded or unloaded handgun, rifle, or shotgun from a successful hunt to a business that processes/butchers the successfully taken game; (3) transporting a loaded or unloaded handgun, rifle, or shotgun from a Federal Firearms Licensee (*i.e.* gun dealer) to another Federal Firearms Licensee; (4) transporting a loaded or unloaded handgun, rifle, or shotgun from a range to another range; and, (5) while

---

[5] Contrary to Defendant's assertion (Doc. 24, pg. 12), per 6106(e)(1), for purposes of the applicable exceptions of 6106(b) to the Plaintiffs, a firearm is defined as "any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of the weapon;" thus, including all types of firearms, unlike the general definition of firearm found in 18 Pa.C.S. § 6102.
[6] Also contrary to Defendant's contention that 6106 only applies to "transportation of firearms in *motor vehicles*" (Doc. 24, pg. 12 (emphasis added)), 6106(a) regulates the "carr[ying of] a firearm in any vehicle" with the term "vehicle" defined extremely broadly in 18 Pa.C.S. § 501, as "[a] conveyance of any kind, whether or not motorized, that is designed to transport people or property." Thus, bikes, horses, rollerskates, rollerblades, and even wheelbarrows constitute "vehicles" to which 6106 applies.
[7] Defendant also incorrectly contends that Plaintiffs' claims are limited to "carrying of concealed weapons or the transport of *loaded* firearms" Doc. 24, pg. 18 (emphasis added), when Plaintiffs claims are far more encompassing and include, but not limited to, the preclusion on transporting unloaded firearms to locations not authorized by Section 6106(b), as well as, stopping to pick up a friend, a coffee, or to use a bathroom when going to or from an authorized location. *See* e.g., Doc. 1, ¶¶ 4, 50, 66, 81, 100-102, 116, 127, 142-143; Doc. 8-1, ¶¶ 7, 26-27, 50.

transporting a handgun, rifle, or shotgun to or from a range or other permitted location form stopping for bathroom breaks, food, coffee, or to pick up or drop off a friend. Doc. 8-1, ¶ 7.

Pennsylvania further prohibits the "carry[ing of] a firearm[8] upon the public streets or upon any public property[9] during an emergency proclaimed by a State or municipal governmental executive" unless the individual possesses a valid LTCF. 18 Pa.C.S. § 6107. Doc. 8-1, ¶ 8. Because of Opioid and COVID-19[10] declarations of emergency by

_____

[8] As Defendant acknowledges (Doc. 24, pg. 6), per 6107(c), a firearm is defined as "any weapon that is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any weapon."

[9] The "public streets and property" include not only government buildings and spaces but also all roads and sidewalks "used by members of the public," *Commonwealth v. Goosby*, 380 A.2d 802, 806 (1977) (interpreting identically worded provision in 6108), and "circumstantial evidence" that an individual without a license "travelled at least some distance on a public street" with a firearm before reaching his destination is sufficient to place him outside the scope of this supposed "location-specific" limitation, *Commonwealth v. Hopkins*, 747 A.2d 910, 918 (Pa. Super. Ct. 2000).

Thus, when 6107 is triggered, it constitutes a *de facto* ban on carrying operable firearms without a LTCF in any place that one can only access via a public street or sidewalk—which is to say, virtually any place outside one's own home.

[10] While Defendant is correct that the COVID emergency was recently ended by the General Assembly (Doc. 24, pg 7, fn. 1), there is no dispute that the opioid emergency is still in effect, and even if, *arguendo*, both

Governor Wolf, Pennsylvania has been in a state of emergency since 2018.[11] Doc. 8-1, ¶ 9-10. Because of the proclamations, 6107 additionally and currently restricts the Plaintiffs, and all those similarly situated, from transporting or carrying firearms in public, and upon public streets and public property, even for lawful purposes, including self-defense. Governor Wolf had an opportunity to lift this unconstitutional restriction but vetoed an act passed by the Commonwealth's Legislature, House Bill 1747. Doc. 8-1 ¶ 11.

