## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JULIO SUAREZ,** | : | **CIVIL ACTION NO. 1:21-CV-710** |
| **DANIEL R. BINDERUP,** | : | |
| **DANIEL F. MILLER,** | : | **(Judge Conner)** |
| **FIREARMS POLICY COALITION,** | : | |
| **INC., and SECOND AMENDMENT** | : | |
| **FOUNDATION,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **Col. CHRISTOPHER PARIS,**[1] | : | |
| **Commissioner of Pennsylvania** | : | |
| **State Police,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Although there are numerous exceptions, the Commonwealth of

Pennsylvania generally permits open carry of firearms without a license.  To carry a

concealed weapon, however, you must be at least 21 years old and possess a

firearms license issued by the sheriff of the county in which you reside.

Plaintiffs challenge the constitutionality of several provisions of

Pennsylvania's Uniform Firearms Act of 1995 ("UFA" or "the Act").  <u>See</u> 18 PA.

CONS. STAT. § 6101 *et seq*.  The UFA regulates possession and use of firearms in the

Commonwealth of Pennsylvania.  <u>See id.</u>  It provides for the issuance of firearms

licenses, <u>see id.</u> § 6109; prohibits both concealed carry and transporting firearms in

---

[1] Colonel Christopher L. Paris became the Commissioner of the Pennsylvania State Police on March 9, 2023, during the pendency of this action.  <u>See</u> FED. R. CIV. P. 25(d).

a vehicle without a firearms license, see id. § 6106; prohibits possession of firearms in public by unlicensed individuals during a declared state of emergency, see id. § 6107; and prohibits unlicensed carry of firearms on public property and in the streets of Philadelphia, see id. § 6108.[2] The Act also prohibits issuance of licenses to individuals who have been charged with or convicted of a crime punishable by a term of imprisonment exceeding one year. See id. § 6109(e)(1)(viii).

Based upon evolving Second Amendment jurisprudence, we will uphold plaintiffs' challenge to the vehicle provision of Section 6106 as well as their challenge to Section 6107. We reject, however, plaintiffs' challenge to the concealed carry provision of Section 6106 and the disqualification provision of Section 6109.

## I.   **Factual Background and Procedural History**[3]

Plaintiffs Julio Suarez, Daniel R. Binderup, and Daniel F. Miller (collectively, "individual plaintiffs") are residents of the Commonwealth of Pennsylvania, as well as members of the Firearms Policy Coalition and the Second Amendment Foundation (collectively, "organizational plaintiffs"). (See Doc. 1 ¶¶ 13-15; Doc. 39-6

---

[2] The UFA does not regulate carry of a firearm in one's home or fixed place of business. See 18 PA. CONS. STAT. § 6106(a)(1).

[3] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 39-6, 42, 45, 47). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

¶¶ 17-18, 29-30, 40-41; Doc. 45 ¶¶ 17-18, 29-30, 40-41).  Each individual plaintiff has been convicted of a criminal offense punishable by a term of imprisonment of more than one year.  (See Doc. 1 ¶¶ 37, 54, 70; Doc. 39-6 ¶¶ 17, 29, 40; Doc. 45 ¶¶ 17, 29, 40).  For carrying a handgun without a license in Maryland in 1990, Suarez faced up to three years' imprisonment.  (See Doc. 1 ¶¶ 38-39; Doc. 39-6 ¶ 38; Doc. 45 ¶ 38).  For corruption of a minor in 1997, Binderup faced up to five years' imprisonment.  (See Doc. 1 ¶¶ 55-56; Doc. 39-6 ¶ 42; Doc. 45 ¶ 42).  And for making unsworn false statements to state officials and using an altered window tint exemption certificate in 1998, Miller faced up to five years' imprisonment.  (See Doc. 1 ¶¶ 71-73; Doc. 39-6 ¶ 31; Doc. 45 ¶ 31).

Between November 2017 and April 2019, Suarez, Binderup, and Miller applied for licenses under Section 6109 of the Act.  (See Doc. 1 ¶¶ 46-47, 62-63, 77-78; Doc. 39-6 ¶¶ 25, 36, 47; Doc. 45 ¶¶ 25, 36, 47).  The Pennsylvania State Police ("PSP") denied their applications pursuant to Section 6109(e)(1)(viii).  (See id.)[4]  Plaintiffs

_____

[4] Admittedly, PSP does not explicitly identify Section 6109(e)(1)(viii) in the denial letters.  The letters simply state that "the basis for [the] denial can be found under . . . [Section] 6109," and that their convictions are for offenses "outlined in 18 Pa. C.S. § 6109(e) as prohibiting for a license to carry."  (See Doc. 1-2, Ex. C (Suarez denial ltr.), Ex. F. (Binderup denial ltr.), Ex. H (Miller denial ltr.)).  Nevertheless, plaintiffs plainly assert that they were disqualified under Section 6109(e)(1)(viii), (see Doc. 1 ¶¶ 51, 67, 83), and Commissioner Paris focuses his defense on this subpart, (see Doc. 43 at 7).

All three individual plaintiffs, citing various federal court orders, assert that they are not *federally* "disqualified from exercising [their] Second Amendment rights."  (See Doc. 39-6 ¶¶ 22, 33, 44; see also Doc. 1 ¶ 44 (citing Suarez v. Holder, 255 F. Supp. 3d 573 (M.D. Pa. 2015), aff'd *sub nom.* Binderup v. Att'y Gen. U.S. Am., 836 F.3d 336, 345-47 (3d Cir. 2016) (*en banc*)); id. ¶ 59 (citing Binderup v. Holder,

instituted this action by filing a complaint in April 2021 against the Commissioner of PSP, alleging that his enforcement of the Act violates their Second Amendment rights.

In April 2021, the Commonwealth of Pennsylvania was subject to a state of emergency pursuant to several declarations by its Governor in response to the ongoing opioid epidemic and COVID-19 pandemic.  (See Doc. 1 ¶¶ 28-29; Doc. 39-6 ¶¶ 9-10; Doc. 45 ¶¶ 9-10).  The emergency declarations triggered Section 6107.  (See id.)  In their complaint, plaintiffs allege an intention to "travel throughout the Commonwealth" with both loaded and unloaded firearms, "whether concealed or openly," regardless of whether a state of emergency is in effect.  (See Doc. 1 ¶¶ 49, 65, 80; Doc. 39-6 ¶¶ 27-28, 38-39, 49-50; Doc. 45 ¶¶ 27, 38, 49).

Plaintiffs move for summary judgment.  Commissioner Paris moves to partially dismiss plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) and, in the alternative, seeks summary judgment. We will assume jurisdiction over plaintiffs' claims regarding the constitutionality of Sections 6106, 6107, and 6109 of the Act and address the merits of the parties' cross-motions for summary judgment.  We will dismiss plaintiffs' complaint for lack of

---

No. 13-CV-6750, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014), aff'd sub nom. Binderup, 836 F.3d at 345-47); id. ¶ 74 (citing Miller v. Sessions, 356 F. Supp. 3d 472, 485 (E.D. Pa. 2019))).  Suarez and Binderup further claim they have secured judicial decrees restoring their rights.  (See Doc. 1 ¶¶ 43, 58; Doc. 1-2, Ex. B (Suarez restoration order), Ex. E (Binderup restoration order)); see also 18 PA. CONS. STAT. § 6109(e)(1)(iii); id. § 6105(d) (outlining how individuals convicted of crime specified in Section 6105(a) or 6105(b) may apply for relief from disability "imposed by this subsection").  We address the import of these authorities in resolving the cross-motions for summary judgment with respect to Section 6109.  See infra note 26.

subject matter jurisdiction insofar as it seeks declaratory and injunctive relief

regarding Section 6108 of the Act; we will grant leave to amend, but we will also

sever and transfer this claim to the Eastern District of Pennsylvania.

**II.**     <u>**Legal Standards**</u>

    **A.**     **Motion to Dismiss**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the

dismissal of complaints that fail to state a claim upon which relief may be granted.

<u>See</u> FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under

Rule 12(b)(6), the court must "accept all factual allegations as true, construe the

complaint in the light most favorable to the plaintiff, and determine whether, under

any reasonable reading of the complaint, the plaintiff may be entitled to relief."

<u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker</u>

<u>v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to

reviewing the facts contained in the complaint, the court may also consider

"exhibits attached to the complaint, matters of public record, [and] undisputedly

authentic documents if the complainant's claims are based upon these documents."

<u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (citing <u>Pension Benefit Guar.</u>

<u>Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a court

may dismiss a claim for lack of subject matter jurisdiction.  <u>See</u> FED. R.

CIV. P. 12(b)(1).  Such jurisdictional challenges take one of two forms: (1) parties

may levy a "factual" attack, arguing that one or more of the pleading's factual

allegations are untrue, removing the action from the court's jurisdictional ken; or

(2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction. Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)). In either instance, it is the plaintiff's burden to establish jurisdiction. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

### B. Motion for Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

Federal Rule of Civil Procedure 56(c) requires movants and nonmovants alike to support factual assertions by "citing to particular parts of materials in the

record" or otherwise "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c). Rule 56(e) allows the court to deem undisputed any fact not properly countered by record evidence. See FED. R. CIV. P. 56(e)(2). Local Rule of Court 56.1 undergirds these principles by requiring Rule 56 motions to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. Local Rule 56.1 further requires the nonmovant to file a responsive statement identifying genuine issues to be tried and mandates that both parties' submissions "include reference to the parts of the record that support the statements." Id.

