# UNPUBLISHED CASES

2010 WL 817519
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

ARLINGTON INDUSTRIES, INC., Plaintiff
v.
BRIDGEPORT FITTINGS, INC., Defendent.
Bridgeport Fittings, Inc., Consolidated Plaintiff
v.
Arlington Industries, Inc., Consolidated Defendant.

Civil Action No. 3:01–CV–0485.
|
March 9, 2010.

West KeySummary

1   **Patents** Supersedeas or Stay of Proceedings

Alleged patent infringer was entitled to a stay of injunction pending its appeal because there was a reasonable probability that it would ultimately prevail. Infringer's product was declared non-infringing in a parallel action, and a possibility existed that a final judgment in the parallel matter would preclude the jury verdict in favor of the patent holder. Consistency of judgments weighed heavier in the court's analysis than the public policy in favor of maintenance of a patent holder's property rights. Fed.Rules Civ.Proc.Rule 62, 28 U.S.C.A.

**Attorneys and Law Firms**

Auzville Jackson, Jr., Richmond, VA, Kathryn L. Clune, Crowell & Moring, Mark L. Hogge, Shailendra K. Maheshwari, Greenberg Traurig, LLP, Washington, DC, Lucy Grace D. Noyola, Crowell & Moring LLP, Washington, DC, Robert J. Tribeck, Rhoads & Sinon LLP, Harrisburg, PA, for Plaintiff.

Alan M. Anderson, Matthew R. Palen, Sharna A. Wahlgren, Briggs & Morgan P.A., Minneapolis, MN, Joseph G. Ferguson, De Angelo Brother, Inc., Hazleton, PA, Mark E. Ungerman, Morrison & Foerster, LLP, Washington, DC, Robert N. Gawlas, Jr., Rosenn, Jenkins & Greenwald, LLP, Wilkes Barre, PA, for Defendant.

*MEMORANDUM*

CHRISTOPHER C. CONNER, District Judge.

**\*1** Presently before the court are two post-trial motions concerning the propriety of permanent injunctive relief. The first, filed by Arlington Industries, Incorporated ("Arlington"), seeks a permanent injunction prohibiting Bridgeport Fittings, Incorporated ("Bridgeport") from making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import any of the thirty Whipper–Snap connector models adjudged infringing in the above-captioned matter. (*See* Doc. 641.) The second motion, filed by Bridgeport, requests that the court stay enforcement of the 2006 confession of judgment and injunction (Doc. 270) entered by the court in 2006. (*See* Doc. 649.) For the reasons that follow, both motions will be granted.

**I. *Relevant Background & Procedural History*[1]**

This patent infringement dispute focuses upon the market for electrical conduit fittings, which are typically used to connect electrical wiring and cable in a commercial construction site. In 1992, Arlington developed a new type of fitting whose uniquely-designed tensioning tangs allowed a user to more quickly connect the device to a junction box, thus saving significant time and expense. According to Arlington executive Thomas Gretz ("Gretz"), the quick-connect fitting was an instant market success:

> [T]here was nothing on the market at the time like it that I know of.... [The product was] [a]ccepted very well. It was basically a very phenomenal product. We were getting constant phone calls on the first introductions. We were getting calls from every section of the country.

We were sending samples out. It was just, just well received.

(Doc. 655 at 117–18.) Arlington eventually obtained several patents on this quick-connect fitting, including, *inter alia*, United States Patent 5,266,050 (the " '050 patent").

Arlington practices the invention taught by the '050 patent through its "Snap Tight" product lines and has sold over 550 million units of these products since their invention in 1992. (*Id.* at 120.) Over time, Arlington has attempted to maintain its position as the market's sole manufacturer of quick-connect products; thus, it refuses to license the patents for its quick-connect devices to any competitor. (*See id.* at 223.) Bridgeport is, in fact, the sole company that manufactures an acceptable market alternative to Arlington's Snap–Tite products. (*See id.* at 95–96, 234–36; Doc. 658 at 58–62.) Because there are only 5,000 distributors of quick-connect fittings throughout the United States, competition between the two companies is intense. (*See* Doc. 655 at 88, 94–95.)

Bridgeport first entered the quick-connect fitting market in 1999, when it designed its own connectors called the "Snap– In" and "Speed–Snap" fittings. Arlington eventually sued Bridgeport for manufacturing these products, arguing that the Snap–In and Speed–Snap devices infringed the '050 patent. The litigation proceeded for three years only to settle on the eve of trial. The two competitors then entered into a consent decree on April 7, 2004, wherein Bridgeport (1) stipulated to the '050 patent's validity, (2) admitted that its Snap–In and Speed–Snap fittings infringed the '050 patent, and (3) submitted to entry of a permanent injunction prohibiting it from making, using, selling, offering for sale, or importing the infringing products or "any colorable imitation of such products."[2] (*See* Doc. 270.)

**\*2** Approximately one year later, Bridgeport designed a new quick-connect fitting, which it denominated the "Whipper– Snap." Although Bridgeport claimed that it had designed around the '050 patent and its enjoined devices, counsel for Arlington informally accused the Whipper–Snap connector models of patent infringement in December 2005. Arlington's accusation prompted Bridgeport to seek a declaratory judgment of non-infringement, in response to which Arlington countersued with claims of both infringement and breach of contract. (*See* Doc. 471 at 8.)

On May 31, 2006, Arlington filed a parallel suit for infringement before the Honorable A. Richard Caputo. (*See Bridgeport Fittings, Inc. v. Arlington Indus., Inc.* ("*Arlington II*"), No. 3:06–CV–1105 (M.D.Pa.), Dkt. No. 1.) Arlington therein alleged that two of Bridgeport's Whipper–Snap connector models—catalog numbers 3838ASP and 3838SP (hereinafter the "duplex connectors")—were infringing both the '050 patent and United States Patent Number 6,521,831 (the " '831 patent"). During the course of this lawsuit, Judge Caputo construed claim 8 of the '050 patent in a way that was inconsistent with the undersigned's construction of the same claim in the above-captioned matter. *Arlington II* thereafter proceeded to summary judgment, and Judge Caputo held that the duplex connectors did not infringe the '050 patent as a matter of law. Arlington's decision to prosecute parallel litigation on the same patent claim has complicated the instant suit considerably, a point to which the court will return below.[3]

A jury trial in the above-captioned matter commenced on September 14, 2009. After two weeks of presentation, the jury returned a verdict that twenty-nine of the accused Whipper–Snap products literally infringed claim 8 of the '050 patent, and that one connector, the 802ASP, infringed claim 8 under the doctrine of equivalents. (*See* Doc. 632.) In addition, the jury held that twenty-six connector models were colorable imitations of the enjoined Snap–In and Speed– Snap connectors. The jury awarded infringement damages of $2,772,373 in lost profits and $662,278.54 in reasonable royalties. The jury awarded $2,780,555 in damages for Bridgeport's breach of contract. (*See id.*) The court thereafter entered the jury's verdict as a non-final judgment on October 7, 2009. (*See* Doc. 638.)

Bridgeport has continued to sell and market each of the products adjudged infringing by the jury. (*See* Doc. 698, Ex. 1.) On September 28, 2009, counsel for Arlington delivered a cease and desist letter to Bridgeport executive Delbert Auray, demanding that Bridgeport discontinue sales and marketing for each of the twenty-six connector models found to be colorable imitations of the enjoined devices. (*See id.*, Ex. 2.) Counsel for Bridgeport responded to this correspondence on October 1, 2009, explaining that sales of the products would continue until a final verdict was entered in the instant matter. (*See id.*, Ex. 3.) Such sales ostensibly continue to the present.

**\*3** In its present motion, Arlington seeks a permanent injunction barring Bridgeport "from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import, the Whipper–Snap Products" held infringing herein. (*See* Doc. 641 at 2.) Bridgeport objects to imposition of a permanent injunction, but also urges the court to stay enforcement of an injunction in the event that one is imposed.[4] According to Bridgeport, it is manifestly inequitable to enjoin its continued sale of Whipper–Snap products in light of the judgment of non-infringement issued by Judge Caputo in *Arlington II*. Consequently, Bridgeport requests that the court maintain the status quo pending the Federal Circuit Court of Appeals' review of the instant matter and *Arlington II*. The court will first address Arlington's motion for an injunction before turning to Bridgeport's request for a stay.

## II. *Discussion*

### A. *Motion for a Permanent Injunction*

Section 283 of the Patent Act expressly provides that district courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent." 35 U.S.C. § 283. A patent infringement claimant requesting a permanent injunction must satisfy a four-factor test before acquiring such relief. Specifically, a patentee must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). Courts often consider the irreparable harm and lack of an adequate remedy at law factors together, for the former contemplates the inherent inadequacy of legal relief. See *Acumed LLC v. Stryker Corp.,* 551 F.3d 1323, 1328 (Fed.Cir.2008).

### 1. *Irreparable Harm & Lack of Adequate Remedy at Law*

The grant of a patent, by its very nature, bestows the right to exclude competitors from infringing activity. *See Reebok Int'l v. J. Baker, Inc.,* 32 F.3d 1552, 1557 (Fed.Cir.1994). When infringing activity occurs, however, recompense of money damages may be insufficient to compensate the intrusion, and injunctive relief is often necessary to preserve the legal interests of the parties against future infringement. *See Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1246–47 (Fed.Cir.1989); *Acumed,* 551 F.3d at 1328. Courts examine numerous factors to ascertain the extent of the injury, including the patentee's licensing behavior; evidence of past harm to the patentee's market share, revenues, and brand recognition; and the existence of a two-supplier market composed of the patentee and defendant. *See i4i L.P. v. Microsoft Corp.,* 589 F.3d 1246, 1275 (Fed.Cir.2009) (explaining that "[p]ast harm to a patentee's market share, revenues, and brand recognition is relevant for determining" irreparable injury); *Acumed,* 551 F.3d at 1328–29 (considering whether patentee granted "previous licenses, the identity of past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer"); *Mass Engineered Design, Inc. v. Ergotron, Inc.,* 633 F.Supp.2d 361, 393 (E.D.Tex.2009) (holding that the "fact that there is direct competition [with the infringer] in the marketplace weighs heavily in favor of a finding of irreparable injury"); *TruePosition Inc. v. Andrew Corp.,* 568 F.Supp.2d 500, 531 (D.Del.2008) ("Courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor.").

**\*4** In the instant matter, Arlington and Bridgeport are direct market competitors in a two-supplier market, contending for the business of 5,000 nationwide distributors of quick-connect electrical fittings. Each sale of a Bridgeport connector likely deprives Arlington of market share, revenue, and brand recognition. In light of these market dynamics, the court concludes that Bridgeport's infringement has seriously affected Arlington's market position. *See i4i L.P.,* 589 F.3d at 1276 (finding irreparable harm when defendant caused patentee to lose market share and alter its business strategy); *TruePosition Inc.,* 568 F.Supp.2d at 531–32 (finding irreparable harm when defendant's infringement caused patentee to lose business, goodwill, and harmed its reputation). Furthermore, Arlington strategically declines to license the patent on its quick-connect device and, instead,

exploits its monopoly to exclude potential rivals. According to Gretz, Arlington "would never, ever, ever license [the '050 patent] to Bridgeport." (Doc. 655 at 223.) Arlington's licensing behavior illustrates the insufficiency of money damages for future infringement, for financial remuneration alone will not restore Arlington's position as the exclusive non-infringing supplier of quick-connect products. *See Acumed,* 551 F.3d at 1328–29 (weighing licensing behavior as one factor in irreparable harm analysis). The collective weight of these factors compels a conclusion that Arlington will be harmed in a manner for which financial recompense is inadequate, and thus the first two factors favor injunctive relief.

### 2. *The Balance of Hardships*

The balance of hardships inquiry "assesses the relative effect of granting or denying an injunction on the parties." *i4i L.P.,* 589 F.3d at 1277. A court may consider "the parties' sizes, products, and revenue sources," *id.,* but it should not scrutinize the effect of equitable relief upon an infringer's customers, or examine the infringer's costs and expenses in designing its infringing products, *see Acumed,* 551 F.3d at 1330. In short, "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm, Inc.,* 543 F.3d 683, 704 (Fed.Cir.2008).

The court finds that the balance of hardships tips in Arlington's favor. Arlington is the market leader in quick-connect fittings, its Snap–Tite product line is one of its highest volume products, and it has sold over 550 million units since bringing the product to market. (*See* Doc. 661 at 138; Doc. 665 at 223.) Arlington does not license its product and, as a result of Bridgeport's infringement, it has suffered a decline in market share in what is a two-supplier market. In contrast, the Whipper–Snap products constitute but thirty of Bridgeport's 2,000 different products. (*See* Doc. 660 at 236); *see also i4i L.P.,* 589 F.3d at 1277 (finding balance of hardships in patentee's favor when infringing product "relates to only a small fraction of [defendant's] sizable business"). In light of the Snap–Tite's significant importance to Arlington, and the serious effect of infringement to its market position, the court finds that this factor favors equitable relief.[5]

### 3. *Public Interest*

**\*5** "[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i L.P.,* 589 F.3d at 1277. This factor typically "favors the patentee, given the public's interest in maintaining the integrity of the patent system." *MercExchange, L.L.C. v. eBay, Inc.,* 500 F.Supp.2d 556, 586 (E.D.Va.2007). "Where products do not relate to a significant compelling public interest, such as health or safety, this factor weighs heavily in favor of an injunction." *Mass Engineered Design,* 633 F.Supp.2d at 394. The court finds that the public interest is best served by imposition of a permanent injunction. Quick-connect electrical conduit fittings do not relate to public health or safety concerns and, moreover, even if they did, the public will not be deprived of these products. Arlington has demonstrated that it has the capacity to capture all of Bridgeport's infringing sales and Bridgeport's continued infringement has effected a significant harm. The public's interest in maintenance of the patent system compels issuance of an injunction.

In sum, each of the four factors spelled out by *eBay* favor the imposition of a permanent injunction. The court will therefore enjoin Bridgeport from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import, the Whipper–Snap products adjudged infringing by the jury, or any colorable imitations of these products. The injunction will be effective upon entry of final judgment, and expires on December 4, 2011.[6]

### B. *Motion to Stay Injunction Pending Appeal*

Pursuant to Federal Rule of Civil Procedure 62(c), "the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(c). "The purpose of staying an injunction pending appeal is to preserve the status quo." *Kawecki Berylco Indus., Inc. v. Fansteel, Inc.,* 517 F.Supp. 539, 540 (E.D.Pa.1981). A motion under Rule 62 goes to the discretion of the trial court, which must inquire: "(1) whether

the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies." *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Feesers, Inc. v. Michael Foods, Inc.,* Civ. No. 1:CV–04–0576, 2009 WL 1684650, at *1 (M.D. Pa. June 16, 2009); *Sentry Ins. v. Pearl,* 662 F.Supp. 1171, 1173 (E.D.Pa.1987). The court must consider each of these elements, balance the equities, and discern whether the movant can demonstrate a likelihood of success on the merits on appeal. *See First Amendment Coalition v. Judicial Inquiry & Review Bd.,* 584 F.Supp. 635, 636–37 (E.D.Pa.1984) (quoting *Evans v. Buchanan,* 424 F.Supp. 875, 879–80 (D.Del.1976), *aff'd as modified,* 555 F.2d 373 (3d Cir.1977)); *Kawecki,* 517 F.Supp. at 540; 11 Charles A. Wright et al., Federal Practice and Procedure § 2904, at 502–03 (2d ed.1995).