Moreover, 18 Pa.C.S. § 6108 further provides that: "No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless: (1) such person is licensed to carry a firearm; or (2) such person is exempt from licensing under section 6106(b) of this title." Doc. 8-1, ¶ 10. Unless a law-abiding person has a valid LTCF, he or she is further specifically

---

were no longer active, Plaintiffs' Complaint would not be moot, as it constitutes an issue capable of repetition and evading review. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911).

[11] *See* https://www.governor.pa.gov/newsroom/governor-wolf-declares-heroin-and-opioid-epidemic-a-statewide-disaster-emergency and https://www.governor.pa.gov/newsroom/gov-wolf-signs-14th-renewal-of-opioid-disaster-declaration, last visited July 26, 2021.

prohibited from carrying firearms in Philadelphia under State law, since it is the only "city of the first class." Doc. 8-1, ¶ 14.

### B.    Facts Specific to Julio Suarez

In 1990, Plaintiff Suarez was convicted of a violation of Md.Ann.Code art. 27 §36B(b), carrying a handgun without a license, for which he received one year probation, as well as 180 days' imprisonment and a $500 fine, which both were suspended. Doc. 8-1, ¶ 18. Plaintiff Suarez was only once otherwise charged and convicted of another misdemeanor[12]—and never of a felony offense—prior to or since the charge in 1990. Doc. 8-1, ¶19.

In November of 2017, Plaintiff Suarez applied for a LTCF with his County Sherriff and was denied that license by Defendant's Pennsylvania State Police ("PSP"). Doc. 8-1, ¶ 24. He subsequently filed a challenge, to which Defendant's PSP responded, stating that he was denied because of his 1990 conviction for "handgun on person: carry/wear" in the State of Maryland was putatively prohibiting under

---

[12] In 1998, over two decades ago, Plaintiff Suarez was convicted in Maryland of a state law misdemeanor for driving under the influence of alcohol. Doc. 8-1 ¶ 20.

6109(e)(1)(viii) as a crime punishable by imprisonment for a term exceeding one year. Doc. 8-1, ¶ 25.

C.    Facts Specific to Daniel Binderup

In 1997, Plaintiff Binderup pled guilty to corruption of a minor, as a result of a consensual sexual relationship with a seventeen-year-old employee at his bakery, for which he received three years of probation and a $300.00 fine, plus costs and restitution. Doc. 8-1, ¶ 31. He has never been charged with or convicted of any other misdemeanor or felony offense. Doc. 8-1, ¶ 32.

In March of 2018, Plaintiff Binderup applied for a LTCF with his County Sherriff and was denied that license by Defendant's PSP. Doc. 8-1, ¶ 36. Plaintiff Binderup subsequently filed a challenge, to which Defendant's PSP responded, stating that he was denied because of his 1997 conviction for corruption of a minor was putatively prohibiting under 6109(e)(1)(viii), as a crime punishable by imprisonment for a term exceeding one year. Doc. 8-1, ¶ 37.

D.    Facts Specific to Daniel Miller

In 1998, Plaintiff Miller pled guilty to unsworn falsifications to authorities, and use of an altered PennDot window tint exemption

11

certificate, as a result of his use of the altered certificate during a court proceeding, for which he received a year of probation, plus court costs and restitution. Doc. 8-1, ¶ 43. Plaintiff Miller has never been charged with or convicted of any other misdemeanor or felony offense, prior to or since that charge in 1998. Doc. 8-1, ¶ 44.

In April of 2019, Plaintiff Miller applied for a LTCF with his County Sherriff and was denied that license by Defendant's PSP. Doc. 8-1, ¶ 48. Plaintiff Miller subsequently filed a challenge, to which Defendant's PSP responded, stating that he was denied because of his 1998 conviction for use of an altered PennDot window tint exemption certificate that was putatively prohibiting under 6109(e)(1)(viii) as a crime punishable by imprisonment for a term exceeding one year. Doc. 8-1, ¶ 49.