Courts may resolve cross-motions for summary judgment concurrently. See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. FedEx, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the nonmoving party with respect to each motion. See FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

### III.    **Commissioner Paris's Motion to Dismiss**

Commissioner Paris challenges the court's subject matter jurisdiction over plaintiffs' claims regarding Section 6107 based upon mootness, and he asserts that plaintiffs lack standing to challenge Section 6108. (See Doc. 43 at 22-27). Jurisdiction is "a fundamental pre-requisite to the exercise of judicial power," Aurum Asset Managers, LLC v. Bradesco Companhia de Seguros, 441 F. App'x 822,

824 (3d Cir. 2011) (nonprecedential),[5] without which "the court cannot proceed at all in any cause," id. (quoting *Ex Parte* McCardle, 74 U.S. 506, 514 (1869)); see Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998**).  Accordingly, we will address Commissioner Paris's motion to dismiss, and we will consider the cross-motions for summary judgment only if satisfied of our jurisdiction.  See Steel Co., 523 U.S. at 101-02.

### A.    Plaintiffs' Challenge to Section 6108

Commissioner Paris seeks dismissal of plaintiffs' challenge to Section 6108 because plaintiffs have not specifically alleged their intent to carry firearms in Philadelphia and, therefore, face no credible threat of prosecution; Section 6108 covers only public streets and public property in the Commonwealth's largest city.  (See Doc. 43 at 26-27 (citing Firearm Owners Against Crime v. City of Harrisburg, No. 1:15-CV-322, 2016 WL 1162283, at *7 (M.D. Pa. Mar. 24, 2016))); see also 18 PA. CONS. STAT. § 6108; Spahn v. Zoning Bd. of Adjustment, 977 A.2d 1132, 1143 (Pa. 2009).  We agree with Commissioner Paris.

The "irreducible constitutional minimum of standing" requires that a plaintiff establish: (1) an injury in fact, understood to be "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the

---

[5] The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  However, we cite these nonprecedential decisions because we have carefully considered each decision and we are persuaded by each panel's *ratio decidendi*.

injury and the conduct complained of," such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted)).  In pre-enforcement contexts, the injury-in-fact prong tasks the court to consider whether a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [whether] there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014) (quoting Babbitt v. U. Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

In ruling on a motion to dismiss, we confine our review to the complaint's allegations, exhibits attached thereto, "matters of public record," and, in some cases, "undisputedly authentic documents." Mayer, 605 F.3d at 230 (citing Pension Benefit Guar. Corp., 998 F.2d at 1196).  The individual plaintiffs in this case have only expressed a general desire to "travel throughout the Commonwealth" and to carry firearms on "public streets and public property" in Pennsylvania.  (See Doc. 1 ¶¶ 50(c)-(d); 66(c)-(d); 81(c)-(d)).  These allegations are too abstract and lacking in detail to satisfy Article III.  See Yaw v. Del. River Basin Comm'n, 49 F.4th 302, 319 (3d Cir. 2022) (affirming dismissal of challenge to fracking ban based upon only hypothetical future projects).  Plaintiffs' failure to plead facts placing them in Philadelphia, where they would be subject to the constraints of Section 6108, renders their asserted injuries "conjectural" and "hypothetical," as opposed to "actual or imminent." Lujan, 504 U.S. at 560.  In sum, plaintiffs have not stated an

injury in fact.  Consequently, the court will not assume jurisdiction over their facial and as-applied challenges to Section 6108.  We note, however, that these deficiencies are factual rather than legal.  Because curable amendment is feasible, we will grant plaintiffs leave to amend their complaint.  <u>See</u> <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002).

Despite the relative ease of curable amendment,[6] any amended complaint will present a venue quandary.  <u>See generally</u> 28 U.S.C. § 1391(b).  Federal courts are empowered to transfer a civil action to another district in which it might have been brought if, on balance, "the litigation would 'more conveniently proceed and the interests of justice be better served by transfer to a different forum.'"  <u>See</u> <u>In re McGraw-Hill Global Educ. Holdings, LLC</u>, 909 F.3d 48, 57 (3d Cir. 2018) (quoting <u>Jumara v. State Farms Ins. Co.</u>, 55 F.3d 873, 879-80 (3d Cir. 1995) (further citation omitted)).[7]  And the United States Supreme Court has instructed courts to consider, <i>inter alia</i>, "the local interest in having localized controversies decided at home."  <u>See</u> <u>Atl. Marine Constr. Co. v. U.S. District Court</u>, 571 U.S. 49, 62 n.6 (2013).

Local interests of Philadelphia in the viability of Section 6108 are manifold.  By definition, violations of Section 6108 occur "upon the public streets or upon any

---

[6] While Suarez and Miller express a more detailed desire and intent to go to Philadelphia in the statement of material facts supporting their motion for summary judgment, they voice no such intentions in their complaint.  (<u>Compare</u> Doc. 39-6 ¶¶ 27(f), 38(d), <u>with</u> Doc. 1 ¶¶ 50(c), 81(c)).  Because our jurisdictional analysis is generally limited to the four corners of the complaint, <u>see</u> <u>Steel Co.</u>, 523 U.S. at 101; <u>Mayer</u>, 605 F.3d at 230, we offer no comment upon the legal sufficiency of those belated assertions.

[7] <u>See</u> 28 U.S.C. § 1404(a); <u>Amica Mut. Ins. Co. v. Fogel</u>, 656 F.3d 167, 171 (3d Cir. 2011) (courts may issue transfer pursuant to Section 1404 <i>sua sponte</i>).

public property" in Philadelphia, see 18 Pa. Cons. Stat. § 6108, which falls outside our jurisdiction.  It is therefore unsurprising that the only reported cases at the federal district court level applying Section 6108 are Eastern District of Pennsylvania cases.  See, e.g., Gurten v. Sessions, 295 F. Supp. 3d 511, 524-25 (E.D. Pa. 2018); United States v. Williams, 533 F. Supp. 448, 450 (E.D. Pa. 1982).[8]  PSP is not the only entity authorized to enforce Section 6108, let alone the most likely entity to hypothetically enforce it.  Though it is beyond cavil that PSP may make arrests and bring charges under Section 6108, it is an open question whether enjoining such enforcement without considering the interests of the Philadelphia Police Department would be prudent.[9]  It also bears mention that, as a city of the first class, Philadelphia enjoys unique prerogatives and interests in Pennsylvania's state constitutional scheme.  See generally Spahn, 977 A.2d at 1143-44 (reviewing origin and implications of Philadelphia's Home Rule Charter).

Mindful of these local interests, we find that the most appropriate course of action is severance and transfer.  Assuming that plaintiffs pursue an amended

---

[8] We note that the legal and historical underpinnings of Section 6108's geographic limitation are well-trod ground in the courts of this Commonwealth. See, e.g., Commonwealth v. Scarborough, 89 A.3d 679, 685 (Pa. Super. Ct.) (rejecting challenge to Section 6108 on equal protection and due process grounds), alloc. denied, 89 A.3d 679 (Pa. 2014); Commonwealth v. Hicks, 208 A.2d 916, 953 (Pa. 2019) (Dougherty, J., dissenting) (examining legislative rationale for Section 6108).

[9] Philadelphia's police force is among the oldest in the country, and its origins predate the birth of PSP.  See Aziz Z. Huq, *Fourth Amendment Gloss*, 113 Nw. U. L. Rev. 701, 750 (2019) ("[t]he first police forces . . . emerged in cities like Philadelphia and Charleston in the 1820s and 1830s").

challenge to Section 6108, we will sever it and transfer it to our sister court in the Eastern District.

### B.  Plaintiffs' Claims Regarding Section 6107 Are Not Moot

Commissioner Paris argues that plaintiffs' challenge to Section 6107 is moot because the emergencies set forth in the complaint are no longer extant. Specifically, he asserts that the public carry restrictions of Section 6107 are no longer in effect because proclamations addressing the opioid epidemic and COVID-19 pandemic have lapsed.  (See Doc. 43 at 32).  In addition, the Commissioner correctly observes that the Commonwealth of Pennsylvania recently amended its constitution to limit the governor's authority to proclaim an emergency.  (See id. at 24); PA. CONST. art. IV § 20(c) (limiting duration of emergency declarations to 21 days absent affirmative extension by General Assembly).

Plaintiffs concede that the emergency declarations in effect at the time they initiated this matter are no longer active.  (See Doc. 46 at 29).  They nonetheless maintain that Section 6107 restricts their rights, citing as an example Philadelphia's renewal of its mask mandate in April 2022.  (Id.)  Plaintiffs note that Section 6107 is triggered not only by statewide emergency declarations, but also by an "emergency proclaimed by a . . . municipal governmental executive."  (See id. (quoting 18 PA. CONS. STAT. § 6107(a))).  Plaintiffs contend their claims are not moot because this issue is capable of repetition yet evading review.  (See id. at 46-47 (citing S. Pac. Terminal Co. v. Interstate Com. Comm'n, 219 U.S. 498, 514-16 (1911))).