**\*6** The first factor in the Rule 62 analysis—whether Bridgeport is likely to succeed on the merits on appeal—favors a stay. The court has encountered unusual circumstances with the presentation of Bridgeport's res judicata argument. The undersigned was first made aware of the potential for conflicting judgments on the eve of trial, and explained at the pretrial conference that it was "very concerned about the issue of collateral estoppel, res judicata, claim preclusion, but ... also very concerned about the costs and expenses that have been incurred to date to get this case where it is, and ... it is ready for trial." (Doc. 571 at 60–61.) This concern did not abate throughout the trial and, in the memorandum and order of court (Doc. 773) dated March 2, 2010, the court concluded that issue preclusion applies to the judgment reached in *Arlington II.* (*See id.* at 12–17.) While the court has declined to apply that doctrine in light of the very unique circumstances present in this case, there is no doubt that Bridgeport has a reasonable possibility of success on appeal. *See Combustion Sys. Servs. v. Schuylkill Energy Resources,* 153 F.R.D. 73, 74 (E.D.Pa.1994) (granting stay when plaintiff possessed a "reasonable possibility of success on the merits of its post trial motions or appeals"); *First Amendment Coalition,* 584 F.Supp. at 636–38 (explaining that a stay is appropriate when "there is a reasonable possibility—albeit not a probability—that [the court] was in error").

Arlington contends that "the possibility that the Federal Circuit may overturn this Court's claim construction does not constitute an extraordinary circumstance warranting a stay in this case." (Doc. 738 at 11–12 (citing cases)). This argument misses the point. It is not the inconsistent claim construction in *Arlington II* that weighs in favor of a stay, but the possibility that the *final judgment* in that matter precludes the jury verdict herein. Although the court has worked assiduously to avoid substantive or procedural error, it cannot deny the unique circumstances of parallel litigation and conflicting claim construction. Furthermore, Arlington cannot be heard to complain on this point, for it chose to initiate parallel litigation on the same patent claim. In the usual case, "irrespective of which action or proceeding was first brought, it is the first final judgment rendered in one of the courts which becomes conclusive in the other as *res judicata." Chicago, R.I. & P.R. Co. v. Schendel,* 270 U.S. 611, 616–17, 46 S.Ct. 420, 70 L.Ed. 757 (1926). In this fashion, it is the applicability of issue preclusion to the instant jury verdict, not the mere fact that Judge Caputo construed claim 8 differently, which provides Bridgeport with a reasonable possibility of success on appeal.

The court also concludes that Bridgeport will suffer irreparable injury absent a stay of injunction. According to Bridgeport executive William Manthey, Bridgeport's lost sales alone will amount to approximately $3,300,000.[7] (Doc. 699 ¶ 2.) Moreover, the market for quick-connect electrical fittings features but two suppliers. Should the court enjoin production of Bridgeport's Whipper–Snap connectors, 100% of its sales will flow to Arlington. The resulting loss of customer goodwill and market share may well be irreplaceable. This factor therefore weighs in favor of maintenance of the status quo.

**\*7** The third factor in the Rule 62 analysis examines whether issuance of a stay will substantially injure the nonmovant. As discussed above, Bridgeport's continuing infringement will harm Arlington in a manner for which financial remuneration is inadequate. Thus, there is no question that Arlington will suffer substantial injury by granting a stay of the permanent injunction. As the market leader, however, Arlington is not exposed to any greater injury by a stay than those Bridgeport will suffer without a stay. Moreover, the extent of a nonmovant's injury is but one factor in the Rule

62 analysis. The court finds that the serious question of law posed by the conflicting infringement judgments simply outweighs Arlington's potential injury. What is more, imposition of a stay will place Arlington in a position identical to that which it has occupied since 2006. This is not to minimize Arlington's injury, but to suggest that it can continue to compete successfully in the marketplace until a decision is rendered by the Federal Circuit.

Finally, the court finds that the public interest lies in granting a stay of the permanent injunction. While it is no doubt true that the public interest typically favors maintenance of a patentee's property rights, *see Abbott Labs. v. Andrx Pharms., Inc. .,* 452 F.3d 1331, 1348 (Fed.Cir.2006), consistency of judgments weighs even heavier in the court's analysis, *see Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (explaining that reliance on judicial action requires that courts "minimiz[e] the possibility of inconsistent decisions"). There is a reasonable possibility that Bridgeport will ultimately prevail on its res judicata arguments and, in the event that this occurs, the jury verdict rendered herein shall stand as an inconsistent judgment. Such a result inherently undermines the integrity of the law and compels the court to maintain the status quo pending appellate review.

Upon consideration of the four factors required by Rule 62, the court concludes that it is appropriate to stay the 2006 confession of judgment and injunction, and the permanent injunction described in Part II.A. In order to secure this stay, Bridgeport must post a bond sufficient to safeguard Arlington's rights. *See Fed. R. Civ. P. 65(c)*. Neither party has directly addressed the bond requirement, but the court will do so below.

**C. Supersedeas Bond**

The bond requirement in Rule 62(c) is intended "to preserve the status quo during the pendency of an appeal, [protecting the winning party] from the possibility of loss resulting from the delay in execution." *HCB Contractors v. Rouse & Assocs.,* 168 F.R.D. 508, 512 (E.D.Pa.1995) (alterations in original) (discussing bond requirement in context of Rule 62(d)). "The propriety of any security posted is a discretionary determination made by the court." *Silver v. Mendel,* Civ. A. No. 86–7104, 1992 WL 163285, at *1

(E.D.Pa.July 8, 1992); *see also Cashman Equip. Corp. v. U.S. Fire Ins. Co.,* Civ. A. No. 06–3259, 2008 WL 5000355, at *4 (E.D.Pa. Nov.21, 2008). The court finds that the most appropriate manner in which to secure Arlington's rights pending appellate disposition is to calculate future damages as a result of Bridgeport's infringing activity. This calculation should extend through the expiry of the '050 patent, even if there is a possibility that an appellate disposition precedes this date.

**8** In order to calculate this bond, the court has utilized the analysis provided by Arlington's damages expert, Mark Gallagher ("Gallagher"). According to Gallagher's third supplemental expert report, Arlington's 2008 lost profits damages for both infringement and breach of contract amount to $1,281,292.80.[8] (*See* PX397 .) Arlington was therefore suffering $106,774.40 per month in lost profits damages in 2008. At this monthly rate, Arlington will suffer approximately $2,882,908.80 from the entry of non-final judgment in October 2009 through December 2011.[9] The court finds that a supersedeas bond of 25% of $2,882,909, or $720,727.25, will adequately secure Arlington's rights pending appellate disposition. Thus, Bridgeport shall be required to post a bond in this amount before a stay of injunction becomes effective.

### III. Conclusion

For the foregoing reasons, the court shall grant Arlington's motion for a permanent injunction. From the date that final judgment is entered, Bridgeport shall be enjoined from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import, the Whipper–Snap products adjudged infringing by the jury, or any colorable imitations of these products. The court shall also grant Bridgeport's motion to stay both this injunction and the 2006 confession of judgment and injunction pending disposition by the Federal Circuit Court of Appeals. The stay shall be effective upon posting of a supersedeas bond in the amount of $720,727.25.

An appropriate order follows.

*ORDER*

AND NOW, this 9th day of March, 2010, upon consideration of the motion (Doc. 641) for a permanent injunction, filed by Arlington Industries, Incorporated, and the motion (Doc. 649) to stay enforcement of the 2006 permanent injunction, filed by Bridgeport Fittings, Incorporated, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion (Doc. 641) for a permanent injunction, filed by Arlington Industries, Incorporated, is GRANTED as follows:

  a. Bridgeport Fittings, Incorporated, its officers, agents, attorneys, servants, employees, successors, assigns and all those in active concert or participation with them, who receive actual notice of this injunction by personal service or otherwise, are permanently enjoined from directly or indirectly making, using, selling, offering for sale or importing or causing or inducing others to make, use, sell, offer to sell, or import the WhipperSnap products identified in this action as models 38ASP, GF38SP, SG38ASP, 8400SP, 850SP, 651SP, 802SP, 841SP, GF50SP, 380SP, SG38SP, 846SP, SG38MCIA, SG38SPL, 840SP, 4502SP, 4501SP, 845SPL, BL16ASP, 851ASP, 845SP, 802MCIA, BL16MCIA, 851SP, 845ASP, 8400MCIA, BL16SP, 84690SP, 651SPX, 802ASP (collectively, "Whipper–Snap products"), or any colorable imitation of such Whipper–Snap products during the term of United States Patent Number 5,266,050, which expires on December 4, 2011, or until said patent is declared invalid or unenforceable by a court of competent jurisdiction, from which no further appeal is possible, whichever occurs first.

  **\*9** b. The permanent injunction described herein shall be effective upon entry of final judgment in the above-captioned matter.

2. The motion (Doc. 649) to stay enforcement of the 2006 permanent injunction, filed by Bridgeport Fittings, Incorporated, is CONSTRUED as a motion to stay both the 2006 permanent injunction (Doc. 270) and the injunction described in Paragraph 1(a) of this order, and is GRANTED as follows:

  a. The injunction described by Paragraph 1(a) of this order shall be STAYED pending appellate disposition. Stay of the injunction shall be effective upon Bridgeport Fittings, Incorporated's posting of the supersedeas bond described by Paragraph 3 of this order.

  b. The confession of judgment and injunction (Doc. 270) entered on June 30, 2006 shall be STAYED pending appellate disposition. Stay of the injunction shall be effective upon Bridgeport Fittings, Incorporated's posting of the supersedeas bond described by Paragraph 3 of this order.

3. The stays of injunction described in Paragraph 2 shall not be effective until Bridgeport Fittings, Incorporated posts a bond in the amount of $720,727.25. *See* Fed. R. Civ. P. 65(c).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 817519

## Footnotes

[1]   The parties are familiar with the circumstances of the present dispute and, therefore, the court will relate only information that is pertinent to this memorandum.

[2]   The court entered this confession of judgment as a federal injunction on June 30, 2006. (*See* Doc. 270.)

[3]   For a more detailed explanation of the parallel litigation and the difficulties engendered by this trial strategy, see Dkt. No. 584 and Dkt. No. 773 at 9–20.

[4]   Bridgeport's motion specifically requests that the court stay enforcement of the 2006 confession of judgment and injunction. (*See* Doc. 649.) However, in its opposition to Arlington's motion for a permanent injunction, Bridgeport also requests that, in the event the court grants Arlington a permanent injunction for infringement, that it stay enforcement of the injunction pending appellate review. (*See* Doc. 732 at 13–18.) The grounds underlying both Bridgeport requests are identical, and the court will therefore construe Bridgeport's motion (Doc. 649) to stay enforcement of the 2006 permanent injunction as a motion to stay both that injunction and any injunctive relief which the court may impose as a result of the most recent finding of infringement.

[5]   Bridgeport proffers several arguments based upon the hardship that its customers will incur if sales of the Whipper–Snap are enjoined. (*See* Doc. 732 at 9–11.) However, the hardship to Bridgeport's customers is irrelevant to the court's inquiry. *See Acumed,* 551 F.3d at 1330.

[6]   The ′050 patent was issued on November 30, 1993, (*see* PX01), and expires December 4, 2011, (*see* Doc. 641 at 2; Doc. 732 at 8–9).

[7]   This figure assumes that the appeal process takes eighteen months. (See Doc. 699 ¶ 2.)

[8]   The court has used the calculations for calendar year 2008 because Gallagher's corresponding calculations for 2009 were based on only a portion of the calendar year.

[9]   The court recognizes that the damage amount is approximate, but the purpose here is to secure Arlington's right, and not to make Arlington whole.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

County of Butler v. Governor of Pennsylvania, Not Reported in Fed. Rptr. (2020)

2020 WL 5868393
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

COUNTY OF BUTLER; County of Fayette; County of
Greene; County of Washington; Nancy Gifford; Mike
Gifford, husband and wife doing business as Double
Image Styling Salon; Prima Capelli Inc., a
Pennsylvania Corporation; Mike Kelly; Marci
Mustello; Daryl Metcalfe; Tim Bonner; Steven
Schoeffel; Paul F. Crawford, trading and doing
business as Marigold Farm; Cathy Hoskins, trading
and doing business as Classy Cuts Hair Salon; RW
McDonald & Sons Inc.; Starlight Drive in LLC, a
Pennsylvania Corporation; Skyview Drive in LLC, a
Pennsylvania Limited Liability Company
v.
GOVERNOR OF PENNSYLVANIA; Secretary
Pennsylvania Department of Health, Appellants

No. 20-2936
|
October 1, 2020

(W.D. Pennsylvania No. 2-20-cv-00677)

**Attorneys and Law Firms**

Thomas E. Breth, Esq., Ronald T. Elliott, Esq., Thomas W.
King, III, Esq., Jordan P. Shuber, Esq., Dillon McCandless
King Coulter & Graham, Butler, PA, for County of Butler.

J. Bart Delone, Esq., Sean A. Kirkpatrick, Esq., Karen M.
Romano, Esq., Office of Attorney General of Pennsylvania,
Harrisburg, PA, Daniel B. Mullen, Esq., Office of Attorney
General of Pennsylvania, Pittsburgh, PA, Claudia M. Tesoro,
Esq., Office of Attorney General of Pennsylvania,
Philadelphia, PA, for Appellants.
Present: SMITH, Chief Judge, CHAGARES and
SHWARTZ, Circuit Judges.

**Opinion**

D. Brooks Smith, Chief Judge

**\*1** 1. Motion filed by Appellants Governor of
Pennsylvania and Secretary Pennsylvania Department
of Health for Stay of the District Court's Order Pending
Appeal.

2. Response filed by Appellees County of Butler, *et al.* to
Motion for Stay of the District Court's Order Pending
Appeal.

3. Unopposed Motion filed by Appellants Governor of
Pennsylvania and Secretary Pennsylvania Department
of Health to accept Motion for Stay of the District
Court's Order Pending Appeal that is in excess of word
limit.

4. Motion filed by the Leaders of the Pennsylvania House
of Representatives for leave to file a Brief as Amici
Curiae in Support of Appellees' Opposition to Motion
for Stay of the District Court's Order Pending Appeal.

5. Motion filed by Eagle Forum Education & Legal
Defense Fund for leave to file Brief as Amicus Curiae
in Support of Appellees' Opposition to Motion for Stay
of the District Court's Order Pending Appeal.