E.    Facts Specific to All Individual Plaintiffs

Individual Plaintiffs are all residents and citizens of the Commonwealth of Pennsylvania. Doc. 8-1, ¶¶ 16, 29, 41. Plaintiffs are members of Firearms Policy Coalition and the Second Amendment Foundation. Doc. 8-1, ¶¶ 17, 30, 42. As the federal courts have held, Plaintiffs are not disqualified from exercising their Second Amendment

rights. Doc. 8-1, ¶¶ 21, 33, 45. Plaintiffs desire to exercise their right to bear arms by carrying loaded, operable firearms on their person, in public, for lawful purposes, including self-defense. Doc. 8-1, ¶¶ 23, 35, 47. Plaintiffs also desire to lawfully transport load and unloaded firearms within the Commonwealth during a proclaimed emergency or during periods where an emergency is not proclaimed. Doc. 8-1, ¶¶ 26, 38, 50. This includes constitutional protected conduct, which exceeds the limited exceptions contained in 6106-6108. *Id*. Plaintiffs lawfully own and possess handguns, rifles, and shotguns. Doc. 8-1, ¶¶ 22, 34, 46. Plaintiffs have abstained from carrying or otherwise transporting loaded and unloaded firearms on their persons and in vehicles in public, for lawful purposes including self-defense, based on their reasonable fear of arrest, prosecution, incarceration, and/or fine under the Commonwealth's regulations as they are actively being enforced by Defendant. Doc. 8-1, ¶¶ 27, 39, 51.

## IV.   Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, when considering a motion to dismiss,

the Court must "accept all of the complaint's well-pleaded facts as true" and "then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). *Fowler* makes clear that while a court is under no obligation to accept legal conclusions, it is under no duty to entirely disregard them. *Id.* Dismissal pursuant to Rule 12(b)(6) is only proper when the factual allegations, accepted as true, are insufficient to "state a claim to relief that is plausible on its face." *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009). However, even where a district court dismisses a case, the court must allow the plaintiff to file an amended complaint, "unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).

## V.   Argument

### A.   The Second Amendment Protects the Rights of Law-Abiding Adults to Carry Firearms Outside of the Home for Self-Defense

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. As

14

the Supreme Court held, this constitutional provision, at its core, protects one's right to "wear, bear, or carry…upon the person or in the clothing or in a pocket, for the…of being armed and ready for offensive or defensive action" and "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 584, 592; *see also Caetano*, 577 U.S. at 413-14 (holding that the Second Amendment also protects the right to possess and use stun guns in public). That right is incorporated against the states through the Fourteenth Amendment. *McDonald*, 561 U.S. at 778.

First, as a matter of plain meaning, the text of the Second Amendment leaves no doubt that it applies outside the home, as otherwise the inclusion of "bear arms" would be rendered superfluous. Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Any other reading of the operative clause would render a guaranteed right to carry to be non-existent, which is incompatible with the plain language of the Second Amendment. However,

Defendant's regulations do just that and as a result, isolate Plaintiffs' Second Amendment right to only *keeping* arms while in their home, amounting to Plaintiffs being able to exercise only half the right.

Second, the purpose behind the Second Amendment's codification requires that it protect carrying of arms outside the home, not just within the home. Self-defense, "the central component" of the Second Amendment, *Heller*, 554 U.S. at 599; *McDonald*, 561 U.S. at 767, obviously "is as important outside the home as inside," *Moore*, 702 F.3d at 942. In fact, the 2019 nationwide data from the Bureau of Justice Statistics show less than a third of violent crimes occur at home or near it.[13] Similarly just as self-defense is not isolated to the home, hunting, just as obviously, does not occur within the home.[14] Even as announced by the Amendment's "prefatory" clause, the constitutional right was

---

[13] Percent of violent victimizations by location of incident, 1993-2019, BUREAU OF JUST. STATISTICS, OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST. (Nov. 11, 2020), generated using the NCVS Victimization Analysis Tool at https://bit.ly/3qWaSQq (select "Custom Tables"; then select "Personal Victimization"; then select "Violent Victimization and "Location of Incident" as the variable; then select "Generate Results"), last visited July 27, 2021.