Recent guidance from our court of appeals resolves this issue in plaintiffs' favor.  In Lara v. Commissioner, Pennsylvania State Police, 91 F.4th 122 (3d Cir.),

reh'g _en banc_ denied, 97 F.4th 156 (3d Cir. 2024), our court of appeals considered a discrete challenge to the constitutionality of Section 6107 brought by unlicensed individuals between the ages of 18 and 20.  Pennsylvanians within that age span may not carry firearms in public during a state of emergency because they are ineligible for a firearms license until they are 21 years old.  See Lara, 91 F.4th at 126-27 (citing 18 PA. CONS. STAT. §§ 6107(a), 6109(b)).  Faced with the same arguments Commissioner Paris advances here, the court concluded that the case was not moot under the "capable of repetition yet evading review" exception.  See id. at 138 (quoting Hamiltonv. Bromley, 862 F.3d 329, 335 (3d Cir. 2017) (citation omitted)).  The court stressed that "Pennsylvania has a recent history of declaring multiple emergencies, and it is reasonably likely that other 18-to-21-year-olds . . . will be banned from carrying guns in public yet again."  See id.  The court reasoned that emergencies may only last 21 days absent intervention by the General Assembly, see PA. CONST. art. IV, § 20(c), and thus challenged actions may be too short in duration to be fully litigated, see Lara, 91 F.4th at 138.  Based upon the _ratio decidendi_ in Lara, we conclude that the instant matter is not moot.

**IV.    Cross-Motions for Summary Judgment**[10]

   **A.    Facial and As-Applied Challenges**

   A facial challenge asks whether "no set of circumstances exists under which the [law] would be valid."  As-applied relief requires plaintiffs to demonstrate that a

---

[10] Commissioner Paris does not challenge the court's jurisdiction over plaintiffs' remaining claims regarding Section 6106 and Section 6109.

law's application in "particular circumstances" results in a deprivation of rights.
See Mazo v. N.J. Sec'y of State, 54 F.4th 124, 134 (3d Cir. 2022) (citing United States
v. Salerno, 481 U.S. 739, 745 (1987)); id. at 134 n.7 (citing United States
v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010)).  The court concludes that—with one
noteworthy exception, see *infra* note 19—plaintiffs have mounted facial challenges
to these provisions.

Plaintiffs seek declaratory and injunctive relief against enforcement of
Sections 6106, 6107, and 6109(e)(1)(vii) not just for themselves, but for others
similarly situated.  (See Doc. 1 at 62-64 (prayer for relief); Doc. 39-7 (proposed
order); Doc. 40 at 1-2).  In other words, if the UFA is unconstitutional as applied to
them in the context of the general hypothetical conduct they describe—carrying a
loaded, operable firearm (i) concealed, (ii) in a vehicle, (iii) in public places
throughout the Commonwealth, and (iv) during a proclaimed state of emergency,
(see Doc. 39-6 ¶¶ 27, 38, 49)—there are no circumstances in which it would be valid
with respect to others.  The relevant question is whether the relief sought would
"reach beyond" this controversy, see Doe v. Reed, 561 U.S. 186, 194 (2010), not how
the parties have labeled their claims, (see Doc. 49 at 1).  Given the arguments and
record before us, we therefore review the facial validity of these provisions.  See
Mazo, 54 F.4th at 135 ("a declaratory judgment would conclusively resolve [the]
facial challenge"); see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,
804 F.3d 242, 265 (2d Cir. 2015) (reasoning that pre-enforcement challenges *ipso
facto* constitute facial challenges).

### B.   Historical Review of Second Amendment Jurisprudence

As ratified in 1791, the Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  The Supreme Court's first meaningful discussion of the Second Amendment came in United States v. Miller, 307 U.S. 174 (1939), which involved the prosecution of two individuals under the National Firearms Act of 1934 for transporting sawed-off shotguns from Oklahoma to Arkansas.  See Miller, 307 U.S. at 175.[11]  The defendants argued that their conduct was constitutionally protected, but the Supreme Court unanimously disagreed.  See id. at 176.  The Court held that sawed-off shotguns have "no reasonable relationship to the preservation or efficiency of a well-regulated militia," which was the "obvious purpose" of the Second Amendment.  Id. at 178.

For decades, federal courts adhered to Miller's collectivist perspective on the right to keep and bear arms.  See United States v. Cole, 276 F. Supp. 2d 146, 149 (D.D.C. 2003) (citing, inter alia, Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995)).  Courts routinely upheld various restrictions on firearm possession, including those applicable to former felons.  See, e.g., Lewis v. United States, 445 U.S. 55, 65 n.8

---

[11] The Court briefly touched upon the Second Amendment on three occasions before Miller, most notably in United States v. Cruikshank, 92 U.S. 542 (1875), when it observed that the amendment "means no more than that [the right] shall not be infringed by Congress, and has no other effect than to restrict the powers of the national government."  See Cruikshank, 92 U.S. at 542; accord Presser v. Illinois, 116 U.S. 252, 265 (1886); Miller v. Texas, 153 U.S. 535, 538 (1894).

(1980) (holding that federal legislation regulating receipt and possession of firearms by felons "do[es] not trench upon any constitutionally protected liberties"); United States v. Wright, 117 F.3d 1265, 1275 (11th Cir. 1997), vacated in part on other grounds on reh'g, 133 F.3d 1412 (11th Cir. 1998) (upholding ban on machineguns).

In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court effected a rather dramatic transformation of Second Amendment jurisprudence. The Court considered a law that effectively banned possession of handguns in the homes of our nation's capital.  See Heller, 554 U.S. at 628.  The Court flatly rejected the narrow purview of Second Amendment rights that had taken hold among lower federal courts.  It opined that the Second Amendment confers an individual right to keep and bear arms "for the core lawful purpose of self-defense," and it invalidated the District of Columbia's stringent law on those grounds.  See id. at 630, 636.

The Heller Court emphasized that "the right secured by the Second Amendment is not unlimited," and certainly does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id. at 626.  The Court did not offer an exhaustive list of historically permissible constraints upon the right, but it took care not to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 626-27.  While the Second Amendment "extends, prima facie, to . . . arms . . . that were not in existence at the time of the founding," see id. at 582, the Court observed an "historical tradition of prohibiting the carrying

16

of 'dangerous and unusual weapons,'" see id. (quoting 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769)).[12]  Critically for present purposes, the majority also recognized that most 19th-century courts assessing challenges to concealed carry laws upheld them under the Second Amendment and state constitutional analogues.  See id. at 626 (citing, *inter alia*, State v. Chandler, 5 La. Ann. 489, 489-90 (La. 1850); Nunn v. State, 1 Ga. 243, 251 (Ga. 1846)).

Heller addressed a discrete challenge to a District of Columbia law.  It did not address whether Second Amendment protections were enforceable against state actors.  See Heller, 554 U.S. at 620 n.23 (citing Cruikshank, 92 U.S. at 553; Presser, 116 U.S. at 265; Miller, 153 U.S. at 538).  The Supreme Court cured that omission in McDonald v. City of Chicago, 561 U.S. 742 (2010), which involved a Chicago ordinance prohibiting individuals from possessing firearms without valid registration certificates.  By a 5-4 vote, the McDonald Court held that the Second Amendment applies to the states by way of the Fourteenth Amendment,[13] and it declared Chicago's ordinance an unconstitutional infringement upon the "basic right" to possess a handgun in one's home for the purpose of self-defense.  See id. at 767, 791; id. at 807 (Thomas, J., concurring in judgment).  The principal opinion

---

[12] See also Caetano v. Massachusetts, 577 U.S. 411, 411-12 (2016) (*per curiam*) (reversing decision upholding prohibition on possession of stun guns because such weapons were not "in common use at the time of the Second Amendment's enactment") (citation omitted); id. at 416-19 (Alito, J., concurring in judgment) (elaborating).

[13] Rationales diverged as to which provision of the Fourteenth Amendment incorporated the Second Amendment's guarantees against the states.  Compare McDonald, 561 U.S. at 758-59, 780-91 (plurality), with id. at 805-58 (Thomas, J., concurring in judgment).

echoed <u>Heller</u>'s cautionary note that Second Amendment rights are not unlimited and that its decision should not be construed to "cast doubt on [] longstanding regulatory measures." <u>See</u> <u>id.</u> at 786 (plurality).

<u>Heller</u> and <u>McDonald</u> endeavored to make plain that the right to keep and bear arms in the home for self-defense should not be subject to judicial interest-balancing. <u>See</u> <u>Heller</u>, 554 U.S. at 634 ("We know of no other enumerated constitutional right whose core protection has been subjected to a free-standing 'interest-balancing' approach."); <u>McDonald</u>, 561 U.S. at 791 (plurality). Yet, most federal appellate courts followed a two-step approach to determine the constitutionality of Second Amendment restrictions, combining historical analysis with means-ends scrutiny. <u>See, e.g.</u>, <u>Kolbe v. Hogan</u>, 849 F.3d 114, 133 (4th Cir. 2017); <u>Kachalsky v. County of Westchester</u>, 701 F.3d 81, 86 (2d Cir. 2012). First, the government could justify its regulation by establishing that the conduct at issue fell outside the scope of the Second Amendment as it was originally understood. <u>See, e.g.</u>, <u>Kanter v. Barr</u>, 919 F.3d 437, 441 (7th Cir. 2019) (citing <u>Ezell v. City of Chicago</u>, 846 F.3d 888, 892 (7th Cir. 2017)); <u>United States v. Marzzarella</u>, 614 F.3d 85, 89 (3d Cir. 2010). If the conduct at issue fell within the Amendment's scope, then courts analyzed "how close the law [came] to the core of the . . . right and the severity of the law's burden on that right." <u>Kanter</u>, 919 F.3d at 441; <u>see also</u> <u>Binderup</u>, 836 F.3d at 345-47.