ORDER

The motion by Appellants for stay of the District Court's
order pending appeal is GRANTED. The unopposed motion
by Appellants to file a stay motion in excess of the word
limit is GRANTED. The motions by Leaders of the
Pennsylvania House of Representatives and Eagle Forum
Education & Legal Defense Fund for leave to file briefs as
Amici Curiae in support of Appellees' opposition to the
motion for a stay are GRANTED.

**All Citations**

Not Reported in Fed. Rptr., 2020 WL 5868393

County of Butler v. Governor of Pennsylvania, Not Reported in Fed. Rptr. (2020)

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

108 F.4th 194
United States Court of Appeals, Third Circuit.

DELAWARE STATE SPORTSMEN'S ASSOCIATION,
INC.; Bridgeville Rifle & Pistol Club, Ltd.; Delaware
Rifle & Pistol Club; Delaware Association of Federal
Firearms Licensees; Madonna M. Nedza; Cecil Curtis
Clements; James E. Hosfelt, Jr.; Bruce C. Smith;
Vickie Lynn Prickett; Frank M. Nedza, Appellants in
No. 23-1641
v.
DELAWARE DEPARTMENT OF SAFETY &
HOMELAND SECURITY; Cabinet Secretary,
Delaware Department of Safety & Homeland
Security; Superintendent, Delaware State Police
Gabriel Gray; William Taylor; Djjams LLC; Firearms
Policy Coalition, Inc.; Second Amendment
Foundation, Appellants in No. 23-1633
v.
Attorney General of Delaware
Christopher Graham; Owen Stevens; Firearms Policy
Coalition, Inc.; Second Amendment Foundation,
Appellants in No. 23-1634
v.
Attorney General of Delaware

No. 23-1633, No. 23-1634, No. 23-1641
|
Argued: March 11, 2024
|
(Filed: July 15, 2024)

**Synopsis**

**Background:** Gun rights advocacy organizations and
individuals brought actions against Delaware Department of
Homeland Security alleging that Delaware law prohibiting
sale and limiting possession of assault weapons and large-
capacity magazines (LCMs) violated Second Amendment.
After cases were consolidated, the United States District
Court for the District of Delaware, Richard G. Andrews, J.,
664 F.Supp.3d 584, denied plaintiffs' motion for preliminary
injunction, and they appealed.

**Holdings:** The Court of Appeals, Bibas, Circuit Judge, held
that:

[1] plaintiffs failed to demonstrate irreparable harm in
absence of preliminary injunction, and

[2] balance of equities and public interest did not favor
issuance of preliminary injunction.

Affirmed.

Roth, Senior Circuit Judge, concurred and filed opinion.

**Procedural Posture(s):** On Appeal; Motion for Preliminary
Injunction.

West Headnotes (21)

[1]  Federal Courts ⚬— Abuse of discretion in general
     Federal Courts ⚬— Questions of Law in General
     Federal Courts ⚬— "Clearly erroneous" standard
     of review in general

     Court of Appeals reviews district court's factual
     findings for clear error, its legal rulings de novo,
     and its ultimate decision for abuse of discretion.

[2]  Federal Courts ⚬— Preliminary injunction;
     temporary restraining order

     Court of Appeals reviews denial of preliminary
     injunction deferentially because that decision is
     almost always based on abbreviated set of facts,
     requiring delicate balancing that is district
     judge's responsibility.

[3]  Injunction ⚬— Extraordinary or unusual nature of
     remedy

     Preliminary injunctions are not automatic; rather,
     tradition and precedent have long reserved them
     for extraordinary situations.

[4]  Equity ⚬— Grounds of jurisdiction in general

     District courts' authority to provide equitable

relief must comply with longstanding principles of equity that predate country's founding.

[5]  **Injunction**⚷Grounds in general; multiple factors

Court should not grant injunction unless plaintiff's right is clear, his impending injury is great, and only injunction can avert that injury.

[6]  **Injunction**⚷Extraordinary or unusual nature of remedy
     **Injunction**⚷Factors Considered in General

Preliminary injunction is extraordinary remedy that should be granted only in limited circumstances; unless need for one in particular case outweighs risks, court should not grant one.

[7]  **Injunction**⚷Preservation of status quo

Preliminary injunction's purpose is merely to preserve parties' relative positions until trial on merits can be held.

[8]  **Injunction**⚷Factors Considered in General

Preliminary injunction is proper only in rare case when it is necessary to preserve effectiveness of ordinary adjudicatory process.

[9]  **Injunction**⚷Injury, Hardship, Harm, or Effect

Harm prevention has become valid reason to grant preliminary injunction, but that is not its paramount purpose.

[10] **Injunction**⚷Irreparable injury

Threat of irreparable harm does not automatically trigger preliminary injunction.

1 Case that cites this headnote

[11] **Injunction**⚷Grounds in general; multiple factors

Four canonical guideposts for granting or denying preliminary injunctions are (1) likelihood of success on merits, (2) risk of irreparable injury absent preliminary relief, (3) balance of equities, and (4) public interest; first two factors are the most critical, and if both are

present, court then balances all four factors.

[12] **Injunction**⚷Clear showing or proof

Because preliminary injunction is extraordinary and drastic remedy, movant bears burden of making clear showing.

[13] **Injunction**⚷Extraordinary or unusual nature of remedy
     **Injunction**⚷Likelihood of success on merits

Preliminary injunction is extraordinary remedy never awarded as of right; instead, it is matter of equitable discretion that does not follow from success on merits as matter of course.

1 Case that cites this headnote

[14] **Injunction**⚷Discretionary Nature of Remedy

No test for considering preliminary equitable relief should be so rigid as to diminish, let alone disbar, discretion.

[15] **Injunction**⚷Grounds in general; multiple factors

Though not all four preliminary injunction factors must weigh heavily in every case, any one factor may give district court reason enough to exercise its sound discretion by denying preliminary injunction.

[16] **Equity**⚷Nature and source of jurisdiction

Equity is contextual; it turns on facts, and it supplements remedies at law only when needed.

[17] **Civil Rights**⚷Preliminary Injunction

Constitutional harm is not necessarily synonymous with irreparable harm necessary for issuance of preliminary injunction.

1 Case that cites this headnote

[18] **Civil Rights**⚷Preliminary Injunction

When weighing preliminary injunctions, courts may presume that suppressing speech or worship protected by First Amendment inflicts irreparable injury, but this presumption is exception, not rule. U.S. Const. Amend. 1.

[19]   **Injunction**⚫Weapons and explosives

Gun rights advocacy organizations and individuals failed to demonstrate irreparable harm in absence of preliminary injunction enjoining enforcement of Delaware laws prohibiting sale and limiting possession of assault weapons and large-capacity magazines, despite their contention that law violated their Second Amendment rights; there was no allegation that Delaware tried to enforce disputed laws against them or to seize guns or magazines that they already owned, or that they had time-sensitive need for such guns or magazines. U.S. Const. Amend. 2; 11 Del. Code §§ 1465(2)–(6), 1466(a), 1468(2), 1469(a).

1 Case that cites this headnote
More cases on this issue

[20]   **Injunction**⚫Injunctions Against Enforcement of Laws and Regulations

When ruling on motion to preliminarily enjoin enforcement of democratically enacted state laws, federal court must err on side of respecting state sovereignty.

[21]   **Injunction**⚫Weapons and explosives

Balance of equities and public interest did not favor issuance of preliminary injunction enjoining enforcement of Delaware laws prohibiting sale and limiting possession of assault weapons and large-capacity magazines; laws were enacted by state legislature and signed by its governor, and organization challenging laws delayed for four months in seeking preliminary injunction. 11 Del. Code §§ 1465(2)–(6), 1466(a), 1468(2), 1469(a).

1 Case that cites this headnote
More cases on this issue

\*196 On Appeal from the United States District Court for the District of Delaware (D.C. Nos. 1:22-cv-00951; 1:22-cv-

01500; 1:23-cv-00033), District Judge: Honorable Richard G. Andrews

**Attorneys and Law Firms**

Erin E. Murphy [ARGUED], Clement & Murphy, 706 Duke Street, Alexandria, VA 22314, Francis G.X. Pileggi, Lewis Brisbois Bisgaard & Smith, 500 Delaware Avenue, Suite 700, Wilmington, DE 19801, Counsel for Appellants Delaware State Sportsmen's Association Inc.; Bridgeville Rifle & Pistol Club Ltd.; Delaware Rifle & Pistol Club; Delaware Association of Federal Firearms Licensees; Madonna M. Nedza; Cecil Curtis Clements; James E. Hosfelt, Jr.; Bruce C. Smith; Vickie Lynn Prickett; and Frank M. Nedza

Paul D. Clement, Erin E. Murphy [ARGUED], Mariel A. Brookins, Matthew Rowen, Clement & Murphy, 706 Duke Street, Alexandria, VA 22314, Counsel for Amicus Appellant National Shooting Sports Foundation

William V. Bergstrom, John D. Ohlendorf [ARGUED], Peter A. Patterson, David H. Thompson, Cooper & Kirk, 1523 New Hampshire Avenue, N.W., Washington, DC 20036, Bradley Lehman, Gellert Scali Busenkell & Brown, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801, Counsel for Appellants Gabriel Gray; William Taylor; DJJams LLC; Firearms Policy Coalition, Inc.; Second Amendment Foundation, Inc.; Christopher Graham; and Owen Stevens

Stephen P. Halbrook, 3925 Chain Bridge Road, Suite 403, Fairfax, VA 22030, Counsel for Amicus Appellant Delaware Association of Second Amendment Lawyers II

David B. Kopel, Independence Institute, 727 East 16th Avenue, Denver, CO 80203, Counsel for Amicus Appellants National Association of Chiefs of Police, International Law Enforcement Educators & Trainers Association, Law Enforcement Legal Defense Fund, Randy Barnett, Robert Cottrol, Lee Francis, Nicholas Johnson, Donald Kilmer, George Mocsary, Joseph Muha, Joseph Olson, Michael O'Shea, Glenn Reynolds, and Independence Institute

Anna M. Barvir, Carl D. Michel, Michel & Associates, 180 E. Ocean Boulevard, Suite 200, Long Beach, CA 90802, Counsel for Amicus Appellants Gun Owners of America, Inc.; Second Amendment Law Center; California Rifle & Pistol Association, Inc.; Gun Owners of California, Inc.;

Second Amendment Defense & Education Coalition; Guns
Save Life; Federal Firearms Licensees of Illinois; and Gun
Owners Foundation

Peter M. Torstensen, Jr., Montana Attorney General's Office,
Solicitor General's Office, 215 N. Sanders Street, P.O. Box
201401, Helena, MT 59620, Counsel for Amicus Appellants
Montana, Alabama, Georgia, Idaho, Indiana, Iowa,
Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New
Hampshire, North Dakota, South Carolina, South Dakota,
Utah, Virginia, West Virginia, and Wyoming

Garrett B. Moritz, David E. Ross [ARGUED], Ross
Aronstam & Moritz, 1313 N. Market Street, Suite 1001,
Wilmington, DE 19801, Kenneth L. Wan, Delaware
Attorney General's Office, Delaware Department of Justice,
Carvel Office Building, 820 N. French Street, 6th Floor,
Wilmington, DE 19801, Counsel for Appellees Delaware
Department of Safety & Homeland Security; Cabinet
Secretary, Delaware Department of Safety & Homeland
Security; Superintendent, Delaware State Police; and
Attorney General of Delaware

Jeremy Feigenbaum [ARGUED], Angela Cai, New Jersey
Attorney General's Office, Richard J. Hughes Justice
Complex, 25 Market Street, P.O. Box 112, Trenton, NJ
08625, Counsel for Amicus Appellees New Jersey,
Massachusetts, California, Colorado, Connecticut, District of
Columbia, Hawaii, Illinois, Maine, Maryland, Michigan,
Minnesota, New York, Oregon, Pennsylvania, Rhode Island,
Vermont, and Washington

Janet Carter, Everytown Law, 450 Lexington Avenue, P.O.
Box 4184, New York, NY 10163, Counsel for Amicus
Appellee Everytown for Gun Safety

Scott A. Eisman, Freshfields Bruckhaus & Deringer U.S., 3
World Trade Center, 175 Greenwich Street, 51st Floor, New
York, NY 10007, Counsel for Amicus Appellees Giffords
Law Center to Prevent Gun Violence, Brady Center to
Prevent Gun Violence, and March for our Lives
Before: BIBAS, MONTGOMERY-REEVES, and ROTH,
Circuit Judges

OPINION OF THE COURT

BIBAS, Circuit Judge.

**\*197** A preliminary injunction is not a shortcut to the merits.
Before granting one, a district court must also weigh the
equities, the public interest, and the threat of irreparable
harm. Yet the challengers here urge us to leapfrog these
careful considerations and just resolve the case. They argue
that, if a plaintiff will likely succeed on the merits of a
constitutional claim, a court *must* grant a preliminary
injunction. Not so. This equitable remedy is never automatic:
It always involves a district court's sound discretion. Key to
that discretion is whether an alleged injury jeopardizes the
court's ability to see a case through.

Delaware residents and organizations challenged a pair of
new state gun laws in federal court. Then they moved to
preliminarily enjoin enforcement of those laws. But the
injury they allege does not threaten the court's ability to
decide the case or to give meaningful relief later on. We will
thus affirm the District Court's order denying a preliminary
injunction.

**I. Appellants Challenge Two Delaware Gun Restrictions**

In mid-2022, Delaware passed a package of gun laws. One
law bans having, making, buying, selling, transporting, or
receiving an "assault weapon." Del. Code Ann. tit. 11, §
1466(a). "[A]ssault weapon[s]" include dozens of specific
semiautomatic long guns and pistols, plus certain types of
"copycat weapon[s]." § 1465(2)–(6). Another law bans
having, making, buying, selling, or receiving a magazine that
can hold more than seventeen rounds. §§ 1468(2), 1469(a).
The assault-weapon ban (though not the large-magazine ban)
grandfathers in guns already owned but limits carrying them
publicly. § 1466(c)(3). Neither ban applies to members of the
military or law enforcement. §§ 1466(b)(1), 1469(c)(1)–(4).

Soon after these bans became law, the Delaware State
Sportsmen's Association **\*198** challenged them in federal
court. Four months later, it sought a preliminary injunction
based on the Second and Fourteenth Amendments. The next
day, Gabriel Gray filed a similar suit and soon sought a
preliminary injunction. Two months after that, Christopher
Graham challenged only the large-magazine ban.

After consolidating these three cases, the District Court held a preliminary-injunction hearing. The challengers put on no live witnesses, nor did they offer any evidence that Delaware had tried to enforce these laws or take away their magazines. All they submitted were declarations from three Delaware residents and one Delaware gun dealer who want to buy or sell assault weapons and large magazines. They offered no details about how they would be harmed.

In March 2023, on that limited "evidentiary record," the District Court denied the preliminary injunction. JA 8 & n.2. It found that the challengers were not likely to succeed on the merits because both bans "are consistent with the Nation's historical tradition of firearm regulation." JA 34. It also refused to presume that all Second Amendment harms are irreparable. Rather, because Delaware's laws "regulate[ ] only a subset of semi-automatic weapons," the challengers "retain ample effective alternatives" to defend themselves. JA 35. Because the challengers had not borne their burden of showing a likelihood of success or irreparable harm, the District Court did not reach the other preliminary-injunction factors.