[14] The Second Amendment affirmed the "ancient right" to bear arms, finding it "important for…hunting" in addition to self-defense. *Heller*, 554 U.S. at 599.

designed in part "to prevent elimination of the militia." *Id*. And a right to bear arms only at home would not aid "rearing up and qualifying a well-regulated militia," *id*. at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), as citizens who cannot bear arms in public cannot act as a militia. Thus, it is undisputable that Defendant's regulations cut against the various purposes for which the Second Amendment was codified.

Third, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home. As *McDonald* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. at 767.[15] Further, because the need to exercise the right to self-defense may and often does arise in public, it has long been recognized that the right may be exercised in public. Sergeant William Hawkins's widely read "Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532

---

[15] Likewise, it cannot be seriously contended that when the Supreme Court declared that—at the *core* of the Second Amendment—to "bear arms" means to "wear, bear, or carry…upon the person or in the clothing or in a pocket, for the purpose…of being armed and ready for offensive or defensive action in a case of conflict with another person" that it was articulating that such is limited to within one's home.

U.S. 318, 331 (2001), explained that "the killing of a Wrong-doer…may be justified…where a Man kills one who assaults him in the Highway to rob or murder him," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716); *see also*, *Beard v. United States*, 158 U.S. 550, 563-64 (1895)(declaring that one has a constitutional right to carry and use a weapon "outside of his dwelling house" in self-defense); JOSHUA PRINCE, ESQ. and ALLEN THOMPSON, ESQ., *The Inalienable Right To Stand Your Ground*, 27 ST. THOMAS L. REV. 32 (2015). And because the right to self-defense was taken to extend beyond the home, the right to armed self-defense naturally was, too. Seventeenth-century English courts even recognized the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES, App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its

authority were it to "pass a law prohibiting any person from bearing arms." 1 id. App.n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington went armed on expedition into the Ohio Country, for example. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). Patrick Henry regularly walked armed from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010). John Adams, although defending British soldiers charged for the Boston Massacre, conceded that, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And Thomas Jefferson, who traveled with pistols for self-protection and designed a holster for ready retrieval, *see Firearms*, MONTICELLO, https://goo.gl/W6FSpM, also advised his nephew to "[l]et your gun . . . be

the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884).

Early American courts and commentators shared this understanding of the scope of the right to bear arms. James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804).[16]

---

[16] While the dispositive question on the scope of the Second Amendment is "the public understanding in 1791," Reconstruction-era views provide "confirmation of what . . . ha[s] already been established"—the right to bear arms protects the carrying of firearms outside the home for self-defense. *See Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019).

At least, that was true for those whose rights were respected. For decades before the Civil War, the southern States schemed at every turn to prevent their enslaved and free black populations from enjoying their freedom, including their freedom to bear arms. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* ROBERT J. COTTROL & RAYMOND T. DIAMOND, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice

Finally, confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Moore*, 702 F.3d at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess and *carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the

Taney recoiled so strongly from recognizing African Americans as citizens in the infamous Dred Scott case precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Parallel restrictions were enacted in Louisiana and Alabama. COTTROL & DIAMOND, supra, at 344–45. And several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906). As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress' efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also* McDonald, 561 U.S. at 775–76.

key constitutional phrase "bear arms" as to " 'wear, bear, or carry…upon the person or in the clothing or in a pocket, for the purpose…of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *Id.* at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

*Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise, identifying exceptions would be pointless. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano*, 577 U.S. at 412 (vacating ruling that Second Amendment does not protect right to carry a stun gun in public).