The Supreme Court upended this prevailing analysis of Second Amendment restrictions in <u>Bruen</u>. <u>See</u> <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1, 19 (2022). <u>Bruen</u> concerned a challenge to New York's "may issue"

licensing regime, pursuant to which authorities issued public carry licenses only upon demonstration of special need.  See id. at 14-15.  The Court rejected New York's subjective licensing standards, proclaiming that core Second Amendment rights extend beyond the home.  See id. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms.").  The Court articulated the proper standard for evaluating Second Amendment claims as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 24 (citation omitted).

Applying that standard to New York's licensing scheme, the Court held that the law impermissibly infringed upon New Yorkers' Second Amendment rights.  See id. at 31-71.  New York officials wielded broad discretion and could deny an application when they deemed the special need showing to be inadequate.  Id. at 13.  When an application was denied, judicial review of that decision was limited.  See id.  The Court contrasted New York's "may issue" approach—practiced by just six states and the District of Columbia—with the "shall issue" regimes adopted by 43 states, whereby authorities "*must* issue concealed-carry licenses whenever applicants satisfy certain threshold requirements."  Id. (emphasis added).[14]

---

[14] Vermont alone "has no permitting system for the concealed carry of handguns."  See Bruen, 597 U.S. at 13 n.1.

"[N]othing in our analysis," the Court later clarified, "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'" Id. at 38 n.9 (quoting Drake v. Filko, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)).

Having determined that New York's licensing scheme burdened public carry of handguns for self-defense, and that such conduct is among the core activities protected by the Second Amendment, see id. at 31-32, the Bruen Court evaluated whether the state had met its burden to demonstrate that the "special need" requirement was consistent with historical traditions of firearm regulation, see id. at 33-39. New York sought to meet its burden by amassing a variety of relevant historical practices. The Bruen Court rejected New York's proffered evidence and concluded that there was no "tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." Id. at 38.

The Court explained that defenders of gun laws need not identify an "historical *twin*" to vindicate a law's constitutionality; "a well-established and representative historical *analogue*" will suffice. Id. at 30 (emphases in original).[15]

---

[15] The Court also acknowledged an ongoing debate as to whether the appropriate historical reference point is 1791, when the Second Amendment was adopted, or 1868, when the Fourteenth Amendment was ratified, setting the stage for applying the Second Amendment's protections to state regulations. See id. at 37-38 (citations omitted). Because public understanding of the right to public carry was essentially identical in both eras, the Court did not resolve that debate. See id. It stressed, however, that evidence of regulations from the late-19th and 20th centuries provides little to no "insight into the meaning of the Second

The analysis is relatively simple when considering regulations which address problems that society has known since the Founding.  See id. at 26.  If a "distinctly similar historical regulation addressing that problem" cannot be identified, or if there is evidence that the public dealt with the problem "through materially different means," then the challenged regulation is inconsistent with the Second Amendment.  See id. at 26-27.  When a present-day regulation would be "unimaginable at the founding," analogical reasoning is still appropriate, but the proffered analogue must be "relevantly similar" by some appropriate metric.  See id. at 28-29.  Ultimately, *how* and *why* a regulation burdens Second Amendment conduct are two "*central* considerations" in any such inquiry.  See id. (emphasis in original) (citations omitted).  The fatal flaw in New York's licensing law was its relegation of the right to bear arms to "second-class" status, permitting individuals to exercise the right in public only upon demonstration of a special need.  See id. at 70.

The Bruen concurrences are enlightening, and collectively reflect a cautionary perspective on Bruen's ambit.  Justice Alito described the Court's holding as deciding "nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun," nor "anything about the kind of weapons that people may possess."  Id. at 72 (Alito, J., concurring).  Justice Kavanaugh, joined by Chief Justice Roberts, reiterated Heller and McDonald's

---

Amendment when it contradicts earlier evidence."  Id. at 66 n.28; see also discussion *infra* note 24.

assurances that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," including "longstanding prohibitions on the possession of firearms by felons."  Id. at 80-81 (Kavanaugh, J., concurring) (quoting Heller, 554 U.S. at 626-27, 636).  Finally, Justice Barrett cautioned against "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights," to avoid "giving post enactment history more weight than it can rightly bear."  Id. at 83 (Barrett, J., concurring).

Our court of appeals recently interpreted and applied Bruen in Range v. Attorney General of the United States, 69 F.4th 96 (3d Cir. 2023) (en banc).  Bryan Range was precluded from possessing a firearm due to a criminal conviction.  See Range, 69 F.4th at 98 (citing 18 U.S.C. § 922(g)(1)).  Federal law generally prohibits "felons"—that is, individuals convicted of a crime punishable by more than one year's imprisonment—from possessing a firearm.  See 18 U.S.C. § 922(g)(1).  The prohibition extends to individuals convicted of state offenses classified as misdemeanors punishable by more than two years' imprisonment.  See id. § 921(a)(20)(B).  Range had pled guilty in 1995 to one count of making a false statement to obtain food stamp benefits, a misdemeanor punishable by a maximum of five years' imprisonment under Pennsylvania law.  See Range, 69 F.4th at 98. Range challenged Section 922(g)(1)'s constitutionality.  The district court granted summary judgment to the government; while Range's appeal was pending, the Supreme Court decided Bruen.  Interpreting Bruen, a Third Circuit panel initially affirmed the district court's disposition, but our court of appeals granted rehearing en banc. See Range v. Att'y Gen. of the U.S., 53 F.4th 262, 266 (3d Cir. 2022) (per

*curiam*), <u>vacated</u>, 56 F.4th 992 (3d Cir. 2023) (Chagares, C.J., mem.), <u>vacated *sub*</u>

<u>*nom.*</u> <u>Garland v. Range</u>, No. 23-374, ___ S. Ct. ___, 2024 WL 3259661 (July 2, 2024).

The *en banc* court rebuffed the government's contention that the mere fact of Range's conviction empowered it to deprive him of the right to keep and bear arms. Invoking <u>Heller</u>, the government argued that Range's conviction removed him from the category of "law-abiding responsible citizen[s]," to which the Second Amendment applies.  <u>See</u> <u>Range</u>, 69 F.4th at 101-03 (quoting <u>Heller</u>, 554 U.S. at 635). The court dismissed <u>Heller</u>'s language as "hopelessly vague" *dicta*.  <u>See</u> <u>id.</u>  It then systematically dismantled the government's efforts to identify historical analogues.[16]  Federal law has prohibited some criminals from possessing firearms since the adoption of the Federal Firearms Act of 1938, but the ban was initially limited to those convicted of certain *violent* crimes until Congress expanded its reach in 1961.  <u>See</u> <u>id.</u> at 103-04 (citing Pub. L. No. 75-785 §§ 1(6), 2(f), 52 Stat. 1250, 1250-51 (1938); Pub. L. No. 87-342, 75 Stat. 757 (1961)).  Thus, the court concluded that the federal ban was not "longstanding."  <u>See</u> <u>id.</u> at 103-05.

The <u>Range</u> court characterized lifetime disarmament as a "*particular* (and distinct)" consequence that found no root in history or tradition.  <u>See</u> <u>id.</u> at 105 (emphasis in original).  Although some Founding-era laws required the perpetrators

---

[16] Our court of appeals noted that history disquietingly reflects the use of status-based restrictions to disarm certain groups, notably Catholics, Native Americans, African Americans, and others deemed insufficiently loyal to the American cause.  <u>See</u> <u>Range</u>, 69 F.4th at 105.  But the court dismissed any attempt to liken those status bans to Range as "far too broad[]" an analogy, to say nothing of the obvious invalidity of such status-based restrictions under present-day constitutional standards.  <u>See</u> <u>id.</u> at 104-05 (quoting <u>Bruen</u>, 597 U.S. at 31).

of firearms-related offenses to forfeit weapons used in the offenses, those laws "often" did not "affect[] the perpetrator's right to keep and bear arms generally." Id. (citations omitted).  Moreover, Range's offense conduct did not even involve a firearm.  See id.  The majority also credited evidence unearthed by the dissent showing that, historically, "a felon could 'repurchase arms' after completing his sentence and reintegrating into society."  See id. (quoting Range, 69 F.4th at 127-28 (Krause, J., dissenting)).  After dismissing the government's proffered analogues at every turn, the *en banc* court found Section 922(g)(1) to be unconstitutional as applied to Range.  Id. at 106.