After denying the preliminary injunction, the District Court started preparing for a November 2023 trial. Instead of proceeding to trial, the challengers chose to appeal and put the District Court proceedings on hold. We heard argument in March 2024.

[1] [2] We review the District Court's factual findings for clear error, its legal rulings de novo, and its ultimate decision for abuse of discretion. *Del. Strong Fams. v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015). At this early stage, we review deferentially because the "denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing that is the responsibility of the district judge." *Marxe v. Jackson*, 833 F.2d 1121, 1125 (3d Cir. 1987) (cleaned up).

[3] The challengers focus on the merits. If they are right on those, they argue, they should get an injunction because all constitutional harm is supposedly irreparable and the equities and public interest track the merits. But that is not how equity works. Preliminary injunctions are not automatic. Rather, tradition and precedent have long reserved them for extraordinary situations. We see nothing extraordinary here.

## II. Preliminary Injunctions Are Extraordinary Remedies

### A. Chancery's limits at the Founding still cabin equitable relief

The judicial power extends to cases in equity. U.S. Const. art. III, § 2, cl. 1. During the debates over ratifying the Constitution, Anti-Federalists worried that equitable jurisdiction would give federal judges unchecked discretion. Brutus, *No. XI*, N.Y. J., Jan. 31, 1788, *reprinted in* 2 *The Complete Anti-Federalist* 417, 419–20 (Storing ed., 1981) (¶¶ 2.9.137–38). The Federal Farmer thought it "very dangerous" to give the same judge both legal and equitable power, because "if the law restrain him, he is only to step into his shoes of equity, and give what judgment his reason or opinion may dictate." Letter No. 3 (Oct. 10, 1787), *reprinted in id.* at 234, 244 (¶ 2.8.42). As equity was a royal power to **\*199** absolve violations of law, they worried that granting the courts equitable power would leave them unbounded by law.

In response, Alexander Hamilton assuaged those legitimate concerns. He explained that "[t]he great and primary use of a court of equity is to give relief *in extraordinary cases*, which are *exceptions* to general rules." *The Federalist No. 83*, at 505 (Rossiter ed., 1961) (footnote omitted). Looking to Blackstone's *Commentaries*, Hamilton insisted "that the principles by which that relief is governed are now reduced to a regular system." *Id.* at 505 n.\*. By the Founding, that system had stabilized into "the practice of the Court of Chancery in England." Letter from Timothy Pickering to Charles Tillinghast (Dec. 24, 1787), *in* 4 *The Founders' Constitution* 231 (Kurland & Lerner eds., 1987).

[4] Hamilton's understanding of equity prevailed. Congress gave Article III courts concurrent jurisdiction with state courts over civil suits in equity. Judiciary Act of 1789, ch. XX, § 11, 1 Stat. 73, 78. The Supreme Court later described this equitable jurisdiction as constrained by the "body of doctrine" that Chancery applied to "suits in equity" at the Founding. *Atlas Life Ins. Co. v. W.I.S., Inc.*, 306 U.S. 563, 568, 59 S.Ct. 657, 83 L.Ed. 987 (1939). Even after the merger of law and equity, "the substantive principles of Courts of Chancery remain unaffected" to this day.

*Stainback v. Mo Hock Ke Lok Po*, 336 U.S. 368, 382 n.26, 69 S.Ct. 606, 93 L.Ed. 741 (1949); *see also Petrella v. MGM, Inc.*, 572 U.S. 663, 678, 134 S.Ct. 1962, 188 L.Ed.2d 979 (2014). "[W]hether the authority comes from a statute or the Constitution, district courts' authority to provide equitable relief is meaningfully constrained. This authority must comply with longstanding principles of equity that predate this country's founding." *Trump v. Hawaii*, 585 U.S. 667, 716, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) (Thomas, J., concurring).

### B. For good reason, injunctions were and still are extraordinary relief

Injunctions fall within this equitable framework. The English Court of Chancery enjoined parties sparingly. When a plaintiff's claim did not fit within one of the narrow common law writs, he could petition the King for relief through his chancellor. *See* Douglas Laycock, *The Death of the Irreparable Injury Rule* 19–20 (1991). Over time, the chancellor's power developed into the Court of Chancery. *Id.* To keep equity from swallowing up the common-law courts, Chancery could enjoin parties only when there was no adequate remedy at law. *Id.*

Following Chancery's supplemental role, early American law reserved injunctions for exceptional cases. Justice Joseph Story, for instance, feared that because injunction procedure is "summary," it is "liab[le] to abuse." 2 *Commentaries on Equity Jurisprudence as Administered in England and America* § 959a, at 227 (2d ed. 1839). Courts must use "extreme caution" and "appl[y] [injunctions] only in very clear cases." *Id.* Professor James P. Holcombe took an even narrower view. Because injunctions can irreparably injure parties, courts must use "great caution," granting them "only in cases[ ] where [they are] *clearly indispensable* to the ends of justice." *An Introduction to Equity Jurisprudence, on the Basis of Story's Commentaries* 150 (1846) (emphasis added).

[5] The Supreme Court largely agreed with Holcombe's narrow view. As it explained, "issuing an injunction" requires "great[ ] caution, deliberation, and sound discretion." *Truly v. Wanzer*, 46 U.S. (5 How.) 141, 142, 12 L.Ed. 88 (1847) (quoting **\*200** *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 827 (C.C.D.N.J. 1830)). Injunctions themselves can inflict harm. Thus, a court should not grant an injunction unless the plaintiff's right is clear, his impending injury is great, and only an injunction can avert that injury. *Id.* at 142–43.

Preliminary injunctions raise further problems. For one, "many preliminary injunctions [are] granted hurriedly and on the basis of very limited evidence." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (en banc) (McConnell, J., concurring). Time pressures limit adversarial testing. Affidavits drafted by lawyers are poor substitutes for discovery, live testimony, and cross-examination. And when challengers sue to enjoin enforcement of a new law, courts must forecast how the law will work.

Plus, this hasty process makes the district court jump to conclusions. A preliminary injunction "forces a party to act or desist from acting, not because the law requires it, but because the law *might* require it." *Id.* at 1014–15. In this sense, it is like "judgment and execution before trial." *Herman v. Dixon*, 393 Pa. 33, 141 A.2d 576, 577 (1958).

Finally, forecasting the merits risks prejudging them. The trial process forces judges to keep open minds, considering questions from every angle before deciding. Preliminary relief short-circuits that process, freezing first impressions in place. True, judges will not always stick with those impressions—and the system trusts judges to update them as a case proceeds—but this flexibility becomes harder when an impression solidifies into a preliminary ruling. Even if judges keep an open mind, the parties and the public may see their tentative forecasts as the writing on the wall.

[6] For all these reasons, a preliminary injunction "is an extraordinary remedy[ ] [that] should be granted only in limited circumstances." *Mallet & Co. v. Lacayo*, 16 F.4th 364, 391 (3d Cir. 2021) (internal quotation marks omitted). Unless the need for one in a particular case outweighs these risks, the court should not grant one.

### III. Preliminary Injunctions Protect Courts' Power to Adjudicate

**A. Preliminary injunctions' primary purpose is to keep cases alive until trial**

Despite these inherent risks, preliminary injunctions are occasionally warranted. At this stage, "before there has been a trial on the merits, the function of the court is *not* to take whatever steps are necessary to prevent irreparable harm, but primarily to keep things as they were, until the court is able to determine the parties' respective legal rights." *O Centro,* 389 F.3d at 1012 (McConnell, J., concurring) (emphasis added). "Traditional equity practice held that the *sole* purpose of a preliminary injunction was to preserve the status quo during the pendency of litigation." *Id.* (collecting mid-nineteenth-through mid-twentieth-century cases).

[7] The Supreme Court has recognized this limited purpose, as have we. The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney,* —— U.S. ——, 144 S. Ct. 1570, 1576, —— L.Ed.2d —— (2024) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)); *see also Ortho Pharm. Corp. v. Amgen, Inc.,* 882 F.2d 806, 813–14 (3d Cir. 1989); *Warner Bros. Pictures v. Gittone,* 110 F.2d 292, 293 (3d Cir. 1940) (per curiam). The goal is to ensure that, at the end of the case, the court can still grant an adequate remedy.

**\*201** [8] Our sister circuits concur. Preliminary injunctions exist "ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *accord Meis v. Sanitas Serv. Corp.,* 511 F.2d 655, 656 (5th Cir. 1975). That relief is proper only in "the rare case when a preliminary injunction is necessary to preserve the effectiveness of the ordinary adjudicatory process." *McKinney ex rel. NLRB v. S. Bakeries, LLC,* 786 F.3d 1119, 1124 (8th Cir. 2015). In short, "the most compelling reason" to grant a preliminary injunction is "to preserve the court's power to render a meaningful decision after a trial on the merits." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2947, at 112, 114 (3d ed. 2013).

**B. Preventing interim harm is at the service of preserving the case**

[9] Though courts recognize this primary purpose, they have strayed from it and started using preliminary injunctions just to prevent harm. To be sure, harm prevention has become a valid reason to grant a preliminary injunction. *See id.* §§ 2948, 2948.1. But that "is not [its] paramount purpose." *O Centro,* 389 F.3d at 977 (Murphy, J., concurring) (citing 11A Wright & Miller § 2947). "The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). "Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." 11A Wright & Miller § 2948.1, at 129.

[10] Thus, the threat of irreparable harm does not automatically trigger a preliminary injunction. Sometimes, harm threatens to moot a case, as when one party's conduct could destroy the property under dispute, kill the other party, or drive it into bankruptcy, "for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). Much more often, though, even nonpecuniary injury does not rise to that level.

The recent drift from preserving cases to preventing interim harm can stunt litigation. This extraordinary remedy has become ordinary. All too often, "the preliminary injunction [becomes] the whole ball game." *Winter v. NRDC,* 555 U.S. 7, 33, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (internal quotation marks omitted). That shortcut exceeds injunctions' limits. The "purpose of such interim equitable relief is not to conclusively determine the rights of the parties." *Trump v. Int'l Refugee Assistance Project,* 582 U.S. 571, 580, 137 S.Ct. 2080, 198 L.Ed.2d 643 (2017) (citing *Camenisch,* 451 U.S. at 395, 101 S.Ct. 1830). Rather, it is supposed to be "only a prediction about the merits of the case." *United States v. Loc. 560 (I.B.T.),* 974 F.2d 315, 330 (3d Cir. 1992).

Case preservation is thus the main reason that the benefits of a preliminary injunction may outweigh its risks. Courts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case. That approach is often, perhaps usually, the wiser course.

## IV. The District Court Properly Denied the Preliminary Injunction

[11] [12] Though district courts have sound discretion to grant or deny preliminary injunctions, precedent guides this discretion. **\*202** Four canonical guideposts are (1) the likelihood of success on the merits; (2) the risk of irreparable injury absent preliminary relief; (3) the balance of equities; and (4) the public interest. *Winter, 555 U.S. at 20, 129 S.Ct. 365.* The first two factors are the "most critical." *Nken v. Holder,* 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). If both are present, a court then balances all four factors. *Id.* Because "a preliminary injunction is an extraordinary and drastic remedy," the movant bears the burden of making "*a clear showing.*" *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam) (quoting and emphasizing 11A Wright & Miller § 2948).

Yet the challengers try to sidestep this framework. They argue that in constitutional cases, a likelihood of success on the merits is enough. It is not.

### A. Likely success on the merits is not enough for a preliminary injunction

The challengers and their amici argue that if they win on the first factor, then the District Court abused its discretion by denying a preliminary injunction. After all, they reason, constitutional rights are priceless, and the government has no interest in enforcing unconstitutional laws. As they readily admit, their argument collapses the four factors into one. The Ninth Circuit has followed that siren. *Baird v. Bonta,* 81 F.4th 1036, 1042 (9th Cir. 2023) (reasoning that when a party shows the first factor, it "almost always" shows irreparable harm and "the merged third and fourth factors [tip] decisively in [its] favor"). For five reasons, though, we plug our ears to that siren song.

[13] *First,* "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter,* 555 U.S. at 24, 129 S.Ct. 365. Instead, it "is a matter of equitable discretion" that "does not follow from success on the merits as a matter

of course." *Id.* at 32, 129 S.Ct. 365. Contrary to the challengers' position, success on the first factor is not enough.

[14] *Second,* "no test for considering preliminary equitable relief should be so rigid as to diminish, let alone disbar, discretion." *Reilly v. City of Harrisburg,* 858 F.3d 173, 178 (3d Cir. 2017). Yet the challengers' test would do just that, forcing judges to grant preliminary equitable relief based on only a likelihood of success on the merits. That cannot be right: "[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Judges are not robots, especially in equity.

*Third,* "[c]rafting a preliminary injunction ... often depend[s] as much on the equities of a given case as the substance of the legal issues it presents." *Int'l Refugee Assistance Project,* 582 U.S. at 579, 137 S.Ct. 2080. The challengers ask us to treat a preliminary injunction as rising and falling with the merits. But the merits are just one piece of the puzzle. This equitable remedy calls for courts to weigh the equities, the public interest, and irreparable harm too.

*Fourth,* if the challengers were right, whenever someone sought a preliminary injunction, courts would always have to prejudge the merits; but they need not. Even assuming irreparable injury, the Supreme Court has overturned an injunction based solely on the balance of equities and the public interest. *Winter,* 555 U.S. at 26, 32, 129 S.Ct. 365. In doing so, it "d[id] not address the underlying merits of plaintiffs' claims." *Id.* at 31, 129 S.Ct. 365. We have taken this approach too. *See* **\*203** *Weissbard v. Coty, Inc.,* 66 F.2d 559, 560 (3d Cir. 1933) (not opining on the merits because the District Court would be better placed to rule on them after a "final hearing"). The other factors are independent grounds to deny relief.

*Fifth,* the challengers' automatic approach presumes clarity early on. They perceive a finished drawing, while we see only the initial sketch. Early in a case, the merits are seldom clear, even when they seem black and white. The litigation process gradually adds hues to this monochrome sketch, sharpening the issues until the trial provides full color. Jumping to conclusions this early is like finding guilt right

after hearing each side's key witness, without keeping an open mind long enough to reflect on their weaknesses. A rushed judgment is a dangerous one; judges must be humble enough to stay their hands.

[15] Given the background of the rules of equity, we should not treat the four-factor test as a mechanical algorithm. Law sometimes uses such strict formulae, but equity sees tests as guideposts only. They help the court balance the risks of mootness against the perils of injunctions. Though not all four factors must weigh heavily in every case, any one factor may give a district court reason enough to exercise its sound discretion by denying an injunction. *Reilly*, 858 F.3d at 177–79 (not all factors required). "When one factor is dispositive, a district court need not consider the others." *D. T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

Because we must weigh all the factors before *granting* relief, we may take the factors out of order, as *Winter* and *Weissbard* did. We start by considering whether the alleged harm is irreparable. We see no evidence that it is. Plus, failing to grant interim relief would not moot this case.