Against this overwhelming and unconverted evidence from the text, purpose, history, and precedent, Defendant argues that *Drake*, 724 F.3d at 427 controls; however, beyond *Drake* not being applicable, a

circuit court can never overrule the Supreme Court. As Defendant acknowledges (Doc 24, pg. 17), *Drake* expressly *left open* whether "the individual right to bear arms for the purpose of self-defense extends beyond the home" and therefore cannot control this Court's answer to that question. *Drake*, 724 F.3d at 431. In fact, Drake assumed "some application [of the Second Amendment] beyond the home." *Id*. *Drake merely* upheld a licensing scheme in New Jersey on the ground that requiring permit applicants to show a "justifiable need" to carry firearms outside the home "qualifies as a 'longstanding,'" "presumptively lawful" regulation of conduct outside the scope of the Second Amendment's guarantee." *Id*. at 434. Whatever the soundness of that holding, it is completely irrelevant here, as Plaintiffs *do not challenge* a "justifiable need"-type licensing standard. Rather, they individually and collectively challenge the effect of: (1) Defendant's restrictions on carrying and transporting loaded and unloaded firearms, including on the public streets and property, without a LTCF—Sections 6106, 6108; (2) Defendant's requirement that during a declared emergency (like the present), a law-abiding citizen can *only* "carry weapons in case of confrontation" outside the home, *Heller*, 554 U.S. at

592, if they obtain a LTCF—Section 6107; and (3) Defendant's rule both *barring* Plaintiffs from obtaining a LTCF and imposing a fee for a LTCF, in violation of *Murdock*—6109(e)(1)(viii). These provisions, by eliminating Plaintiffs' ability to obtain a LTCF and imposing a tax on their constitutional rights, while maintaining a state of emergency in excess of three years, effectively preclude Plaintiffs from carrying loaded firearms outside their home in any manner, as well as, transporting loaded or unloaded firearms for lawful purposes not enumerated by extremely limited allowances of 6106, in direct contravention of *Heller*, *McDonald*, and *Caetano*.

Defendant also cites *Drake* for the proposition that certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct he regulates is not within the scope of the Second Amendment. That is irrelevant, too, as Defendant has provided no historical evidence whatsoever that a total ban on individuals such as Plaintiffs carrying firearms outside the home is a "longstanding regulation." Defendant says that "Pennsylvania has long restricted the possession and use of firearms in public through various statutory measures" (Doc. 24, pg. 10), but the only regulations he cites that date

24

to the Founding—the only relevant period for determining "the public understanding…of the right codified by the Second Amendment," *Gamble*, 139 S. Ct. at 1975 (2019)—are limits on "the public discharge of firearms" or "hunting on lands other than on one's own." *Id*. Such picayune, time, place, and manner-type restrictions are no precedent for Pennsylvania's drastic ban. *See Heller*, 554 U.S. at 632 (dismissing laws that "restricted the firing of guns within the city limits" as "no support for the severe restriction in the present case.")

Therefore, Defendant's regulations and his past and continued enforcement of them violate the Supreme Court's jurisprudence.

B.   <u>Defendant's Regulations Violate the Second Amendment Right to Bear Arms in Public</u>

1.   *Defendant's Actions are Categorically Unconstitutional*

As recounted *supra,* the Second Amendment protects the rights of law-abiding individuals, like Plaintiffs, to transport and carry firearms for all lawful purposes, including for self-defense, outside the home. *Heller* makes the next analytical steps clear. "The very enumeration of the right takes out of the hands of government, even the Third Branch of Government, the power to decide on a case-by-case basis whether the right is really worth insisting upon." Therefore, wholesale

infringements on Plaintiffs' rights textually protected by the Constitution must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. Defendant's prohibition on the right of law-abiding citizens to bear arms in public without a LTCF is just such an infringement of Second Amendment conduct and therefore, unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach…the Court has applied…in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), holding instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text. *Id.* at 635. And in *McDonald*, the Court reaffirmed that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785.