Most recently, in United States v. Rahimi, 602 U.S. ___, 144 S. Ct. 1889 (2024), the Supreme Court endeavored to correct how "some courts have misunderstood" the Bruen standard.  See Rahimi, 144 S. Ct. at 1897.[17]  Zackey Rahimi challenged a

---

[17] Lower court misapprehension is, in a word, understandable given the Justices' dissonant constructions of Bruen.  Bruen's principal author penned a lengthy dissent in Rahimi explicitly rejecting the majority's application of Bruen.  See Rahimi, 144 S. Ct. at 1944 (Thomas, J., dissenting) ("The question before us is whether a single historical law has both a comparable burden and justification . . . not whether several laws can be cobbled together to qualify.").  Various and discordant assessments offered by the several concurrences further obfuscate proper analysis of gun regulations.  See id. at 1904 (Sotomayor, J., concurring) (opining that a "shared principle is sufficient"); id. at 1910 (Gorsuch, J., concurring) (claiming adherence to "exactly the path [the Court] described in Bruen"); id. at 1913-20 (Kavanaugh, J., concurring) (discussing weight of pre-ratification history, post-ratification history, and precedent); id. at 1925 (Barrett, J., concurring) (cautioning against flawed assumption that "founding-era legislatures maximally exercised their power to regulate"); id. at 1928-29 (Jackson, J., concurring) (describing level of generality problems).

Minds differ, it appears, regarding how courts should "differentiate between 'general societal problem[s]' that have 'persisted since the 18th century,'" and "modern regulations that were unimaginable at the founding," see Bruen 597 U.S. at 27, or between historical "analogues" as distinct from historical "twins," let alone

different provision of Section 922(g), one that prohibited him from possessing a firearm because he was subject to a domestic violence restraining order under Texas law.  See id. at 1894-95; see also 18 U.S.C. § 922(g)(8).  The United States Court of Appeals for the Fifth Circuit credited Rahimi's argument and concluded that the statute did not comport with historical firearm regulations.  See United States v. Rahimi, 61 F.4th 443, 460-61 (5th Cir. 2023).  The Supreme Court reversed by a vote of 8 to 1.  The Court explained that "[s]ince the founding," states have promulgated laws to restrain people "who threaten physical harm to others from misusing firearms."  See Rahimi, 144 S. Ct. at 1896.  Surety laws, for example, were used prophylactically to coerce individuals for whom there was "a probable ground to suspect of future misbehaviour" to refrain from engaging in antisocial conduct with the threat of financial loss or jailtime.  See id. at 1899-1900 (quoting 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 251 (10th ed. 1787)).  By contrast, affray or "going armed" laws provided a *post hoc* mechanism for

---

"cousin[s]," see United States v. Daniels, 77 F.4th 337, 359 (5th Cir. 2023) (Higginson, J., concurring) (quoting Bruen, 597 U.S. at 26, 30); Rahimi, 144 S. Ct. at 1925 (Barrett, J., concurring).  Indeed, many questions remain in the wake of Bruen and Rahimi.  See, e.g., Rahimi, 144 S. Ct. at 1898 n.1 (declining to resolve scholarly debate over relevance of public understanding of right's scope when Fourteenth Amendment was ratified in 1868) (citing Bruen, 597 U.S. at 37-38); id. at 1901, 1903 (sidestepping "suggest[ion]" that Second Amendment precludes categorical prohibitions, but declaring that classifications cannot be justified by vague notions of "responsible[ness]"); id. at 1902 (limiting discussion to "temporary" nature of disarmament); id. at 1902-1903 (holding that Rahimi's challenge fails both facially and as applied, but providing no guidance on reviewing as-applied challenges when facial challenges fail).  Suffice it to say, the jurist struggling to arrive at a workable standard in light of these lingering uncertainties will, at the very least, find themselves in good company.  See id. at 1927 n.1 (Jackson, J., concurring) (collecting lower court pleas for clarification).

"punishing those who had menaced others with firearms." See id. (citing, *inter alia*, T. BARLOW, THE JUSTICE OF THE PEACE: A TREATISE 11 (1745); State v. Huntly, 25 N.C. 418, 421-22 (1843) (*per curiam*)).  Together, these types of statutes established a tradition of restricting an individual's right to bear arms when he was determined to be a threat to others.  See id. at 1901.

The Court in Rahimi highlighted two ways in which surety laws were key to establishing a tradition of regulation for purposes of Section 922(g)(8).  See id. at 1901-03 (citing Bruen, 597 U.S. at 55-60).  First, like surety bonds, the federal prohibition only temporarily burdens Second Amendment rights, specifically during the period "of limited duration" that an individual is subject to a domestic violence restraining order.  See id.  New York's disarmament provision in Bruen, on the other hand, was indefinite.  See Bruen, 597 U.S. at 13.  Second, Rahimi's dispossession resulted from a judicial determination that he posed a credible threat to the physical safety of another person.  See Rahimi, 144 S. Ct. at 1902.  This individualized factfinding process comports with analogous Founding-era restrictions.  See id. (citations omitted).  The Court noted that Section 922(g)(8) was akin to a surety law insofar as it neither restricts the public's use of firearms generally nor distorts Second Amendment principles by effectively enacting a presumption against exercising those rights.  See id. (citing Bruen, 597 U.S. at 56).

Separately, the Court engaged in a brief comparison between "going armed" laws and Section 922(g)(8).  "Going armed" laws threatened imprisonment of individuals who rode around "with dangerous or unusual weapons, to terrify the good people of the land."  See id. at 1901 (quoting 4 W. BLACKSTONE,

COMMENTARIES at 149) (cleaned up).  By comparison, the Court reasoned that

"temporary disarmament" for individuals who were found to be a physical threat to

others pursuant to Section 922(g)(8) was a permissible, "lesser restriction" on the

continuum of firearm regulations.  See id. at 1902.  Lastly, as in Heller, the Rahimi

Court was careful not to suggest that the Constitution proscribes laws banning

firearm possession on a categorical basis if a legislature determines that certain

classes of people "present a special danger of misuse."  See id. at 1901-02 (citing

Heller, 554 U.S. at 626).

>   **C.    Commissioner Paris is entitled to summary judgment with respect
>            to Section 6106 insofar as it prohibits concealed carry without a
>            license.**

Section 6106 of the UFA prohibits individuals without a license from

"carry[ing] a firearm concealed on or about [their] person, except in [their] place of

abode or fixed place of business."  18 PA. CONS. STAT. § 6106(a)(1).  We find that

plaintiffs' desired conduct—carrying loaded, operable firearms on their person,

"whether concealed or openly," in public for lawful purposes including self-defense,

(see Doc. 1 ¶¶ 49, 65, 80; Doc. 39-6 ¶¶ 28, 39, 50)—plainly is covered by the Second

Amendment.

We reject Commissioner Paris's suggestion that any challenge to a regulation

on concealed carry fails at Bruen's threshold inquiry.  (See Doc. 43 at 21).  The

Bruen Court squarely held that "th[e] definition of 'bear' naturally encompasses

public carry."  Bruen, 597 U.S. at 32.  The Court acknowledged the historical

"consensus" that states could constitutionally eliminate concealed carry if they "did

not similarly prohibit *open* carry." Id. at 53 (emphasis in original).[18]  To be clear, the protected conduct at issue is *public* carry.  The constitutionality of a restriction upon concealed carry, in other words the *manner of public carry*, depends upon whether it comports with history and tradition when viewed in the context of its statutory framework.  See id. at 17.  Applying Bruen, we therefore proceed to the question of whether Pennsylvania's prohibition on concealed carry without a license comports with America's history and tradition of firearm regulations.

The regulatory framework *sub judice* is fundamentally different from that in Bruen.  Under New York statutory provisions, the only lawful way to carry a handgun in public was to obtain a concealed carry license.  See N.Y. Penal Law § 400.00(2); Kachalsky, 701 F.3d at 86 ("New York bans carrying handguns openly."), abrogated by Bruen, 597 U.S. at 17-19.  The Commonwealth of Pennsylvania, by contrast, generally permits unlicensed open carry as a matter of course.  See 18 PA. CONS. STAT. § 6109(a); id. § 6106(a).[19]  Plaintiffs' inability to carry

---

[18] See also Bruen, 597 U.S. at 126 (Breyer, J., dissenting) ("[T]he Court does not say whether the result in this case would be different if New York allowed open carriage by law-abiding citizens as a matter of course.").

[19] Philadelphia is the exception to the general rule.  See 18 PA. CONS. STAT. § 6108 (forbidding unlicensed carry "upon the public streets or upon any public property in a city of the first class" absent an exception under Section 6106(b)); Spahn, 977 A.2d at 1143 ("Philadelphia presently is the only city of the first class in Pennsylvania.").  We recognize that an individual who is traveling to Philadelphia but cannot obtain a firearms license pursuant to Section 6109(e)(1)(viii), may have a viable as-applied challenge.  See Mazo, 54 F.4th at 134 n.7 (citing Marcavage, 609 F.3d at 273).  Because we dismissed plaintiffs' claim regarding Section 6108, see *supra* Part III.A, we will adhere to the principles of judicial restraint and constitutional avoidance.  See Kajmowicz v. Whitaker, 42 F.4th 138, 153-54 (3d Cir. 2022) ("These principles counsel courts to avoid deciding issues, especially constitutional ones, when they need not do so in order to resolve cases.") (citing

concealed firearms without risking prosecution does not *ipso facto* foreclose their ability to exercise core Second Amendment rights.  Cf. Bruen, 597 U.S. at 53 (identifying historical consensus that states cannot "ban public carry *altogether*") (emphasis added); Rahimi, 144 S. Ct. at 1902 (discussing Bruen).  Rather, Section 6106 constitutes a regulation of "the *manner* of public carry," a practice the Supreme Court found dates to antebellum America.  See Bruen, 597 U.S. at 59 (emphasis in original); see also id. (noting such regulations are "subject to" a "reasonable[ness]" test).