### B. Except in First Amendment cases, we do not presume constitutional harms irreparable

The challengers bear the burden of proving irreparable injury; yet they ask us to lift that burden from their shoulders by presuming all constitutional harms irreparable. We will not. Presuming irreparable harm is the exception, not the rule. Plus, the presumption they propose would trample on traditional principles of equity.

[16] Equity is contextual. It turns on the facts, and it supplements remedies at law only when needed. When lower courts have tried to harden equitable standards into rules, the Supreme Court has rebuked them. For example, a district court presumed that patent holders who do not practice their patents and are willing to license them cannot suffer irreparable injury. *eBay*, 547 U.S. at 393, 126 S.Ct. 1837. In response, the Federal Circuit tilted to the other extreme, adopting a rule that made patent-infringement injunctions all but automatic. *Id.* at 393–94, 126 S.Ct. 1837. The Supreme Court, however, rejected both such "broad classifications" as foreign to equity. *Id.* at 393, 126 S.Ct. 1837. Rather, it held that district courts must apply their equitable discretion to the

facts of each case, guided by "traditional principles of equity." *Id.* at 394, 126 S.Ct. 1837.

True, our sister circuits have presumed harm in various settings. *See Baird*, 81 F.4th at 1042 (Second Amendment); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (Fourth Amendment); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (Eighth Amendment).

[17] We respectfully decline to do the same. As we have explained, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). **\*204** We explicitly refused to presume that an alleged equal-protection violation irreparably injured the plaintiff. *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 819–20 (3d Cir. 1978). Even as some courts presumed constitutional harms irreparable, we still favored "traditional prerequisites for injunctive relief" over categorical presumptions. *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997).

The challengers suggest that we applied such a presumption to Fourth Amendment violations in *Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971). We did not. That case did deal with an unreasonable search and seizure. *Id.* at 1344. But the irreparable harm there came because the plaintiffs had "alleged that First Amendment rights have been chilled as a result of government action.*" Id.* at 1350 n.12 (capitalization added).

That case highlights the exception to our rule: we presume that First Amendment harms are irreparable. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020) (per curiam); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 300 (D.C. Cir. 2006) (collecting cases).

Unique First Amendment doctrines warrant that exception. Take the "heavy presumption" against prior restraints on speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). First Amendment activity, like weekly worship and political speech, can be especially time-sensitive. *See Roman Cath. Diocese*, 592 U.S. at 19, 141 S.Ct. 63; *Elrod v. Burns*, 427 U.S. 347, 374 n.29, 96

S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion). We thus presume that prior restraints are unconstitutional because we fear "communication will be suppressed ... before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). As a rule, then, the government may not preliminarily enjoin speech. Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 169–72 (1998).

Or take courts' deference to sincere religious belief. Courts are ill-suited to weigh religious harms, much less assess whether they would be irreparable. If a believer's religious scruples are sincere, courts will not second-guess their centrality. *See Holt v. Hobbs*, 574 U.S. 352, 361–62, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015); *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). This deference comes from the longstanding principle that "the judges of the civil courts" are not as "competent in the ecclesiastical law and religious faith." *Watson v. Jones*, 80 U.S. 679, 729, 13 Wall. 679, 20 L.Ed. 666 (1871). This history, though, limits the principle to the First Amendment.

[18] Thus, when weighing preliminary injunctions, courts may presume that suppressing speech or worship inflicts irreparable injury. But this presumption is the exception, not the rule. We will not extend it.

### C. At this early stage, the challengers have failed to show irreparable harm

[19] Without a presumption in their favor, the challengers' claim of irreparable harm collapses. They must show that, without a preliminary injunction, they will more likely than not suffer irreparable injury while proceedings are pending. *Reilly*, 858 F.3d at 179. To satisfy that burden, they submitted only four declarations from **\*205** Delaware residents who "wish to obtain these firearms and magazines." Oral Arg. Tr. 5:9–10. They do not even allege that Delaware has tried to enforce the disputed laws against them or to seize the guns or magazines that they already own. Nor do they allege a time-sensitive need for such guns or magazines. This status quo shows no signs of changing. Thus, the challengers have not shown that a preliminary

"injunction is required to preserve the status quo" while litigation is pending. *Warner Bros.*, 110 F.2d at 293.

Plus, given preliminary injunctions' inherent risks, the challengers' generalized claim of harm is hardly enough to call for this "extraordinary and drastic remedy." *Mazurek*, 520 U.S. at 972, 117 S.Ct. 1865. The harm they allege is a far cry from "media companies hav[ing] to alter their editorial policies and posting practices to comply with [a] new speech law" or "businesses hav[ing] to restructure their operations or build new facilities to comply with the new [environmental] regulations" for years while they challenge these regulations. *Labrador v. Poe ex rel. Poe*, —— U.S. —— ––, 144 S. Ct. 921, 929, —— L.Ed.2d —— (2024) (Kavanaugh, J., concurring). What is more, the challengers offered no evidence that without a preliminary injunction, the District Court will be unable to decide the case or give them meaningful relief. Thus, the court properly found no irreparable harm.

We rule only on the record before us. The challengers have shown no harms beyond ones that can be cured after final judgment. That finding alone suffices to support the District Court's denial of a preliminary injunction. *Pennsylvania ex rel. Creamer v. U.S. Dep't of Agric.*, 469 F.2d 1387, 1388 (3d Cir. 1972) (per curiam). We do not hold that Second Amendment harms, or constitutional harms generally, cannot be irreparable. Still, the scant evidence before us here hardly shows that the challengers' harm is.

We also limit our analysis of irreparable injury to this preliminary injunction. For permanent injunctions, courts focus not on preserving the case and avoiding interim harms, but on whether the remedy at law is adequate. Emily Sherwin & Samuel L. Bray, *Ames, Chafee, and Re on Remedies* 653 (3d ed. 2020). We do not decide here whether the challengers should get a permanent injunction if they win on the merits.

### D. The other factors also support denying the injunction

Even if the challengers had shown an irreparable injury, the third and fourth factors would weigh against a preliminary injunction, as in *Winter.* Those factors, harm to the opposing party and the public interest, "merge when the Government

is the opposing party." *Nken, 556 U.S. at 435, 129 S.Ct. 1749*. They call for caution because this injunction threatens federalism and the separation of powers—"[t]wo clear restraints on the use of the equity power." *Missouri v. Jenkins, 515 U.S. 70, 131, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995)* (Thomas, J., concurring).

The challengers seek to enjoin enforcement of two democratically enacted state laws. Courts rightly hesitate to interfere with exercises of executive or legislative authority. *Rathke v. MacFarlane, 648 P.2d 648, 651 (Colo. 1982)* (en banc); *cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–38, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)* (Jackson, J., concurring). "There is always a public interest in prompt execution" of the laws. *Nken, 556 U.S. at 436, 129 S.Ct. 1749*.

[20] That is doubly true when federal courts are asked to block states from enforcing their laws. *See, e.g.,* **\*206** *Younger v. Harris, 401 U.S. 37, 53–54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)*. A federal court must weigh how best to deal with state laboratories of democracy. On a complete record, the duty of the federal court sometimes includes correcting a state that goes beyond the U.S. Constitution's bounds. Without the clarity of a full trial on the merits, though, we must err on the side of respecting state sovereignty. Delaware's legislature passed these bills, and Delaware's governor signed them into law. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King, 567 U.S. 1301, 1303, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012)* (Roberts, C.J., in chambers) (brackets and internal quotation marks omitted).

[21] Plus, Delaware Sportsmen delayed seeking a preliminary injunction. A classic maxim of equity is that it "assists the diligent, not the tardy." Sherwin & Bray 441. The logic behind preliminary injunctions follows the general logic of equity: "[T]here is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)*. Delaware Sportsmen's four-month delay suggests that it felt little need to move quickly. Its continuing delay as it chooses not to

hasten to trial does not help its case. Thus, the final two factors support denying a preliminary injunction as well.

**V. The Challengers Had Other Ways to Get Relief Promptly**

Our decision today leaves open several ways to vindicate constitutional rights promptly. First, a district court may move up the trial to consolidate it with the preliminary-injunction hearing. *Fed. R. Civ. P. 65(a)(2)*. Second, the court may convert a preliminary-injunction motion into a summary-judgment motion if they first give the parties enough notice. *See Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc., 898 F.2d 1393, 1397 n.4 (9th Cir. 1990)*. Third, rather than move for a preliminary injunction, the parties may agree to an accelerated trial. *See 11A Wright & Miller § 2948.1* & n.1.

Those approaches have many advantages. Often, "it would be more efficient to consolidate the trial on the merits with the motion for a preliminary injunction under *Rule 65(a)(2)*." Morton Denlow, *The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard, 22 Rev. Litig. 495, 534 (2003)*. Here, for instance, the trial would have happened in November 2023. Final rulings on the merits would resolve issues definitively and let us review legal rulings de novo on fully developed records. This preliminary posture, by contrast, just encourages snap judgments in the abstract.

\* \* \* \* \*

A preliminary injunction is not a first bite at the merits. Rather, it is an extraordinary, equitable remedy designed to protect the court's ability to see the case through. It risks cementing hasty first impressions. We trust district courts to reserve this drastic remedy for drastic circumstances. Because the District Court did so here, we affirm its order denying a preliminary injunction. We express no view of the merits.

ROTH, Circuit Judge, concurrence

Although I concur with the result reached by the Majority, I write separately to address the plaintiffs' likelihood of

success on the merits and, briefly, the balance of the equities and public interest. These additional thoughts may guide future **\*207** litigants in formulating any steps that they may take following this decision.

As the Majority observes, a court may deny a preliminary injunction under "any one" of the four factors.[1] The District Court did so because plaintiffs failed to establish a likelihood of success on the merits[2]—the first of the two "most critical"[3] factors—and addressed irreparable harm "for thoroughness only."[4] By contrast, the Majority affirms the denial of injunctive relief solely based on a lack of irreparable harm.[5] While I agree that plaintiffs failed to demonstrate irreparable harm, I believe it would be helpful to future litigants to present a full discussion. As the District Court held, I believe that plaintiffs are not likely to succeed on the merits of their constitutional claim.

Moreover, because I also believe that *none* of the assault weapons and LCMs at issue are "Arms" protected by the Second Amendment, I would hold that plaintiffs' challenge to Delaware's laws fails at *Bruen*'s first step, not its second.[6]

**I. Governing Law**

"In a crisp, if not enigmatic, way,"[7] the Second Amendment provides: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."[8] In interpreting its meaning, we are guided by the principle that "the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning."[9] "Normal and ordinary meaning" is that which would "have been known to ordinary citizens in the founding generation."[10] Therefore, our interpretation of the Second Amendment—and our understanding of the "Arms" it protects in the present moment—is necessarily informed and cabined by history and Supreme Court precedent discussing the same.[11]

We thus turn to the "normal and ordinary" meaning of the phrase "keep and bear Arms" as it is used in the Second Amendment.[12] The Supreme Court's decision in *District of Columbia v. Heller* is our north star.[13] In *Heller*, the Court

instructed **\*208** that the founding-era meaning of the word "Arms" "is no different from the meaning today."[14] Contemporaneous dictionaries defined "arms" as "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."[15] Most importantly, the term was applied "to weapons that were not specifically designed for military use and were not employed in a military capacity."[16] The Court then went on to explain that the most natural reading of "keep Arms" is simply to have or possess weapons.[17] By contrast, "bear Arms" means something else. By itself, to "bear" meant, then as now, to "carry."[18] But when used with "Arms," "bear" referred "to carrying for a particular purpose—confrontation."[19] Accordingly, to "bear Arms" means to carry weapons "for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person."[20]

At first blush—especially in light of the prefatory clause's reference to "[a] well-regulated Militia"—it might seem nonsensical that the Arms referred to in the Second Amendment do not include those "specifically designed for military use."[21] The Court's discussions of founding-era history in *United States v. Miller* and *Heller* clear things up.[22] When the Second Amendment was ratified, the term "Militia" referred to "all males physically capable of acting in concert for the common defense."[23] At that time, the "Militia" was "set in contrast with Troops which [States] were forbidden to keep without the consent of Congress."[24] "Troops" were "standing armies" made up of soldiers, while the "Militia" was made up of ordinary citizens who would "appear bearing arms supplied by themselves and of the kind in common use at the time" when called to serve.[25] As **\*209** a result, the "small-arms weapons" used by the "Militia" and the weapons "used in defense of person and home were one and the same."[26]

*Heller* held that the Second Amendment confers an individual right to keep and bear "Arms" for self-defense—weapons akin to those to those that ordinary citizen-militiamen would keep at home and bring when called to duty—and thus protected respondent's right to keep and bear a handgun. However, *Heller* also made clear that "the right [is] not a right to keep and carry any weapon whatsoever and for whatever purpose."[27] Most importantly for our purposes, *Heller* recognized that right "extends only to certain types of

weapons."[28] While "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," it does not protect "dangerous and unusual weapons."[29] Among the "dangerous and unusual weapons" outside its scope are (1) weapons that are "not typically possessed by law-abiding citizens for lawful purposes," such as short-barreled shotguns;[30] and (2) weapons that are "most useful in military service," such as "M-16 rifles and the like."[31] *Heller*'s discussion of the latter is worth revisiting in full:

> It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.[32]

In other words, the fact that a militia member no longer brings along his or her own weapon to militia duty, does not prevent us from recognizing the significance of the words used in the 18th century to create the Second Amendment.

Two years after *Heller*, the Court in *McDonald v. Chicago* expanded *Heller's* scope by confirming that the Second Amendment applies to the states through **\*210** incorporation under the Fourteenth Amendment.[33] *McDonald* said nothing new about the kinds of Arms protected by the Second Amendment; as in *Heller*, the weapons at issue in *McDonald* were handguns.[34] *McDonald* reiterated that self-defense is the "central component" of the Second Amendment right and the "core lawful purpose" for which the weapons it protects are used.[35]

Twelve years after *McDonald*, the Court made "more explicit" a two-step analytical approach for evaluating Second Amendment claims in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*.[36] At step one, the court determines whether the Second Amendment's "plain text" covers the "conduct" at issue.[37] If it does, the court proceeds to step two to determine whether the challenged laws are "consistent with the Nation's historical tradition of firearm regulation."[38] At step two, the government must show that that the modern regulation is "relevantly similar" to historical regulation in "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[39]

## II. Discussion

### A. Plaintiffs failed to establish a likelihood of success on the merits.

The laws challenged here restrict having, making, buying, selling, and receiving "assault weapons" and "large capacity magazines."[40] "Assault weapons" include: (1) forty-four semi-automatic "assault long guns," including the AR-15, AK-47, and Uzi; (2) nineteen semi-automatic "assault pistols"; and (3) "copycat weapons."[41] "Large capacity magazines" (LCMs), are magazines "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition."[42]

We must first decide whether these assault weapons and LCMs are "Arms" that individuals are entitled to "keep and bear" under the plain text of the Second Amendment. If they are not properly characterized as "Arms," then Delaware is free to regulate them as it chooses. If they are **\*211** properly characterized as "Arms," we proceed to *Bruen*'s second step and determine whether the laws are "consistent with the Nation's historical tradition of firearm regulation."[43]

Three principles, the contours of which are disputed by the parties, guide our analysis at *Bruen* step one. First, the Second Amendment extends to "all instruments that constitute bearable arms,"[44] meaning weapons that "are in

common use for self-defense today."[45] Second, for purposes of assessing whether a given weapon is in common use for self-defense, what matters is whether the weapon in question is suitable for, owned for, and actually used in self-defense. Third, the Second Amendment does not protect "dangerous and unusual weapons," meaning those weapons that are "not typically possessed by law-abiding citizens for lawful purposes"[46] or are "most useful" as weapons of war.[47]

### i. "Bearable arms" are those that are commonly used for self-defense.

The parties disagree about the kinds of "bearable arms" presumptively protected by the Second Amendment. Plaintiffs contend that weapons used for *any* lawful purpose *including* self-defense are protected, while Delaware argues that *only* weapons that are commonly used for self-defense are protected. Delaware's argument proves stronger.