Rights covered by the text of the Second Amendment—as interpreted and understood according to history, practice, and public meaning—are not divided into lesser and greater categories. The Constitution itself has done the categorizing and those rights covered "shall not be infringed." Period. There is no further clause beginning with "except * * *." No qualification of the prohibition saying some of those rights can be infringed a little, or if the government really feels strongly about it, or has reconsidered the costs and benefits of protecting such rights. *Heller*, 554 U.S. 570, 635-36. The text of the Second Amendment, informed by history and tradition, makes clear that the rights of individuals to bear firearms outside the home for self-defense and all lawful purposes is constitutionally protected.

Yet, Defendant continues to enforce 6106-6109, which are as extensive and unqualified as that in *Heller*. Except for a favored few anomalously excluded—law-enforcement officers, military personnel, or the like, *see* Section 6106(b)—*all* adult Pennsylvania citizens are, at present, in the absence of a LTCF, *absolutely prohibited* from carrying an operable firearm in public for self-defense or transporting a firearm, except as limitedly permitted by Section 6106(b) and then only directly

to and from an enumerated location.[17] And these unconstitutional provisions have no opening through the false door of 6107(a)(1), to which Defendant points, since by merely carrying a firearm for purposes of self-defense, an individual is not "actively engaged" in defense of their life or property and is therefore precluded from having a firearm for the purposes of self-defense when outside their home or business.[18] Rather, under 6106-6108, Plaintiffs must *leave their firearms at home* except in narrow circumstances such as when they are transporting them directly to or from their place of business, between homes, or from the gun or repair shop—and even then their firearms must be "not loaded" and "in a secure wrapper." *See* 6106(b)(8). Thus, a law-abiding individual, who, in compliance with Pennsylvania law, *leaves her firearm at home*—or unloaded in her car[19]—and who

---

[17] *See* fn 4, *supra*.

[18] *See* Doc. 24, pgs. 17-18, where Defendant concedes that 6106-6108 feloniously "regulate the unlicensed carrying of weapons on public property and public streets during declared states of emergency by people who are not *actively engaged* in self-defense and unlicensed carrying on the public property and public streets of Philadelphia."

[19] This assumes that she has gone directly to an enumerated location from an enumerated location specified in 6106(b), because otherwise—even stopping for a coffee on her way to an enumerated location—would

suddenly finds herself "actively engaged" in self-defense outside the home will find little comfort in the thought that *at that point* 6107 would allow her to carry a loaded firearm—a firearm which she does not have, as her wearing, bearing, and carrying it, prior to that point, would have been a felonious violation of the law. These limits utterly vitiate the "engaged in self-defense" proviso. Criminals are not in the habit of targeting only individuals traveling to or from the gun shop, or of giving intended victims sufficient notice to retrieve their firearm from the gun case and load it. *See Heller*, 554 U.S. at 630 (invalidating requirement "that firearms in the home be rendered and kept inoperable at all times" because it "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional"). The Second Amendment protects the right to " 'be[ ] *armed and ready*' " "*in case* of confrontation," *Heller*, 554 U.S. at 584, 592 (quoting *Muscarello*, 524 U.S. at 143) (emphases added), not a right to race your attacker home to retrieve your firearm.

---

result in her no longer meeting the draconian criteria of 6106 and therefore, she would no longer be exempt under 6107(a)(2).

Here, the Plaintiffs wish only to bear firearms that are in common use for constitutionally-protected purposes. However, Defendant's regulations currently restrict the Plaintiffs from transporting or carrying firearms in public, and upon public streets and public property,[20] even for lawful purposes, including self-defense. This is simply because Plaintiffs do not have LTCFs, which they have attempted to obtain but have been denied by Defendant, the result of which is a categorical prohibition that virtually bars them from bearing firearms in public period. And, as illustrated *supra*, the right to bear arms extends beyond one's own home. This includes simply transporting a firearm in a way that 6106(b) criminalizes in the absence of a LTCF, such as stopping to utilize a bathroom or to pick up a friend or coffee on the way to one of the extremely limited locations. In fact, the absurdity of the 6106 even prevents a hunter, in the absence of a LTCF, from stopping at a business that processes/butchers the successfully taken game on his/her way home, in the absence of the hunter first returning home, divesting him/herself of his/her firearms, and then proceeding back to the processor/butcher.