Analogues cited in Bruen and Heller confirm that this part of Section 6106 comports with history and tradition.  Bruen recognized an historical consensus that states allowing open carry could eliminate concealed carry *in toto*.  See id. at 47-49, 53.  Though it was not a proper analogue for New York's scheme, the Bruen Court uncovered a 1686 East Jersey statute prohibiting concealed carry.  See id. at 47-48 (citation omitted).  Heller references 19th-century prohibitions on carrying concealed weapons as examples of lawful limitations of Second Amendment rights.  See Heller, 554 U.S. at 626; see also Chandler, 5 La. Ann. at 489-90 (holding concealed carry ban "interfered with no man's right to carry arms . . . 'in full open view'"); Nunn, 1 Ga. at 243 (upholding concealed carry ban so long as it did not impair the right to bear arms "altogether").  Far from eliminating concealed carry, Section 6106 merely limits that privilege to those individuals who obtain a license

---

Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988)).  Thus, our focus is the facial constitutionality of Section 6106's prohibition on concealed carry without a license.

within the context of a "shall issue" licensing regime.  See Bruen, 597 U.S. at 13 n.1

(citing, *inter alia*, 18 PA. CONS. STAT. § 6109).

The court concludes that the UFA's concealed carry provision addresses a

"societal problem" that has existed since the Founding era, see id. at 26-27, and that

it is "analogous enough" to established history to withstand constitutional scrutiny,

id. at 30.  If a state may ban the practice of concealed carry entirely without

offending the Constitution, it necessarily follows that the Commonwealth's less

restrictive licensing rule withstands Bruen's test.  Cf. Rahimi, 144 S. Ct. at 1902.

Commissioner Paris is entitled to summary judgment on this claim.

**D.    Plaintiffs are entitled to summary judgment with respect to Section 6106 insofar as it prohibits carrying a firearm in a vehicle without a license.**

Section 6106 also prohibits unlicensed individuals from carrying firearms in

their vehicles.  See 18 PA. CONS. STAT. § 6106(a)(1). The vehicle provision applies

equally to those who conceal their weapons and to those who display them openly.

Plaintiffs express a desire and intention to carry firearms while traveling

throughout the Commonwealth in motor vehicles.  (See Doc. 39-1 ¶¶ 14-16 (Suarez

Decl.); Doc. 39-2 ¶¶ 13-15 (Miller Decl.); Doc. 39-3 ¶¶ 13-15 (Binderup Decl.)).

If public carry necessarily extends beyond the home such that an individual

may lawfully bear a firearm in a public place, commonsense dictates that the

Constitution's protections cannot simply evaporate whenever a vehicle is required

to travel between the two.  See Bruen, 597 U.S. at 32 (noting that the "definition of

'bear' naturally encompasses public carry"); id. ("Nothing in the Second

Amendment's text draws a home/public distinction with respect to the right to keep

and bear arms.").[20]  Under <u>Bruen</u> and its progeny, Pennsylvanians must be permitted to freely transport firearms for their constitutional rights to have potency. Just as confining the right to bear arms to the home would "nullify half of the Second Amendment's operative protections," <u>see</u> <u>id.</u>, the court cannot countenance an interpretation whereby those protections extend only as far as an individual can travel by foot.  We therefore conclude that the conveyance of firearms in motor vehicles is conduct protected by the Second Amendment.

Applying <u>Bruen</u> and <u>Rahimi</u>, we must now examine whether the vehicle provision of Section 6106 comports with the nation's history and tradition of firearm regulation.  Unfortunately, Commissioner Paris has submitted nothing of evidentiary value in support of his position.  The <u>Bruen</u> Court cautioned that lower courts should "follow the principle of party presentation," and that we are "entitled to decide a case based on the historical record compiled by the parties."  <u>Id.</u> at 25 n.6 (quoting <u>United States v. Sineneng-Smith</u>, 590 U.S. 371, 375 (2020)).  Judges "are not obliged to sift the historical materials for evidence" to uphold a regulation; that burden rests with the government.  <u>Id.</u> at 60.

Commissioner Paris has failed to demonstrate that Section 6106's vehicle provision is consistent with historically analogous firearm regulations.  He cites no primary sources and just two scholarly articles: one in support of his argument regarding Section 6107, and the other in support of his argument regarding

---

[20] <u>See also</u> <u>Muscarello v. United States</u>, 524 U.S. 125, 127-39 (1998) (tracing etymology of the word "carries" from Latin and Old French and concluding it covers conveyance by vehicle in context of federal firearm law).

Section 6106's concealed carry provision.[21]  Neither source addresses laws

governing the transportation of firearms, let alone supports a blanket prohibition

on possessing them in conveyances of any kind.  Citing case law abrogated by

Bruen, the Commissioner also tenuously suggests that prohibiting carry in a vehicle

is akin to prohibiting concealed carry.  (See Doc. 43 at 22 (citing United States

v. Masciandro, 638 F.3d 458, 473-74 (4th Cir. 2011)).  We agree to a certain extent.

Firearms carried in vehicles are frequently concealed from public view.  On the

surface, a vehicle carry prohibition is a "manner of carry" regulation.  See Bruen,

597 U.S. at 17.  That said, the Commissioner has failed to present any basis in

history or tradition to uphold comprehensive prohibitions on the transportation of

firearms in vehicles.  Vehicle transport prohibitions, like concealed carry

prohibitions, must undergo standard Bruen scrutiny.[22]

---

[21] (See Doc. 48 at 6 (citing Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. REV. 1443, 1516 (2009)); Doc. 44 at 15 and Doc. 48 at 12 (both citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 234 n.111 (2018))).

[22] We cannot conclude on the record before us that concealed carry provisions are "relevantly similar" or "analogous enough" to the vehicle provision to withstand plaintiffs' challenge.  See Bruen, 597 U.S. at 28-30.  As one court noted, many 19th-century prohibitions on concealed carry specifically exempted individuals transporting their firearms while traveling or on a journey.  See Koons v. Platkin, 673 F. Supp. 3d 515, 655-56 (D.N.J. 2023) (collecting examples), appeal filed No. 23-2043 (3d Cir. May 17, 2023).  Furthermore, as plaintiffs correctly observe, Section 6106's vehicle provision applies to all types of conveyances, beyond simply those vehicles in which firearms presumptively would be concealed from public view.  (See Doc. 40 at 8 n.8 (quoting 18 PA. CONS. STAT. § 501 (defining vehicle as "conveyance of any kind, whether or not motorized . . . designed to transport people or property"))).  Perhaps most critically, we are reminded that "individual self-defense is the central component of the Second Amendment right."  Bruen, 597 U.S. at 29 (quoting McDonald, 561 U.S. at 767 (quoting Heller, 554 U.S. at 599)).

We could end our analysis at this juncture.  However, for the sake of completeness in this matter of first impression, the court conducted its own search for historical exemplars.  Cf. Bruen, 597 at 36.  What we found falls short of rescuing Section 6106's vehicle provision from its fate under Bruen.

The English Parliament "prohibited riding on a highway with a loaded gun or crossbow" in the 16th century.  See Kopel & Greentree, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. at 219 (citing 33 Henry VIII ch. 6 (1541)).  But this analogue is too far removed from the Bruen inquiry, in both time and place.  It was enacted centuries before the Founding and on the other side of the Atlantic, undermining its probative value.  See Rahimi, 144 S. Ct. at 1914 (Kavanaugh, J., concurring) (noting that "[t]he Framers drafted and approved many provisions of the Constitution precisely to depart from rather than adhere to certain pre-ratification laws, practices, or understandings").  The court also uncovered a few restrictions on traveling with a firearm that applied in discrete political subdivisions, such as counties and cities, including similar ordinances adopted in some territories before their admission to the Union.[23]  However, these local

---

Concealed carry prohibitions do not geographically constrain the right of self-defense to the same degree that a vehicle prohibition does.  Absent a more developed comparison between the "how and why" of historical concealed carry regulations and the "how and why" of the vehicle provision, we decline the Commissioner's invitation to construe the former as a "regulatory blank check." See id. at 29-30 ("[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue'") (citation omitted).

[23] See Eric J. Mogilnicki & Alexander Schultz, *The Incomplete Record in* New York State Rifle & Pistol Association v. City of New York, 73 SMU L. REV. FORUM 1, 4-6 (2020) (discussing late-19th-century regulations in, *inter alia*, Nashville, Dallas, Los Angeles, and Shelby County, Tennessee) (citations omitted); see id. (discussing

regulations—which post-date ratification of the Second Amendment[24]—are not analogous to Section 6106's blanket, statewide prohibition.  Moreover, we are mindful of <u>Bruen's</u> caution to avoid relying upon laws passed in "not-yet mature jurisdictions on the way to statehood."  <u>Bruen</u>, 597 U.S. at 69.