Limiting the scope of "bearable arms" to those that are used for self-defense comports with the "normal and ordinary" meaning of "bear arms."[48] *Heller* made clear that to "bear arms" means to carry weapons "for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." Thus, the phrase "bearable arms" necessarily refers to weapons that are carried for that same express purpose.[49]

To be sure, weapons can be (and are) used for lawful purposes besides self-defense. Recreational target shooting, hunting, and pest-control all come to mind.[50] But *Heller* holds, and its progeny affirms, that self-defense is "*the* core lawful purpose" protected by the Second Amendment.[51] While these other uses may be lawful, the Supreme Court has never recognized them as "core" purposes protected by the Second Amendment.[52] Until it might do so, the "bearable arms" presumptively protected by the Second Amendment are limited to weapons used explicitly for self-defense.[53]

### *212 ii. Whether a weapon is "in common use for self-defense" hinges on more than its popularity.

The parties dispute (1) when common use should be assessed (at *Bruen* step one or two), (2) what type of common use matters, and (3) how common use should be measured.

"When" is a question easily answered. *Bruen* acknowledged that the handguns at issue were " 'in common use' today for self-defense" before conducting its historical analysis, thereby indicating that "common use" comes into play at step one.[54]

"What type" can also be resolved by reference to *Bruen.* As the latest in a line of decisions holding that "individual self-defense is 'the *central component*' of the Second Amendment right," *Bruen* confirms that the only weapons protected by the right are those that are commonly used for self-defense--not for any lawful purpose *like* self-defense.[55]

"How" is more complicated. The Supreme Court has yet to address exactly how we should assess whether a weapon is "in common use today for self-defense."[56] The District Court did so only by considering whether the assault weapons and LCMs were popular.[57] But the plain meaning of "common use," the frameworks of other constitutional rights, and the problems that might flow from the District Court's approach all point toward additional metrics: a weapon's objective suitability for self-defense and whether it is commonly used in self-defense.

Consider the plain meaning of "common use." "Common" is defined as "occurring, found, or done often; in general use; usual, prevalent."[58] "Use" is defined as "a long-continued possession and employment of a thing for the purpose for which it is adapted[.]"[59] Read together, a weapon is in common use for self-defense if evidence shows it is (1) well adapted for self-defense and (2) widely possessed and employed for self-defense. However, evidence that a weapon is widely possessed or that a widely possessed weapon is occasionally used in self-defense is not, alone, enough to show it is in common use for self-defense—not if we want to heed the phrase's plain meaning.

Beyond plain meaning, *Bruen* says that its two-step standard "accords with how we protect other constitutional rights."[60] We frequently define the boundaries of these rights with objective standards.[61] *213 There is no reason not to do the same in the Second Amendment context.[62] By taking into

account whether a weapon is objectively suitable for self-defense, we ensure that the Second Amendment right to self-defense is not "subject to an entirely different body of rules than the other Bill of Rights guarantees."[63]

Finally, a "common use" analysis that hinges solely on a weapon's popularity produces absurd results. Take, for example, the AR-15 and the Federal Assault Weapons Ban, which made civilian possession of AR-15s unlawful.[64] When the Ban first went into effect in 1994, few civilians owned AR-15s.[65] When it expired in 2004, AR-15s "began to occupy a more significant share of the market."[66] Today, plaintiffs describe the AR-15 as "America's most popular semi-automatic rifle" and "the second-most common type of firearm sold[.]"[67] If we looked to evidence of the AR-15's popularity alone, the Ban would have been constitutional before 2004 but unconstitutional thereafter.[68] A law's constitutionality cannot be contingent on the results of a popularity contest.[69]

### iii. "Dangerous and unusual weapons" is a category, not a test.

Though the Second Amendment presumptively protects "Arms" that are in common use for self-defense, it does not extend to "dangerous and unusual weapons."[70] The District Court likened this to a "test," and concluded that a weapon must "check both boxes" to qualify as "dangerous and unusual."[71] But *Heller* instructs that "dangerous and unusual" is best understood as a two-part category unto itself.[72] As discussed above, "dangerous and unusual weapons" are either (1) weapons that are "not typically possessed by law-abiding citizens for lawful purposes, such **\*214** as short-barreled shotguns," or (2) weapons that "are most useful in military service," such as "M-16 rifles and the like."[73] For the latter, it is worth noting that "most" is a superlative descriptor.[74] Therefore, even though a weapon might be useful in civilian and military contexts, a weapon that is "most" suited for military use falls outside the scope of "Arms" protected by the Second Amendment.[75]

While the District Court concluded that the assault weapons and LCMs at issue *are* typically possessed by law-abiding citizens for lawful purposes, it did not consider whether any

of the assault weapons and LCMs at issue "are most useful in military service" and therefore "may be banned" without infringing the Second Amendment right (as *Heller* tells us).[76] That was error.

### iv. None of the assault weapons and LCMs are "Arms" protected by the Second Amendment.

The District Court concluded that assault long guns and LCMs are fairly characterized as "Arms," but assault pistols and copycat weapons are not.[77] However, its analysis rested on an incomplete assessment of "common use" and a misunderstanding of what makes a weapon "dangerous and unusual." Analyzed correctly, the record shows that *none* of the assault weapons and LCMs are "Arms" protected by the Second Amendment.

*Assault long guns:* The assault long guns set forth at § 1465(2) may be commonly owned, but they are nonetheless best categorized as weapons that are most useful in military service and are therefore unprotected by the Second Amendment.[78] Generally speaking, assault long guns derive from weapons of war and retain nearly all of the features of their military counterparts.[79] These "famed" military features—designed to increase lethality and allow shooters to inflict severe damage over great distances—serve as civilian selling points.[80] But while these features may be useful in military contexts, **\*215** they make assault long guns ill-suited for self-defense.[81] Unlike wartime offensives, home and self-defense scenarios rarely, if ever, involve lengthy shootouts at long ranges or extensive exchanges of gunfire. Moreover, projectiles traveling at velocities as high as a 5.66 mm or .223 caliber cartridge can easily penetrate most home construction materials, posing a serious risk of harm to bystanders in adjacent rooms or even outside the home entirely.[82]

The lethality of an assault long gun is best illustrated by way of comparison. Take the damage inflicted by a handgun (*Heller's* "quintessential self-defense weapon") and the damage inflicted by an assault rifle.[83] A common caliber handgun cartridge (9 mm or .38) travels at a muzzle velocity of roughly 1,600 feet per second. When it hits tissue, it strikes directly, producing "a small temporary cavity" in

tissue that "plays little or no role in the extent of wounding."[84] By contrast, a 5.66 mm or .223 caliber cartridge—the kind typically used in assault weapons—travels at double the speed.[85] And unlike a handgun cartridge, it turns sideways when it hits tissue, creating a cavity over ten times larger than the cartridge itself and resulting in "catastrophic" wounding.[86] Doctors who have treated people shot by assault rifles have witnessed "multiple organs shattered, bones exploded, soft tissue absolutely destroyed, and exit wounds a foot wide."[87]

The record is clear: the assault long guns at issue are most useful as weapons of war. As such, they fall outside the scope of "Arms" presumptively protected by the Second Amendment.

*LCMs:* The District Court explained it was "bound" by our pre-*Bruen* decision in *ANJRPC* in two ways.[88] First, because *ANJRPC* "broadly held that 'magazines are arms,' " the District Court assumed the LCMs at issue here must also be "arms."[89] Second, because plaintiffs in both cases proffered similar "common use" evidence, the District Court determined that these LCMs must also be "in common use for self-defense today."[90] As a result, the **\*216** District Court held that the LCMs Delaware seeks to regulate are "Arms" presumptively protected by the Second Amendment. While the District Court's reliance on *ANJRPC* was understandable, it read our decision too broadly.

In *ANJRPC*, we held that "magazines are 'arms' " insofar as they "feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended[.]"[91] But *ANJRPC* does not stand for the proposition that *all* magazines are categorically protected Arms under the Second Amendment. Indeed, we expressly assumed without deciding that the LCMs at issue (those with 10 or more rounds of ammunition) were "commonly owned and typically possessed by law-abiding citizens for lawful purposes."[92] Other courts took a similar approach pre-*Bruen*.[93] But we now have the benefit of *Bruen*, which confirms that only "weapons 'in common use' today for self-defense," as opposed to generally "lawful purposes," are protected by the Second Amendment.[94] As a result, the evidence that sufficed for the sake of argument in *ANJRPC*—evidence showing magazines are "typically possessed by law-abiding citizens for hunting, pest-control,

and *occasionally* self-defense"—does not suffice here.[95] Not all guns are "Arms" protected under the Second Amendment, nor are all magazines.

Plaintiffs show that LCMs are widely owned but otherwise offer no evidence that the LCMs at issue here—magazines that can hold seventeen or more rounds—are suitable for or actually used in self-defense. By contrast, Delaware offered evidence showing that LCMs are most useful as weapons of war. Like assault long guns, LCMs were designed for military use to allow a soldier to "fire an increased quantity of cartridges without reloading."[96] They are marketed to civilians for the same express purpose ("Twice the violence of action. Half the reloads. Win-win"), but that purpose is plainly most useful in combat.[97] The record shows it is "extremely rare" for a person to fire even ten rounds, let alone more than seventeen, in self-defense.[98] Quite the opposite. A study of "armed citizen" stories collected by the National Rifle Association from 2011 to 2017 found that the average number of shots fired in self-defense was 2.2.[99]

Based on the record presented, the LCMs Delaware seeks to regulate are most useful as military weapons and thus are not "Arms" protected by the Second Amendment.

*Assault pistols:* Plaintiffs offered no evidence that the nineteen types of assault pistols listed at § 1465(3) are best adapted for self-defense, commonly owned for self-defense, or commonly used for self-defense. Plaintiffs' sole argument is that that the Supreme Court has already "clarifi[ed]" that assault pistols listed "are in common use," citing Justice Alito's concurrence in *Caetano v. Massachusetts.*[100] Not **\*217** so. Although Justice Alito observed that "revolvers and semiautomatic pistols" are "the weapons most commonly used today for self-defense," the Court's *per curiam* opinion pertained only to stun guns and simply affirmed *Heller*'s holding that a weapon need not have existed at the time of the founding to receive Second Amendment protection.[101] Moreover, Justice Alito's broad observation about "revolvers and semiautomatic pistols" tells us nothing about the nineteen specific assault pistols Delaware seeks to regulate.[102]

Dictum from Justice Alito's *Caetano's* concurrence notwithstanding, and based on the record presented, the assault pistols at issue are not "Arms" presumptively protected by the Second Amendment.

*Copycat weapons:* Plaintiffs claim that the assault long guns and assault pistols listed at §§ 1465(2) and (3) are no different from the copycat weapons listed at § 1465(6). According to plaintiffs, because assault long guns and assault pistols are widely owned and therefore protected under the Second Amendment, the same is true for copycat weapons. However, as discussed above, plaintiffs failed to demonstrate that assault long guns and assault pistols are in common use for self-defense. By plaintiffs' own logic, our analysis of copycat weapons ends there. Moreover, the only evidence plaintiffs submitted was a survey regarding the ownership and use of the "AR-15 or similarly styled rifles."[103] These statistics, by themselves, do not establish that copycat weapons are commonly used for self-defense. Accordingly, copycat weapons are not "Arms" protected by the Second Amendment.

Because I would hold that none of the assault weapons or LCMs Delaware seeks to regulate are "Arms" at *Bruen* step one, it is unnecessary to consider whether Delaware met its burden at *Bruen* step two. But even assuming that the assault weapons and LCMs at issue fall within the ambit of Arms protected by the Second Amendment, the District Court's careful analysis leaves no doubt that Delaware's laws are consistent with the nation's historical traditional of firearm regulation.[104] Either way, plaintiffs failed to demonstrate a likelihood of success on the merits of their Second Amendment claim, and the District Court correctly denied injunctive relief.

### B. The balance of the equities and the public interest also weigh in favor of denying the preliminary injunction.

Finally, I turn briefly to the balance of the equities and the public interest.[105] I **\*218** agree with the Majority that neither factor weighs in plaintiffs' favor. However, I believe the Majority construes the state's interest in this case too narrowly. While the Majority rightly identifies Delaware's interest in the execution of its democratically enacted laws,[106] the state has an equally important interest in the safety of its citizens.

In recent years, the United States has experienced an exponential increase in the frequency of mass shootings. Scholars estimate that only twenty-five mass shootings occurred between 1900 and 1965.[107] By contrast, the United States now endures more than 600 mass shootings per year—nearly two per day. Assault weapons and LCMs have been the weapons of choice in many of these mass shootings, and unsurprisingly, mass shootings involving assault weapons and LCMs result in far more fatalities and injuries than those that do not.[108] The Delaware legislature recognized that assault weapons and LCMs pose a grave "threat to the health, safety, and security" of Delawareans and acted accordingly.[109]

Confronted with unprecedented violence, Delaware determined it was in the public interest to address the proliferation of assault weapons and LCMs—instruments that were purpose-built to kill as many people as quickly as possible. It is clear to me that the Second Amendment does not compel Delaware to turn a blind eye to the safety of its citizens. Moreover, Delaware's interest in public safety is relevant to the propriety of denying injunctive relief.

* * * * *

For the above reasons, I agree that we should affirm the District Court's order denying injunctive relief, but I urge that these other relevant factors be kept in mind by future courts in future cases.

### All Citations

108 F.4th 194

# Footnotes

[1]   Maj. Op. 203.

[2]   *See Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 590-603 (D. Del. 2023).

[3]   Maj. Op. 201-02 (quoting *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).

[4]   *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 603 n.17.

[5]   Maj. Op. 206.

[6]   The District Court determined that assault long guns and LCMs are "Arms" protected by the Second Amendment, but assault pistols and copycat weapons are not. *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 593-97.

[7]   *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023).