---

[20] *See* fn 9, *supra*.

Defendant's regulations categorically bar Plaintiffs from bearing arms in public for lawful purposes. But the Second Amendment takes Defendant's regulations prohibiting Plaintiffs from carrying of loaded or unloaded firearms in public "off the table." *Heller*, 554 U.S. at 636. Therefore, *Heller*'s categorical approach must apply. *See Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases); *Moore*, 702 F.3d at 942 (same).

2. *In the Alternative, Defendant's Actions Still Fails Under Tiered Scrutiny*

Should this Court apply tiered scrutiny instead of *Heller's* prescribed text as informed by history and tradition standard, the proper analysis requires strict scrutiny because Defendant's actions "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). However, Defendant's regulations fail even under intermediate scrutiny.

First, this conclusion follows as a matter of law from the Supreme Court's secondary-effects doctrine. To this end, constitutionally

protected conduct, particularly expressive conduct, is subject to intermediate scrutiny if the purpose and effect of the restrictions is to reduce the negative "secondary effects" of the expression—rather than to suppress the expression itself. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). A restriction fails intermediate scrutiny if "it will reduce secondary effects by reducing speech in the same proportion," for government shall not "attack secondary effects indirectly by attacking speech." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 449, 450 (2002); *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Drake,* 724 F.3d at 455–56 (Hardiman, J., dissenting); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016).

This analysis applies to the enforcement of Defendant's regulations here, which do not to merely regulate the manner of bearing arms in public, but instead bar the conduct outright if an individual does not or cannot obtain a LTCF. This is true even when individuals, like Plaintiffs, are impermissibly denied a LTCF by the Defendant. Any alleged purpose behind Defendant's regulations in maintaining public safety is outweighed by the regulations outrightly barring the conduct

of bearing arms in public. Under any level of heightened scrutiny, that is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148. Thus, Defendant's actions fail intermediate scrutiny because to achieve a secondary goal of maintaining public safety, the Commonwealth bars bearing arms openly in public unless a person holds a valid LTCF, which Defendant denied to the Plaintiffs, thus completely foreclosing access to the right.

Second, Defendant's regulations fail intermediate scrutiny because they are insufficiently tailored to the government's asserted goals. As an initial matter, the Commonwealth needed to—but did not—carefully consider alternatives. *McCullen v. Coakley*, 573 U.S. 464, 494–95 (2014); *accord Bruni v. City of Pittsburgh*, 824 F.3d 353, 367–68. (3d Cir. 2016). That is, "the government is obliged to demonstrate that it actually tried or considered less-[arms-bearing]-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020).

Nowhere in Defendant's brief does he demonstrate that the Legislature or the Governor tried or considered alternatives to 6106-

6109 and the resultant categorical ban on Plaintiffs and those similarly situated. Evidently, the law was enacted and implemented without consideration of alternatives.

Furthermore, the law must be narrowly tailored, possessing "a close fit between ends and means." *McCullen*, 573 U.S. at 486; *accord Bruni*, 824 F.3d at 365, such that "the law in dispute does not 'regulate [bearing arms] in such a manner that a substantial portion of the burden on [arms-bearing] does not serve to advance its goals," *Billups*, 961 F.3d at 688 n.9 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

But once again, Defendant's regulations fail to have any fit—let alone a close fit—between the end and means; instead simply criminalizing conduct that is otherwise lawful simply because the Plaintiffs would bear arms.[21] Defendant's enforcement of 6106–6109