What remains from the court's survey, three state enactments dating to the late-19th century, does not yield viable historical analogues.  In 1871, Texas restricted the transportation of some firearms by forbidding "any person . . . [from] carrying on or about his person, saddle, or in his saddle bags, any pistol," though the statute included an exception for, *inter alia*, "persons traveling" to and from Texas jurisdictions and did not apply to long guns.  <u>See</u> Moglinicki & Schultz, *The Incomplete Record*, 73 SMU L. Rev. Forum at 4 & n.19 (quoting An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25).  In 1881, Arkansas made it a crime to "wear or carry in any manner whatever . . . any pistol of any kind."  <u>Id.</u> at 6 (quoting Act of Apr. 1, 1881, ch. XLV, § 1907, 1884 Ark. Acts 490, 490).  That same year, Kansas instructed city councils to "prohibit and punish the carrying of firearms . . . concealed or otherwise."  <u>Id.</u> at 7 (quoting An Act to Incorporate and Regulate Cities of the First

---

the Territory of Arizona's prohibition on carrying "on or about his person, saddle, or in his saddlebags, any pistol") (citation omitted).

[24] In <u>Rahimi,</u> the Court declined to resolve the debate over whether 1791 or 1868 is the proper temporal touchstone for understanding the right at issue.  <u>See</u> <u>Rahimi</u>, 144 S. Ct. at 1898 n.1; <u>Bruen</u>, 597 U.S. at 37-38.  Our court of appeals, however, has stated unambiguously that "the Second Amendment should be understood according to its public meaning in 1791."  <u>Lara</u>, 91 F.4th at 134; <u>see</u> <u>id.</u> (setting aside "catalogue of statutes . . . enacted at least 50 years after the ratification of the Second Amendment").

Class, and to Repeal All Prior Acts Relating Thereto, ch. 18, art. 3, § 23, 1881 Kan. Sess. Laws 146, 146).  Both the Arkansas law and the Kansas law are far broader in scope than Section 6106's vehicle provision, and we do not consider them to be proper analogues.  Moreover, Kansas amended its law in 1901 to clarify that the statutory language simply authorized, rather than required, municipalities to enact prohibitions on firearms.  Id. at 7 n.47 (citing State v. Bolin, 436 P.2d 978, 979 (Kan. 1968)).  And finally, the Texas regulation does not constitute the sort of "open, *widespread*, and unchallenged" government practice that should guide our interpretation of the Second Amendment.  Bruen, 597 U.S. at 36 (quoting NLRB v. Noel Canning, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)) (emphasis added); see also *supra* note 24.

Pursuant to the UFA, Pennsylvanians may carry a concealed firearm in a vehicle if they obtain a license under Section 6109.  But neither the parties' advocacy nor the court's independent analysis has provided us with an historical analogue that justifies limiting that privilege to licensees and burdening the Second Amendment rights of non-licensees.  Accordingly, plaintiffs are entitled to declaratory relief in this respect, and the court will grant their motion for summary judgment as to Section 6106's vehicle provision.  Because Commissioner Paris has presented "no set of circumstances . . . under which the [statute] would be valid," Salerno, 481 U.S. at 745; see Rahimi, 144 S. Ct. at 1898 & n.2 (citing Salerno and resolving facial challenge under Bruen), we conclude that the vehicle provision is facially unconstitutional.

**E.     Plaintiffs are entitled to summary judgment with respect to Section 6107.**

Commissioner Paris's defense of Section 6107 focuses almost exclusively upon the issue of mootness and does not address the underlying merits of plaintiffs' challenge.  (See Doc. 43 at 29).  As previously stated, this defense is unavailing.  See *supra*, Part II.B; Lara, 91 F.4th at 138.  The Bruen Court unambiguously assigned the burden of demonstrating that a given regulation is consistent with history and tradition to the governmental actor seeking to uphold that regulation.  See Bruen, 597 U.S. at 38-39, 58 n.25.

On the merits, Commissioner Paris cites one scholarly article which itself cites a treatise for the notion that, at common law, "arms carrying was lawful for individuals except 'under circumstances giving just reason to fear that he purposes to make an unlawful use of them.'"  (See Doc. 48 at 12 (citing Kopel & Greenlee, 13 CHARLESTON L. REV. at 234 n.111)).  The Commissioner points to Bruen's recognition that the right to bear arms did not extend to "deadly weapons [carried] in a manner likely to terrorize others."  (See id. (quoting Bruen, 597 U.S. at 59)).  This argument is undeveloped with respect to the Bruen "how" and "why" framework, see Bruen, 597 U.S. at 29, unsupported by primary sources or specific regulations, and of questionable relevance in that it appears to contemplate only open carry.[25]  In sum, it is woefully insufficient to carry the government's burden.  See id. at 24-25.

---

[25] Section 6107 applies to all carry, both open and concealed.  See 18 PA. CONS. STAT. § 6107.

Section 6107 plainly burdens the core Second Amendment right of self-defense in public.  Commissioner Paris has failed to provide the court with any record basis upon which we could facially uphold the provision.  Thus, plaintiffs are entitled to summary judgment insofar as they challenge the constitutionality of the ban on unlicensed carry during states of emergency.

### F.   Commissioner Paris is entitled to summary judgment with respect to Section 6109(e)(1)(viii).

In the context of Pennsylvania's licensing scheme writ large, Section 6109(e)(1)(viii) provides that "[a] license shall not be issued to . . . [a]n individual who is charged with or has been convicted of a crime punishable by imprisonment for a term exceeding one year, except as provided in [S]ection 6123."  See 18 PA. CONS. STAT. § 6109(e)(1)(viii).  Plaintiffs do not contest Pennsylvania's authority to regulate firearms generally by requiring individuals to obtain a license to carry in certain circumstances.  They challenge the facial constitutionality of the disqualification provision in Section 6109(e)(1)(viii).  (See Doc. 46 at 1).

Plaintiffs' initial parry against disqualification is to cite their respective declarations from state and federal courts, which they invite us to interpret broadly, as having removed any prohibition from their ability to exercise Second Amendment rights.  See supra note 4.  We decline this invitation because plaintiffs' cited authorities do not address the specific statutory provision invoked by the PSP

in their denial letters, to wit: Section 6109(e)(1)(viii), which constitutes an

independent state law ground for disqualification.[26]

Preliminary to merits review, we dispel several arguments that are

unpersuasive or immaterial to the court's disposition.  First, the parties dispute

whether <u>Bruen</u> effectively sanctioned the constitutionality of Pennsylvania's

licensing scheme.  (<u>Compare</u> Doc. 43 at 16, <u>with</u> Doc. 46 at 43-44).  It did not.  To the

contrary, the <u>Bruen</u> Court assiduously avoided specific review of shall-issue

licensing regimes.  <u>See</u> <u>Bruen</u>, 597 U.S. at 38 n.9.  In addition, both parties rely upon

_____

[26] Suarez and Binderup direct the court's attention to state orders removing any restriction upon their rights pursuant to 18 PA. CONS. STAT. § 6109(e)(1)(iii) (providing for disqualification for individuals "convicted of a crime enumerated in [S]ection 6109").  (<u>See</u> Doc. 1-2 Ex. B (Suarez restoration order), Ex. E (Binderup restoration order)); <u>see also</u> 18 PA. CONS. STAT. § 6105(a)-(b) (providing that an individual convicted of enumerated crimes "shall not obtain a license to possess . . . a firearm"); <u>id.</u> § 6105(d) (providing a mechanism to remove the disability imposed by Section 6105(a) and (b)).  Plaintiffs also cite federal court decisions holding that they are not "prohibited from possessing or acquiring a firearm under the statutes of the United States," as contemplated by 18 PA. CONS. STAT. § 6109(e)(1)(ix); <u>see</u> <u>Miller</u>, 356 F. Supp. 3d at 485; <u>Binderup</u>, 836 F.3d at 356-57.

Based upon initial denials and Commissioner Paris's adherence thereto on administrative appeal, PSP interprets plaintiffs' restoration authorities to preclude disqualifications rendered pursuant to Sections 6109(e)(1)(iii) and 6109(e)(1)(xiv) only, and not disqualifications rendered pursuant to Section 6109(e)(1)(viii).  (<u>See</u> Doc. 43 at 7 ("In this case, the relevant restriction is contained [in Section] 6109(e)(1)(viii).")).  Plaintiffs do not allege any efforts to obtain relief under 18 PA. CONS. STAT. § 6123—the statutory path for vacating disqualification under Section 6109(e)(1)(viii).  Moreover, the record reflects that their federal relief does not come in any of the forms contemplated by Section 6123.  <u>See</u> <u>id.</u> ("A waiver of disability from Federal authorities as provided for in 18 U.S.C. § 925 . . ., a full pardon from the Governor[,] or an overturning of a conviction shall remove any corresponding disability under this subchapter except the disability under Section 6105[.]"); <u>cf.</u> <u>Miller</u>, 356 F. Supp. 3d at 485; <u>Binderup</u>, 836 F.3d at 340; <u>id.</u> at 355 (citing <u>Logan v. United States</u>, 552 U.S. 23, 28 n.1 (2007)).  Accordingly, we agree with Commissioner Paris that plaintiffs' cited authorities do not preclude a finding that they remain disqualified from obtaining a license under Section 6109(e)(1)(viii).

pre-Bruen precedents for essential building blocks of their respective arguments. (Compare Doc. 43 at 17-18, with Doc. 46 at 2-4). We afford no weight to pre-Bruen precedents that have been abrogated or overruled, or that do not purport to resolve the questions before us. See Range, 69 F.4th at 100-01 (recognizing abrogation of Binderup); Binderup, 836 F.3d at 349-50 (overruling Barton). These cases do not assist our inquiry regarding the continuing vitality of Section 6109's disqualification provisions.