[8]   U.S. Const. amend. II.

[9]   *D.C. v. Heller*, 554 U.S. 570, 576, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (cleaned up).

[10]   *Id.* at 577, 128 S.Ct. 2783.

[11]   *See, e.g., id.* at 595, 128 S.Ct. 2783 ("There seems to us no doubt, *on the basis of both text and history*, that the Second Amendment conferred an individual right to keep and bear arms.") (emphasis added). As used herein, the term "Arms" refers to weapons that are protected under the Second Amendment while "arms" refers to weapons generally.

[12]   *Id.* at 576, 128 S.Ct. 2783.

[13]   554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

[14]   *Id.* at 581, 128 S.Ct. 2783.

[15]   *Id.* (alterations omitted) (citing definitions of "arms" from "[t]he 1773 edition of Samuel Johnson's dictionary" and "Timothy Cunningham's important 1771 legal dictionary").

[16]   *Id.* ("Cunningham's legal dictionary gave us as an example of usage: 'Servants and labourers shall use bows and arrows on *Sundays*, &c. and not bear other arms.' ") (emphasis in original).

[17]   *Id.* at 582-83, 128 S.Ct. 2783 (confirming this reading by consulting historical sources).

[18]   *Id.* at 584, 128 S.Ct. 2783.

[19]   *Id.*

[20]   *Id. Heller* expressly endorsed the definition Justice Ginsburg set forth in her dissent in *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998). In analyzing the meaning of the phrase "carries a firearm" as it was used in a federal criminal statute, Justice Ginsburg observed that "[s]urely a most familiar meaning is, as the Constitution's Second Amendment ("keep and *bear* Arms") ... indicate[s]: 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case

of conflict with another person." *Muscarello*, 524 U.S. at 143, 118 S.Ct. 1911 (quoting Black's Law Dictionary 214 (6th ed. 1990)).

21    *Heller*, 554 U.S. at 581, 128 S.Ct. 2783.

22    *U.S. v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); *Heller*, 554 U.S. 570, 128 S.Ct. 2783.

23    *Miller*, 307 U.S. at 179, 59 S.Ct. 816.

24    *Id.* at 178-79, 59 S.Ct. 816.

25    *Id.*; *see also id.* at 179, 59 S.Ct. 816 ("In a militia, the character of the labourer, artificer, or tradesman, predominates over that of the soldier: in a standing army, that of the soldier predominates over every other character; and in this distinction seems to consist the essential difference between those two different species of military force.") (quoting Adam Smith, Wealth of Nations, Book V. Ch. 1).

26    *Heller*, 554 U.S. at 625, 128 S.Ct. 2783 (quoting *State v. Kessler*, 289 Or. 359, 614 P.2d 94, 98 (1980)).

27    *Id.* at 626, 128 S.Ct. 2783.

28    *Id.* at 623, 128 S.Ct. 2783 (discussing *Miller*, 307 U.S. 174, 59 S.Ct. 816).

29    *Id.* at 582, 627, 128 S.Ct. 2783.

30    *Id.* at 625, 128 S.Ct. 2783. In *Miller*, the Supreme Court held that the Second Amendment does not protect the right to keep and bear shortbarreled shotguns "[i]n the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia[.]" *Miller*, 307 U.S. at 178, 59 S.Ct. 816. *See also Heller*, 554 U.S. at 622-23, 128 S.Ct. 2783 (explaining that *Miller*'s "basis for saying that the Second Amendment did not apply was *not* that the defendants were 'bear[ing] arms' not 'for ... military purposes' but for 'nonmilitary use' ... Rather, it was that the *type of weapon* at issue was not eligible for Second Amendment protection[.]") (emphases and alterations in original) (internal citation omitted).

31    *Heller*, 554 U.S. at 627, 128 S.Ct. 2783.

32    *Id.* at 627-28, 128 S.Ct. 2783.

33    *McDonald v. City of Chicago*, 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

34    *Id.* at 750, 130 S.Ct. 3020.

35    *Id.* at 767-68, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 630, 128 S.Ct. 2783).

36    597 U.S. 1, 31, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).

37    *Id.* at 17, 142 S.Ct. 2111. Although *Bruen* does not expressly hold that plaintiffs bear the burden at step one, it necessarily implies that they do. In disposing of the means-ends scrutiny that courts previously applied to Second Amendment claims, the Court explained that its new two-step analysis "accords with how we protect other constitutional rights," such as those guaranteed by the First Amendment. *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. If a plaintiff alleging a violation of their First Amendment rights must "bear[ ] certain burdens," only after which "the focus then shifts to the defendant to show that its actions were nonetheless justified[,]" then the same must be true here. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524, 142 S.Ct. 2407, 213 L.Ed.2d 755 (2022); *see also Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1194 (7th Cir. 2023) ("In order to show a likelihood of success on the

merits, the plaintiffs in each of the cases before us have the burden of showing that the weapons addressed in the pertinent legislation are Arms").).

38    *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111.

39    *Id.* at 29, 142 S.Ct. 2111.

40    *See* Del. Code Ann. tit. 11, §§ 1464-69; *id.* § 1465(4) (assault weapons); *id.* § 1468(2) (LCMs).

41    *Id.* § 1465(2) (assault long guns); *Id.* § 1465(3) (assault pistols); *Id.* § 1465(6) (copycat weapons).

42    *Id.* § 1468(2).

43    597 U.S. at 24, 142 S.Ct. 2111.

44    *Heller*, 554 U.S. at 582, 128 S.Ct. 2783.

45    *Bruen*, 597 U.S. at 47, 142 S.Ct. 2111 (internal quotations omitted).

46    *Id.* at 625, 128 S.Ct. 2783.

47    *Heller*, 554 U.S. at 627, 128 S.Ct. 2783.

48    *Heller*, 554 U.S. at 576, 128 S.Ct. 2783.

49    *Id.* at 584, 128 S.Ct. 2783.

50    *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 594; *Ass'n of New Jersey Rifle and Pistol Clubs, Inc. v. Att'y Gen. New Jersey (ANJRPC)*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 597 U.S. 1, 142 S.Ct. 2111 (2022).; *Bevis*, 85 F.4th at 1192.

51    *Heller*, 554 U.S. at 630, 128 S.Ct. 2783 (emphasis added); *see also Bruen*, 597 U.S. at 29, 142 S.Ct. 2111 ("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is 'the *central component*' of the Second Amendment right.' ") (emphasis in original) (quoting *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020)).

52    *Heller*, 554 U.S. at 630, 128 S.Ct. 2783.

53    *Id.*

54    *See Bruen*, 597 U.S. at 32, 142 S.Ct. 2111.

55    *Id.* at 29, 142 S.Ct. 2111 (quoting *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020).

56    *Id.* (internal quotations omitted).

57    *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 595.

58    *Common, Adj., Sense II.9.a*, Oxford English Dictionary (Feb. 2024) (online ed.), https://doi.org/10.1093/OED/174051 4823.

59    *Use*, Black's Law Dictionary (11th ed. 2019). The complete definition reads: "The application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional." *Id.*; *see also Voisine v. United States*, 579 U.S. 686, 692, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016) ("Dictionaries consistently define the noun 'use' to mean 'the act of employing' something.").

60   *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111.

61   *Id.* For example, in the Fourth Amendment context, we assess the constitutionality of an arrest by determining whether "the circumstances, viewed objectively, justify [the challenged] action." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (alterations in original). In determining whether an individual was subject to an unreasonable search, we consider whether the person being searched had an objectively reasonable expectation of privacy and the objective effect of the officer's actions. *Bond v. United States*, 529 U.S. 334, 338, 338 n.2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000). In the Sixth Amendment context, a criminal defendant claiming ineffective assistance of counsel "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

62   Indeed, even *Bruen* suggests that an objective standard is relevant for judging whether a Second Amendment violation has occurred. The Court specifically held that New York's proper-cause requirement was unconstitutional "in that it prevents law-abiding citizens with *ordinary self-defense needs* from exercising their right to keep and bear arms." *Bruen*, 597 U.S. at 71, 142 S.Ct. 2111 (emphasis added).

63   *Id.* at 70, 142 S.Ct. 2111 (quoting *McDonald*, 561 U.S. at 780, 130 S.Ct. 3020).

64   Pub. L. No. 103-322 § 110102, 108 Stat. 1796.

65   *Bevis*, 85 F.4th at 1199.

66   *Id.*

67   Gray Br. 19-20.

68   *See Bevis*, 85 F. 4th at 1199.

69   *See also Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 102 (D. Conn. 2023) ("[W]hile constitutional protections adapt to the constant evolution of societal norms and technology, no other constitutional right waxes and wanes based solely on what manufacturers choose to sell and how Congress chooses to regulate what is sold, and the Second Amendment should be no exception.").

70   *Heller*, 554 U.S. at 627, 128 S.Ct. 2783.

71   *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 595.

72   We are bound by *Heller* and its progeny, not Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 417, 136 S.Ct. 1027, 194 L.Ed.2d 99 (per curiam) (Alito, J., concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual."). Moreover, and as discussed in greater detail below, affording "great weight" to the *Caetano* concurrence is unwarranted. *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 595.

73   *Heller*, 554 U.S. at 625, 627, 128 S.Ct. 2783.

74   *Hanson v. D.C.*, 671 F. Supp. 3d 1, 12 (D.D.C. 2023) (citing *Heller*, 554 U.S. at 627, 128 S.Ct. 2783).

75   Even Delaware acknowledges that each of the assault weapons it seeks to regulate may "potential[l]y function as a sports or recreational firearm"; however, that potential is "substantially outweighed by the danger that it can be used to kill and injure human beings." Del. Code Ann. tit. 11, § 1464.

76   *Heller*, 554 U.S. at 627, 128 S.Ct. 2783.

77    *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 595-96 (addressing assault long guns); *Id.* at 596-97 (addressing LCMs); *Id.* at 593 (addressing assault pistols and copycat weapons).

78    Del. Code Ann. tit. 11, § 1465(2).

79    The only meaningful distinction between the assault long guns sold to civilians and the assault long guns reserved for military use appears to be firing capability: civilian versions are only capable of semi-automatic operation while military versions can operate both ways. However, the ease with which semi-automatic rifles can be modified to fire at rates approaching that of their fully automatic counterparts reinforces the concept that the design of an assault long gun is a design for a weapon of war. *Cf. Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 600 (citing evidence of "numerous inexpensive products, available for purchase in most states, that allow AR-style rifles to fire at rates comparable to fully automatic weapons."); *Garland v. Cargill*, 602 U.S. 406, 410-12, 144 S.Ct. 1613, ––– L.Ed.2d –––– (2024) (describing the ease with which a semi-automatic rifle can be converted to fire at a rate approaching that of a machine gun).

80    *See, e.g.*, SA 680 (advertising AR-15s as follows: "Out of the jungles of Vietnam comes a powerful, battle-proven rifle ready for sale to civilians for hunting and target use. It's the Army's rakish AR-15, famed for its success in guerilla fighting. The sport version is an exact duplicate of the military weapon ..."); SA 455-56 ¶¶ 57-58 ("Colt sought to capitalize on the military acceptance of the AR-15 / M16 and [ ] proposed production of these rifles for sale to the civilian market ... The sole difference between the military and civilian versions was removal of fully automatic capability ... All of the other features on these rifles that enhanced their capability as combat military firearms remained.").

81    These features also make assault weapons "a counterintuitive choice" for other lawful purposes like hunting and target shooting. SA 474-75 ¶ 88.

82    SA 472-73 ¶¶ 83-84 (discussing results of penetration tests wherein nine different types of .223 / 5.56 mm ammunition were fired through simulated wall sections made of gypsum board, sheet rock, and wooden 2x4 studs, and noting that "all nine (including "frangible" rounds designed to disintegrate when hitting a hard surface) easily penetrated the wall section as well as water jugs placed three feet behind."). In addition to materials commonly used in home construction, .223 caliber ammunition can penetrate 3/8" hardened steel from 350 yards away, while 5.56 mm can penetrate up to 3mm of non-hardened steel.

83    *Heller*, 554 U.S. at 629, 128 S.Ct. 2783.

84    *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 600.

85    SA 472 ¶ 83.

86    *Id.*

87    *Id.*

88    *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 596 (discussing *ANJRPC*, 910 F.3d at 106).

89    *Id.* (quoting *ANJRPC*, 910 F.3d at 106).

90    *Id.* at 596-97.

91    *ANJRPC*, 910 F.3d at 116.

92    *Id.* (internal citations omitted).

93    *See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256-57 (2d Cir. 2015); *Worman v. Healey*, 922 F.3d 26, 30 n.12 (1st Cir. 2019).

94    *Bruen*, 597 U.S. at 48, 142 S.Ct. 2111.

95    *ANJRPC*, 910 F.3d at 116 (emphasis added).

96    SA 454-55 ¶ 55.

97    SA 96 (advertisement for 60-cartridge magazine) (cleaned up).

98    SA 331 ¶ 9.

99    *Id.*

100   Delaware State Br. 12 (citing *Caetano*, 577 U.S. at 416-17, 136 S.Ct. 1027 (Alito, J., concurring), *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1269 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015)); *Del. Code Ann. tit. 11, § 1465(3)*.

101   *Caetano*, 577 U.S. at 416-17, 136 S.Ct. 1027 (Alito, J., concurring); *see id.* at 411-12, 136 S.Ct. 1027.

102   *Id.* at 416-17, 136 S.Ct. 1027 (Alito, J., concurring).

103   William English, 2021 Nat'l Firearms Survey: Updated Analysis Including Types of Firearms Owned 33 (May 13, 2022) (Georgetown McDonough School of Business Research Paper No. 4109494), https://bit.ly/3yPfoHw.

104   *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 597-603. Based on a record "almost entirely supplied by" Delaware, the District Court decided that Delaware met its *Bruen* step two burden. *Id.* at 597 n.13. Rightly so.

105   *See Winter v. NRDC*, 555 U.S. 7, 26, 32, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Reilly*, 858 F.3d at 177-79. There is no tension between our consideration of the public interest and *Bruen*'s disavowal of means-end scrutiny. 597 U.S. at 19, 142 S.Ct. 2111. The former is a threshold inquiry that cabins our use of preliminary injunctions, while the latter concerns the merits of the constitutional claim. These inquiries are also substantively different: means-end scrutiny concerns the tailoring of a law to advance a government objective, while the final two preliminary injunction factors consider the consequences for the parties and the public. *Cf. Bevis*, 85 F.4th at 1203-04.

106   Maj. Op. 205-06.

107   *See* Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4. As used here, a "mass shooting" is a shooting in which four or more people, not including the perpetrator, are injured or killed, where victims are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance.

108   For example, Delaware submitted a study of 179 mass shootings that have occurred between 1982 and October 2022. Of the mass shootings where the weapon type (153) and magazine capacity (115) were known, 24% involved assault weapons and 63% involved LCMs capable of holding ten or more rounds. Mass shootings involving assault weapons had an average of 36 fatalities or injuries per shooting, while those that did not involve assault weapons had an average number of 10. Similarly, mass shootings involving LCMs had an average of 25 fatalities or injuries per shooting, whereas those that did not involve LCMs had an average of 9. Shooters fired more than 17 rounds in 92% of mass shootings known to have been committed with an assault weapon and an average of 116 shots in mass shootings involving LCMs.