---

[21] Even if the specific nature of the present state of emergency is set aside, the challenged limits still fail. Far from becoming somehow *less* important during a time of disaster or upheaval, these periods of crises are when the rights secured by the Second Amendment *are needed most*. "The Second Amendment is a doomsday provision," *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinksi, J., dissenting from denial of rehearing en banc), designed to enable ordinary citizens to protect themselves and their families when all else fails. It is thus

makes it illegal to stop for a bathroom break, coffee, or to pick up a significant other or friend, or to engage in other lawful conduct simply because an individual is bearing a firearm, in the absence of a LTCF. Defendant's regulations impact lawful conduct in a way that is well beyond the goal of public safety. Pray tell, what legitimate public safety interest exists in precluding, and making felons out of those, who stop for a friend, coffee, or to utilize a bathroom either on their way to or from a shooting range or one of the other extremely limited locations specified in 6106(b)? Or, what laudable goal is achieved by making felons out of hunters who, on their way home, after a successful hunt, stop at a butcher? And even more disconcerting—as if that were possible—what public interest is served by making a felon out of an individual, who, in the absence of a LTCF, on his way to the range with all firearms unloaded in his vehicle in compliance with 6106, gets a call from a family friend, who is the victim of domestic violence, and although she's called the police, because of the rural location in which

---

precisely during an emergency—when the social fabric is strained, and law-enforcement resources are stretched thin by the urgent need to address the crisis immediately at hand—that law-abiding citizens, including the Plaintiffs and all those similarly situated, must be able to act *as their own* first responders until the crisis has passed.

she lives, the police have responded that they are only 30 minutes away, and he immediately goes over to get her out of the dangerous situation, without going home first? But that would never happen, right? Well, just ask Mr. Brian Davey, who was charged for that exact conduct. Docket Number MJ-03302-CR-0000120-2012.

Perhaps even more detrimental to Defendant's position that prohibiting individuals from transporting and carrying firearms in public is for public safety, is that the FBI has found that individuals carrying firearms have stopped mass shootings, on eight separate occasions in over relatively short time span. FBI, *Active Shooter Incidents in the United States in 2016 and 2017* 8 (Apr. 2018), https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view. Out of the fifty incidents that the FBI studied, "[a]rmed and unarmed citizens engaged the shooter in 10 incidents. They safely and successfully ended the shootings in eight of those incidents. Their selfless actions likely saved many lives." *Id.* Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that 6106-6109 do not benefit public safety—but may well harm it.

And Defendant has not even sought to tailor his regulations by directing the manner in which law-abiding citizens can bear and transport arms without a LTCF. Instead, Defendant takes the constitutionally untenable position of banning the exercise of the right to bear arms without an LTCF. This outright ban is not sufficiently tailored, and therefore Defendant's regulations must fail even under intermediate scrutiny.

## VI.   Conclusion

As Defendant's regulations fail under a textual and historical analysis of the Second Amendment, and fare no better under strict or intermediate scrutiny, this Court should deny Defendant's Motion to Dismiss. Alternatively, if this Court is inclined to grant Defendant's motion, consistent with *Fletcher-Harlee Corp.*, it should permit Plaintiffs an opportunity to file an amended complaint.

Respectfully Submitted,

Joshua Prince, Esq.
Attorney Id. No. 306521
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505

37

(888) 202-9297 ext 81114
(610) 400-8439 (f)
Joshua@CivilRightsDefenseFirm.com

Adam Kraut, Esq.
Attorney Id. No. 318482
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
Akraut@fpclaw.org

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, the undersigned, certify that the foregoing brief complies with the Court's Order of July 14, 2021, Doc. 20, permitting the Plaintiffs up to and including 8,000 words. This brief contains 7,975 words, as calculated by the word processing system used to prepare this brief.

Joshua Prince, Esq.
Attorney Id. No. 306521

## CERTIFICATE OF SERVICE

I, Joshua Prince, do hereby certify that on this date, I served a true and correct copy of Plaintiffs' foregoing brief on Defendant's counsel through the Court's ECF system.

Joshua Prince, Esq.
Attorney Id. No. 306521