We find that Section 6109(e)(1)(viii) unequivocally burdens conduct covered by the plain text of the Second Amendment. Plaintiffs are among those entitled to constitutional protections, regardless of whether their prior convictions were for misdemeanors or felonies. See Range, 69 F.4th at 103. They seek to carry firearms in public for purposes of self-defense, which falls squarely within the scope of the right defined by Heller and Bruen. The Constitution therefore presumptively shields their conduct, so we must examine whether Section 6109(e)(1)(viii) is consistent with history and tradition.

We consider two "central" questions to determine whether a challenged regulation survives constitutional scrutiny: how does the regulation burden an individual's Second Amendment rights and why? See Bruen, 597 U.S. at 29 (citation and emphasis omitted). Virtually every court to consider the latter question has recognized that legislatures from time immemorial have regulated firearm possession by those convicted of certain criminal offenses or those who

pose a danger to themselves or others.[27]  The obvious reason for these longstanding

regulations is public safety.  At the same time, however, courts have found

insufficient historical support for the particular and substantial burden of lifetime

disarmament.[28]

---

[27] See, e.g., Rahimi, 144 S. Ct. at 1898 (upholding disarmament for individuals found to represent a "credible threat to the physical safety" of another); see id. (acknowledging unanimous agreement that provision complied with traditional "why" of firearm regulation); United States v. Cash, No. 22-2713, 2023 WL 6532644, at *2-4 (3d Cir. Oct. 6, 2023) (affirming conviction for possession of firearm in furtherance of drug trafficking); Atkinson v. Garland, 70 F.4th 1018, 1022-24 (7th Cir. 2023) (recognizing historical support for "dangerousness" test); United States v. Jackson, 69 F.4th 495, 502-06 (8th Cir. 2023) (finding criminal prohibitions consistent with traditional "status-based restrictions"); Vincent v. Garland, 80 F.4th 1197, 1200-02 (10th Cir. 2023) (declining to draw distinction between types of felonies); United States v. Prince, __ F. Supp. 3d ___, No. 22-CR-240, 2023 WL 7220127, at *8 (N.D. Ill. Nov. 2, 2023) (Gettleman, J.) (reasoning that "the legislature has the authority to categorically regulate firearm possession by individuals who have demonstrated that they cannot be trusted to obey the law, or pose some other danger to the political community if armed").

We note, however, that the lack of an historical analogue has proven dispositive in recent challenges to federal laws barring undocumented immigrants and individuals convicted of certain felonies from possessing firearms.  See, e.g., United States v. Carbajal-Flores, No. 20-CR-613, ___ F. Supp. 3d. ___, 2024 WL 1013975, at *3-5 (N.D. Ill. Mar. 8, 2024) (granting as-applied relief to undocumented immigrant subject to federal possession ban because circumstances did not "support a finding that he poses a risk to public safety"); United States v. Bullock, 679 F. Supp. 3d. 501, 537 (S.D. Miss. 2023) (reasoning that, even assuming tradition of "disarming either the violent or the dangerous" exists, "the government put forth no effort to ground in history" disarmament based on charges at issue ); id. at 525 ("the conduct the government seeks to punish is . . . (alleged) knowing possession of a firearm," not "brandishing a weapon, firing one, domestic violence, assault, or battery"); United States v. Quailes, 688 F. Supp. 3d 184, 197-201 (M.D. Pa. 2023) (Wilson, J.) (finding no analogue for "criminalization of firearm possession by a person . . . convicted of a felony drug trafficking offense").

[28] See, e.g., Bullock, 679 F. Supp. 3d. at 537; Prince, 2023 WL 7220127, at *8.

In our discussion of Section 6106's concealed carry provision, the <u>Bruen</u> Court's analysis of generally applicable concealed carry prohibitions resolved both inquiries—how the burden operates and why—in favor of upholding the regulation. By contrast, the lack of an historical analogue before the court pertaining to the conveyance of firearms in vehicles doomed Section 6106's vehicle provision with respect to the "why."  Here, however, we must engage with both questions.  Unlike Section 6106's concealed carry provision, Section 6109(e)(1)(viii) is not generally applicable; it pertains only to those individuals who have been charged with or convicted of a crime punishable by a term of imprisonment exceeding one year. <u>Cf.</u> <u>Rahimi</u>, 144 S. Ct. at 1901.  The court must therefore determine: first, whether regulating the ability of individuals with criminal records to possess firearms is representative of traditional practices; and second, whether the burdens imposed by the UFA's disqualification provision are consistent with those of earlier eras. <u>See</u> <u>Bruen</u>, 597 U.S. at 29.

We agree with those courts that have identified a history and tradition of regulating the possession of firearms by individuals convicted of certain crimes, <u>see</u> <u>supra</u> note 27, and we find that Section 6109(e)(1)(viii) is consistent with that history and tradition.  The sources identified in <u>Prince</u> are particularly enlightening on this question.  Reviewing a comprehensive historical record, Judge Gettleman persuasively identifies a "longstanding tradition" of legislatures categorically regulating firearm possession by members of discrete groups on the basis that, if armed, they would pose a risk to the rule of law or the community.  <u>Prince</u>, 2023 WL 7220127, at *8 (identifying as historical bases "mental health, criminal

record, loyalty, or character"). That tradition finds support in England's infamous disarmament of several status-based groups, *e.g.*, nonconformist Protestants and Catholics, enslaved people, Native Americans, and colonial loyalists. The tradition also finds support in Founding-era efforts to disarm individuals who were guilty of criminal conduct or who posed a danger to the public. See id. at *6-8; see also Range, 69 F.4th at 126-28 (Krause, J., dissenting) (collecting historical regulations affecting convicts' right to possess firearms); accord Jackson, 69 F.4th at 502-04.

Following Bruen's command and reassured by the Court's guidance in Rahimi, we conclude that the General Assembly may adopt laws restricting firearm possession of wrongdoers or those who pose a danger to themselves or others without offending the Constitution. See Rahimi, 144 S. Ct. at 1901-02. Section 6109(e)(1)(viii)'s applicability to the individual plaintiffs by virtue of their convictions is sufficiently analogous to the well-established practice of legislatures determining that a particular group poses a "risk to the rule of law" and public safety. See Prince, 2023 WL 7220127, at *8; see also Rahimi, 144 S. Ct. at 1901-02 (leaving open constitutionality of banning possession "by categories of persons thought by a legislature to present a special danger of misuse").[29]

The burden imposed by the disqualification provision is likewise consistent with history and tradition. Section 6109(e)(1)(viii) regulates only a specific *manner*

---

[29] See *supra* notes 15, 27; see also United States v. Dorsey, 105 F.4th 526, 532 n.9 (3d Cir. 2024) (raising distinction between disarmament as applied to Range in light of thirty-year-old conviction for food stamp fraud and disarmament of individuals "with a more serious (or more dangerous, or more violent) conviction") (citing Range, 69 F.4th at 106).

of carry.  It does not preclude plaintiffs from exercising their Second Amendment rights through other lawful means, *e.g.*, by carrying openly—that is, so long as Pennsylvania continues to allow unlicensed open carry.  See Bruen, 597 U.S. at 59 ("States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."); but see *supra* note 19.  Unlike the New York licensing regime at issue in Bruen and the federal statute at issue in Range, the UFA's disqualification provision does not categorically prohibit plaintiffs from possessing firearms.  Cf. Bruen, 597 U.S. at 12; Range, 69 F.4th at 98 (noting that Section 922(g)(1) prohibited Range from "possessing . . . any firearm or ammunition").  We also note that Section 6109(e)(1)(viii)'s applicability does not hinge upon vague descriptors like "responsible."  Cf. Rahimi, 144 S. Ct. at 1903.  The Commonwealth retains ample authority to condition the right to publicly carry a firearm in certain ways upon receipt of a license.  These burdens are much less restrictive than the "eliminat[ion]" of concealed carry, which the Bruen Court found to be supported by history "so long as [states] left open the option to carry openly."  Id. at 59.  They accordingly do not offend the Second Amendment's guarantee.

The foregoing analogues adequately demonstrate that the UFA's disqualification provision is consistent with the nation's history and tradition of firearm regulation, and thus satisfies Bruen's test.  Commissioner Paris is entitled to summary judgment as a matter of law with respect to Section 6109(e)(1)(viii

**V.**     <u>**Conclusion**</u>

We will grant Commissioner Paris's motion to dismiss plaintiffs' challenge to Section 6108 of the Uniform Firearms Act, and his motion for summary judgment regarding Section 6106's concealed-carry provision and Section 6109's disqualification provision.  We will grant plaintiffs' motion for summary judgment regarding Section 6106's vehicle provision and Section 6107.  An appropriate order shall issue.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     July 24, 2024