Delaware State Sportsmen's Association, Inc. v. Delaware..., 108 F.4th 194 (2024)

109      Del. Code Ann. tit. 11, § 1464.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Prometheus Radio Project v. F.C.C., Not Reported in Fed. Rptr. (2003)
2003 WL 22052896

---

2003 WL 22052896
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

PROMETHEUS RADIO PROJECT, Petitioner

v.

FEDERAL COMMUNICATIONS COMMISSION;
United States of America, Respondents
*FOX ENTERTAINMENT GROUP, INC., Fox
Television Stations, Inc., National Broadcasting
Company, Inc., Telemundo Communications Group,
Inc. and Viacom, Inc., Intervenors, *(Pursuant to
Clerk's Order dated 8/22/03) (FCC No. 03–127)

No. 03–3388
|
Sept. 3, 2003.

## Synopsis

Radio broadcasting company brought motion to stay the effective date of new ownership rules promulgated by Federal Communications Commission (FCC), which would alter ownership rules for multiple media properties including television and radio station networks, pending judicial review. The Court of Appeals held that even though it was currently difficult to predict likelihood of success on merits, potential harms outweighed effect of stay on FCC and relevant third parties so as to warrant stay of effective date of rules pending judicial review.

Motion granted.

West Headnotes (1)

**[1]** **Telecommunications** ⚎ Injunction

Radio broadcasting company was entitled to injunctive relief to stay effective date of new ownership rules promulgated by Federal Communications Commission (FCC) which would substantially alter ownership rules for multi-media properties including television and

radio networks, pending thorough judicial review of rules, even though it was difficult to predict likelihood of success on merits; company alleged that harm from rules' industry consolidation would be widespread and irreversible if they occurred, that harm in absence of stay would likely be loss of adequate remedy if rules were declared invalid in whole or in part, and that stay would maintain status quo, and there was little indication that stay pending appeal would result in substantial harm to FCC or other interested parties.

4 Cases that cite this headnote

**Attorneys and Law Firms**

Samuel L. Spear, Spear, Wilderman, Borish, Endy, Spear & Runckel, Philadelphia, PA, Andrew J. Schwartzman, Media Access Project, Washington, DC, for Petitioner.

Jacob M. Lewis, John A. Rogovin, C. Grey Pash, Jr., Daniel M. Armstrong, Nandan Joshi, Federal Communications Commission, Nancy C. Garrison, Catherine G. O'Sullivan, Washington, DC, for Respondents.

Henk Brands, Paul, Weiss, Rifkind, Wharton & Garrison, Mark L. Evans, Michael K. Kellogg, Kellogg, Huber, Hansen, Todd & Evans, Donald B. Verrilli, Jr., Jenner & Block, Washington, DC, for Intervenors.
Present: SCIRICA, Chief Judge, AMBRO and FUENTES, Circuit Judges.

ORDER

PER CURIAM.

**\*1** Before the Court is Petitioner's motion to stay the effective date of Respondent Federal Communication Commission's new ownership rules, 2002 Biennial Regulatory Review, 68 Fed.Reg. 46,286 (Aug. 5, 2003), pending judicial review.[1] Extensive oral argument was heard on September 3, 2003.[2]

2003 WL 22052896

We consider four factors in determining whether to grant the motion to stay: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the request is denied; (3) whether third parties will be harmed by the stay; and (4) whether granting the stay will serve the public interest. *E.g., Susquenita Sch. Dist. v. Raelee,* 96 F.3d 78, 80 (3d Cir.1996); *In re Penn Cent. Transp. Co.,* 457 F.2d 381, 384–85 (3d Cir.1972).

At issue in this litigation are changes adopted by the FCC that would significantly alter the agency's ownership rules for multiple media properties, including national television networks, local broadcast affiliates, radio stations, and newspapers. Petitioner has alleged harms from industry consolidation contending they would be widespread and irreversible if they occurred. The harm to petitioners absent a stay would be the likely loss of an adequate remedy should the new ownership rules be declared invalid in whole or in part. In contrast to this irreparable harm, there is little indication that a stay pending appeal will result in substantial harm to the Commission or to other interested parties. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). Granting the stay pending judicial review would maintain the status quo in order to permit appellate review after briefing on the merits. While it is difficult to predict the likelihood of success on the merits at this stage of the proceedings,[3] these harms could outweigh the effect of a stay on Respondent and relevant third parties. Given the magnitude of this matter and the public's interest in reaching the proper resolution, a stay is warranted pending thorough and efficient judicial review.

For the foregoing reasons, we will grant Petitioner's motion to stay the effective date of the FCC's new ownership rules and order that the prior ownership rules remain in effect pending resolution of these proceedings.

Subject to the Court's decision on the motion to transfer venue, the Clerk shall issue a briefing schedule.

**All Citations**

Not Reported in Fed. Rptr., 2003 WL 22052896

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22052896

## Footnotes

1    Under 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation has designated this Court to hear this and
     related petitions for review.

2    Ordinarily, we would require strict adherence to Federal Rule of Appellate Procedure 18 that petitioner "move first
     before the agency for a stay of its decision or order." Fed. R.App. P. 18(a)(1). Nonetheless, under the unique
     circumstances of this case, it appears virtually certain that the Commission would not grant a stay in this matter.

3    An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm
     will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the
     movant. There is substantial equity and need for judicial protection, whether or not movant has shown a
     mathematical probability of success.
     *Holiday Tours,* 559 F.2d at 844.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1976890
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Barbara ROBERTSHAW
v.
Gary PUDLES, et al.

Civil Action No. 11–7353.
|
Signed May 15, 2014.

**Attorneys and Law Firms**

F. Emmett Fitzpatrick, III, Walter H. Flamm, Jr., Flamm
Boroff & Bacine, Blue Bell, PA, for Barbara Robertshaw.

Maurice R. Mitts, Geoffrey Paul Huling, Rebecca Field
Emerson, Mitts Law, LLC, Philadelphia, PA, John E.D.
Larkin, Stephen G. Rhoads, Gawthrop Greenwood PC, West
Chester, PA, for Gary Pudles, et al.

Gary F. Pudles, Willow Grove, PA, pro se.

*MEMORANDUM*

O'NEILL, District Judge.

**\*1** Now before me are an emergency motion for a stay
pending appeal by defendants Answernet, Inc. and Gary
Pudles (Dkt. No. 221) and non-party Cerida Investment
Corporation's emergency motion for a stay pending appeal
(Dkt. No. 224). For the reasons that follow, I will grant the
motions.

As the parties are familiar with the background of this case, I
will recount only the essential facts necessary for resolution
of the motions for a stay. On May 6, 2014, I denied
defendants' motion for a new trial, a motion in which
defendants sought to challenge my August 5, 2013 finding
that "the total shares of Answernet, Inc. held by Barbara
Robertshaw and Executel, Inc., constitute a majority of the
issued and outstanding shares of [Answernet]...." Dkt. No.

176 at ECF p. 2; *see also* Dkt. Nos. 215 and 216. Also on
May 6, I denied Cerida's motion to intervene in this matter.
Dkt. Nos. 217 and 218. On May 7, defendants and Cerida
filed notices of their intent to appeal certain of my prior
decisions in this matter. Dkt. Nos. 219 and 220. Later on
May 7, defendants filed their motion for a stay. Cerida filed
its motion seeking a stay on May 8.

Before defendants and Cerida filed their notices of appeal or
their motions to stay, plaintiff Robertshaw[1] and her father,
William Robertshaw, as president of Executel, "being
stockholders of Answernet, Inc., ... holding a majority of the
voting power entitled to vote on the removal, without cause,
of directors," adopted the following resolution: "that Gary
Pudles, Stephen Pudles, Barbara Robertshaw and William
Robertshaw and all other persons who may be directors of
the Corporation, are hereby removed, without cause, as
directors of the Corporation." Dkt. No. 221 at ECF p. 8.
Thereafter, Robertshaw and Executel adopted a further
resolution "that the number of directors of the Corporation
shall be two" and further, that Robertshaw and William
Robertshaw were "elected and appointed as the directors of
the Corporation." Dkt. No. 221 at ECF p. 13. Then, in a
unanimous written consent of the Answernet board of
directors, the Robertshaws removed Betty Babjak as
Answernet's secretary and appointed William Robertshaw.
The Robertshaws also resolved:

> to add a new Article SEVENTH to the Second Restated
> Certificate of Incorporation of the Corporation ... as
> follows ...: 'In furtherance and not in limitation of the
> powers conferred by statute, the Board of Directors of the
> Corporation is expressly authorized to make, alter, amend
> or repeal the Corporation's Bylaws.
>
> Def.'s Hearing Exs. at Ex. C p. 1.

On May 8, 2014, after a telephonic hearing on the motions
for a stay, styled as emergency motions, plaintiff was
ordered to "take no further actions that are permitted by the
Orders issued by the Honorable Thomas N. O'Neill, Jr.,
dated August 5, 2014 (Dkt. No. 176) and May 6, 2014 (Dkt
No. 216)."[2] Dkt. No. 226. At oral argument on the motions
on May 12, I continued the temporary stay entered on May 8.
Neither defendants nor Cerida have asked me to undo the
actions taken by the Robertshaws subsequent to the entry of
the May 6 Orders. To date, Pudles remains in place as the
president of Answernet.

**\*2** Upon consideration of the pending motions, I find that the equities weigh in favor of continuing the stay now in place in order to maintain the status quo pending appeal of the declaratory judgment finding that plaintiff has majority control of Answernet. "[T]ribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844–45 (D.C.Cir.1977). If an appeal is taken from a judgment granting injunctive relief, whether to grant a stay is within the Court's discretion. See Fed.R.Civ.P. 62(c). If an appeal is taken from a monetary judgment, "the appellant may obtain a stay by supersedeas bond." Fed.R.Civ.P. 62(d). "Because a declaratory judgment does not fit neatly into either category, the Court must look beyond the judgment to its practical effect. A declaratory judgment that merely adjudicates rights ... falls within the Court's discretionary power to stay pending appeal." *Peacock v. Merrill,* No. 05–00377–KD–C, 2010 WL 2231896, at \*1 (S.D.Ala. June 2, 2010).

On the one hand, if I do not stay the judgment pending appeal, there would be no reason why Robertshaw would not be permitted to exercise majority control over Answernet in accordance with the declaratory judgment. Indeed, in view of plaintiff's immediate undertakings to exert control over Answernet, if I do not stay the matter Pudles will likely lose his position as president of the Company. His removal could trigger an event of default with respect to a $7,000,000 term loan issued by Firsttrust Bank to Answernet and its Signius subsidiaries, rendering any amount owed on the loan immediately due and payable. *See* Def.'s Hearing Exs. at Ex. D p. 7. The loan terms provide that Answernet and its subsidiary co-borrowers:

> will not make or permit any material change in the nature of its business as carried on as of the date of this Letter Agreement or cause, suffer or permit any reduction in the ownership interest in the Borrower of Gary Pudles or, other than by reason of the incapacity or disability of Gary Pudles, in the management position and responsibilities of Gary Pudles.

*Id.* at p. 2. Also, if I do not stay the judgment, Answernet, under plaintiff's control, could decide to compromise or discontinue other litigation to which Answernet is now a party, decisions with potentially irreversible legal consequences for defendants if the Court of Appeals finds in favor of them on appeal.

On the other hand, if I stay the judgment pending appeal, maintaining the status quo as it now exists, with the Robertshaws as Answernet's sole directors and Pudles as its president, neither Pudles nor Robertshaw will have complete control over Answernet. As counsel for defendants explained at the May 12 hearing on the motions to stay, "what we have right now is, [the Robertshaws are] in-they control the board. They have an officer. They have all the financial information. The status quo would protect their ability to control the company but not dismember the company." Dkt. No. 233 at 10:16–20. Under the status quo, as a director on Answernet's newly re-composed board, plaintiff has access to Answernet's financial records and the ability to exercise oversight over Pudles's operation of the corporation, addressing her concerns regarding Pudles's management of the company, including his alleged use of Answernet funds to finance his personal legal pursuits. If I enter a stay, Robertshaw will be protected from the possible impact of giving unbridled control over the corporation to Pudles. Any actions Pudles may seek to take as president of Answernet pending appeal will necessarily be tempered by the presence of the Robertshaws as the directors of the corporation. Pudles, Answernet and Cerida will also be protected from any efforts by Robertshaw to dismantle Answernet before the Court of Appeals has an opportunity to consider the merits of my prior decisions. Having considered the balance of harms to those involved, I find that they weigh in favor of maintaining the status quo pending appeal: a compromise position that does not give complete control over Answernet to either Robertshaw or Pudles.

**\*3** Further, "predicting the likelihood of appellant's success with an appeal is a difficult inquiry for the trial judge, who already has reached the legal [and here,] factual, merits of the controversy and rendered a conclusion unfavorable to the moving part[ies]." *Kawecki Berylco Indus., Inc. v. Fansteel, Inc.,* 517 F.Supp. 539, 541 (1981). The issues that I anticipate being raised on appeal are of sufficient substance for me to find in favor of granting a stay. Cf. *Combustion Sys. Servs., Inc. v. Schuylkill Energy Resources, Inc.,* 153 F.R.D. 73, 74 (E.D.Pa.1994) ("although the Court will not

2014 WL 1976890

concede that it committed error, this Court cannot conclude that Plaintiff has no reasonable possibility of success on the merits of its ... appeals"); *Cayuga Indian Nation of N.Y. v. Pataki,* 188 F.Supp.2d 223, 253 (N.D.N.Y.2002) ("[B]ecause of the difficulties of the issues ... presented, it would be foolhardy to predict that there is no likelihood of success on appeal.") (internal quotation marks omitted).

An appropriate Order follows.

## *ORDER*

AND NOW, this 15 day of May, 2014, upon consideration of an emergency motion for a stay pending appeal by defendants Answernet, Inc. and Gary Pudles (Dkt. No. 221), non-party Cerida Investment Corporation's emergency motion for a stay pending appeal (Dkt. No. 224), and plaintiff's responses thereto (Dkt. Nos. 227 and 228), and after oral argument it is ORDERED that the motions are GRANTED and plaintiff shall take no further actions that are permitted by the Court's Orders dated August 5, 2014 (Dkt. No. 176) and May 6, 2014 (Dkt No. 216) pending disposition of defendants' and Cerida's appeals to the United States Court of Appeals for the Third Circuit.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1976890

2014 WL 1976890

## Footnotes

[1]    Unless otherwise noted, references to Robertshaw refer to Barbara Robertshaw. References to her father, William (Bill) Robertshaw, will note his first name. References to Pudles refer to Gary Pudles. His brother, Stephen Pudles, is referred to by his full name.

[2]    As I was out of town, this order was issued by one of my colleagues.

---

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.